IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARLENE JACKSON, | : | |
| | : | |
| Plaintiff, | : | CIVIL DIVISION |
| | : | |
| v. | : | NO.: 05-33 (Erie) |
| | : | |
| WAL-MART STORES, INC., | : | Electronically Filed |
| | : | |
| Defendant. | : | |

## STATEMENT OF MATERIAL FACTS OF DEFENDANT WAL-MART STORES, INC.[1]

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, defendant Wal-Mart Stores, Inc. ("Wal-Mart"), by its undersigned attorneys, hereby submits its Statement of Material Facts:

1. Plaintiff began working at Wal-Mart Store # 2561 on November 14, 2000 as a temporary holiday worker in the toy department. (Plaintiff's Deposition dated September 15, 2005 at pgs.17:5-8; 23:2, 78:19; available at Exhibit A of Appendix; see also Hourly Associate Information Sheet, available at Ex. B of Appendix).

2. On December 28, 2000, plaintiff began working as a non-temporary Wal-Mart Associate in the shoe department and as a cashier. (Associate's Commendation Form dated December 28, 2000, available at Ex. C).

---

[1] For purposes of this motion only, Wal-Mart accepts the "evidence in the light most favorable to the nonmovant, giving that party the benefit of all reasonable inferences derived from the evidence." Waldron v. SL Indus., Inc., 56 F.3d 491, 496 (3d Cir. 1995)(citations omitted).

3. Plaintiff testified that she developed asthma following the birth of her son in 1987. (Pl.'s Dep. at p. 41:25-42:8, available at Ex. A).[2] Plaintiff uses an inhaler (also referred to as a "puffer" in her medical records) and caffeine to treat her asthma. (Ex. A at p. 42:19-43:2).

4. Plaintiff's medical records show that from August 2002 through June 2003, plaintiff was treated by her family physician on only two occasions, once on August 26, 2002 for a routine follow-up exam following chest pains and, another time, on May 9, 2003 due to asthma and allergies. (Pl.'s Medical Records dated August 2000 to June 2003 at pgs. D 001 - D 004, available at Ex. D). Plaintiff further telephoned her family physician five times during this period: twice to inquire about a doctor's note to return to work following a cardiac episode in August 2002 and three times regarding allergy tests she underwent in May 2003. (Ex. D at pgs. D 001 - D004).

5. Plaintiff's medical records also show that all of her allergy blood tests in May 2003 were negative. (Ex. D at p. D 005).

6. Plaintiff's medical records also show that from August 2002 through June 2003, plaintiff was admitted to the hospital on only one occasion and that this incident did not involve asthma or allergies. (Ex. D at pgs. D 011 - D 022). Rather, plaintiff presented to the emergency room and was subsequently admitted to the hospital on August 16, 2002, due to chest pains unrelated to asthma. (Ex. D at pgs. D 011 - D 022). Further, plaintiff's medical records show that her asthma was stable during this cardiac episode and that her lungs were clear. (Ex. D at p. D 014).

---

[2] Plaintiff also testified that she has dyslexia. (Pl.'s Dep. at 25:10; 33:4-9, available at Ex. A). Plaintiff's claims under the Americans with Disabilities Act, however, relate only to her asthma. (See Pl.'s Complaint at ¶¶ 9, 22, 26, 27).

7. Plaintiff's personnel file at Wal-Mart contains only three doctor's notes regarding plaintiff's absences from work. (Doctor's notes dated August 2002, December 2002 and May 2003, available at Ex. E). None of the notes state that she suffers from asthma, suggests that she suffers from any debilitating condition, or states that she is restricted from any work activity. (Id.).[3] Plaintiff further testified that she does not have copies of any other doctor's notes explaining her absences from work. (Pl.'s Dep. at p. 38:23-39:7; 39:14-20; 49:6-17, available at Ex. A).

8. Plaintiff testified that while working at Wal-Mart she did not have any restrictions with regard to her asthma. (Pl.'s Dep. at p. 48:3-9, available at Ex. A). Indeed, she was able to walk quickly throughout the store, stand throughout a work shift, and lift heavy objects without any limitations. (Ex. A at pgs. 45:18-22; 46:6-47:14).

9. Plaintiff testified that certain perfumes and plants triggered her asthma. (Ex. A at pgs. 48:5-49:5). Plaintiff further testified that Wal-Mart never required her to work in the store's perfume or plant departments. (Ex. A at pgs. 49:18-50:1). Indeed, when she worked as a cashier, Wal-Mart did not require her to scan plants at her register. (Ex. A at pgs. 48:18-49:5). Instead, plaintiff would call for another Associate to scan such items. (Id.). On several occasions, plaintiff did not wait for another Associate to scan such items, but rather, elected to do so herself in order to "just . . . get the customer through." (Id.).

10. Plaintiff testified that the environmental conditions at Wal-Mart did not trigger her asthma any more than the environmental conditions at her home. (Ex. A at p. 50:2-7).

---

[3] The doctor's note dated May 2003, requests that Wal-Mart excuse plaintiff's absences from May 8, 2003 to May 14, 2003. (See Ex. E). Plaintiff also submitted to Wal-Mart a Request for Leave of Absence, requesting medical leave during this same period. (See Ex. L). There, the reason for plaintiff's request for medical leave is due to "URI [presumably, 'Upper Respiratory Infection']/Laryngitis." (Id.).

11.     Plaintiff testified that she can take care of her personal hygiene, drive herself to and from work and work a full time job.  (Ex. A at pgs. 19:20-24; 45:18-22; 46:19-47:3).

12.     Plaintiff testified that when her asthma prevented her from working during her regularly scheduled shift, it was because her asthma caused her to lose her voice.  (Ex. A at pgs. 26:17-22; 30:4-6; 35:12-20; 47:15-23).

13.     Plaintiff testified that when Wal-Mart hired her, she told either an assistant manager or the human resources manager that she had asthma and that certain smells triggered her asthma.  Plaintiff requested that she be allowed to use her inhaler when her asthma worsened.  Wal-Mart allowed her to use her inhaler whenever she needed to use it and allowed her time away from the sales floor to care for herself.  (Pl.'s Dep. at 23:13-24:2; 34:8-10; available at Ex. A; see also Deposition of Lisa Dolecki dated November 16, 2005 at pgs. 18:12-19:8, available at Ex. F).

14.     On November 6, 2000, plaintiff signed a form declaring that she had the ability to perform all the essential job functions of her position with or without a reasonable accommodation.  (Wal-Mart Stores Matrix of Essential Job Functions dated November 6, 2000, available at Ex. G).

15.     Wal-Mart's Attendance/Punctuality Policy states that regular and punctual attendance is a required and essential function of each Associate's job.  (Wal-Mart Attendance/Punctuality Policy, available at Ex. H).  To that end, Wal-Mart attendance guidelines provide that Associates should not have more than three unapproved absences in a rolling six-month period.  (Id.).  Further, consecutive days missed due to the same or related illness, injury,

or personal situation count as one absence under Wal-Mart's Attendance/Punctuality Policy. (Id.).

16.     An "approved" absence is defined as (a) bereavement leave and emergency volunteer time; (b) emergency situations, such as inclement weather, personal or family medical emergencies; and (c) requested schedule changes that are approved by management one day prior to the change. (Wal-Mart Attendance/Punctuality Policy, available at Ex. H). Further, absences covered under approved Medical Leave or Personal Leave are not unapproved absences. (Id.).

17.     From June 2002 to June 2003, Wal-Mart approved twenty-four of plaintiff's unscheduled absences from work. (Associate Attendance Report run on June 9, 2003, available at Ex. I).

18.     Under Wal-Mart's Attendance/Punctuality Policy, Associates who have more than three unapproved absences in a rolling six month period are subject to formal discipline, which Wal-Mart refers to as a "coaching." (Wal-Mart Attendance/Punctuality Policy, available at Ex. H).

19.     Under Wal-Mart's policy, a doctor's note following an unscheduled absence from work does not automatically convert an Associate's unapproved absence into an approved absence. (Dolecki Dep. at p. 14:7-13, available at Ex. F; see also Deposition of Pete Burns dated November 16, 2005 at p. 37:18-24, available at Ex. J). Rather, an approved absence is defined as detailed in paragraph 16, above.

20.     On November 14, 2000, plaintiff acknowledged receipt of the Wal-Mart Associate Handbook, which also explains Wal-Mart's attendance policy. (Handbook Acknowledgment Form dated November 14, 2000, available at Ex. K). Further, on February 18,

2003, plaintiff received a copy of Wal-Mart's Attendance/Punctuality Policy and acknowledged that she understood this policy. (Wal-Mart Attendance/Punctuality Policy at p. 4, available at Ex. H). Plaintiff testified that she was aware of Wal-Mart's attendance policy and understood it. (Pl.'s Dep. at 25:3-26-6, available at Ex. A).

21. Plaintiff's personnel file contains only two Request for Leave of Absence forms. (Request for Leave of Absence forms dated January 30, 2003 and May 13, 2003, available at Ex. L). Wal-Mart approved all leave requested by plaintiff. (Pl.'s Dep. at p. 28:14-19, available at Ex. A). Under Wal-Mart's policy, these leaves are approved absences. (Wal-Mart Attendance/Punctuality Policy, available at Ex. H).

22. The Request for Leave of Absence form dated January 30, 2003 lists a return date of February 6, 2003 and requests leave to care for plaintiff's daughter. (Request for Leave of Absence form dated January 30, 2003, available at Ex. L).

23. Plaintiff testified that she does not have copies of any other Request for Leave of Absence forms she allegedly submitted to Wal-Mart. (Pl.'s Dep. at pgs. 28:14-29:10, available at Ex. A).

24. Plaintiff received yearly performance reviews from Wal-Mart on October 9, 2001 and October 7, 2002. (Performance Appraisal Forms dated October 9, 2001 and October 7, 2002, available at Ex. M). Attendance is listed on both forms as an area requiring improvement. (Id.). Plaintiff acknowledged reading and signing these performance reviews. (Pl.'s Dep. at pgs. 58:12-14; 59:16-21; 61:14-15, available at Ex. A).

25. On February 15, 2003, plaintiff received a "Decision-Making Day Coaching" because she incurred six unapproved absences within a rolling six-month period ending on January 29, 2003. (Coaching For Improvement Form dated Feb. 15, 2003, available at

Ex. N).[4]  Plaintiff called off work on August 17, 18, 20, 21, 2002; November 1, December 8 and 9, 2002; and January 3 and 29, 2003.  (Associate Attendance Report run on February 15, 2003, available at Ex. P).

26.   During the rolling six-month period ending on February 12, 2003, however, plaintiff also incurred 18 approved absences from her regularly scheduled work days, including a bereavement leave December 13 through December 14, 2002 and a leave of absence February 4, 2003 through February 12, 2003, to care for her daughter.  (Id.; see also Request for Leave of Absence form dated Jan. 30, 2003, available at Ex. L).[5]

27.   On her Decision-Making Day Coaching, Wal-Mart advised plaintiff that if she incurred another unapproved absence before August 17, 2003, six months after her Decision-Making Day Coaching, she would be terminated from employment at Wal-Mart.  (Coaching For Improvement Form dated Feb. 15, 2003, available at Ex. N; see also Dolecki Dep. at p. 26:5-27:1, available at Ex. F).

28.   On February 20, 2003, plaintiff wrote to Wal-Mart that she "will try harder to get to work on time, [sic] and not miss so many days of work."  (Note from pl. dated Feb. 20, 2003, available at Ex. Q).  Plaintiff further acknowledged that her unscheduled and unapproved absences were an inconvenience to other Associates and Wal-Mart's customers.  (Id.).  Plaintiff also stated that she would schedule doctor appointments and "other things" after

---

[4]   Plaintiff received a "Decision-Making Day Coaching" because she previously received a written discipline (known as a "Written Coaching") for purchasing Wal-Mart merchandise with a check from an account with insufficient funds.  (Coaching for Improvement Form dated Nov. 27, 2002, available at Ex. O).

[5]   Plaintiff only requested, and was approved for, a leave from February 4, 2003 through February 6, 2003.  (See Ex. L).  Wal-Mart, however, extended the approved leave through February 12, 2003.  (See Ex. P).

or before work.  (Id.)  Plaintiff, however, made no mention of her asthma causing her to be absent.  (Id.).

29.  Employee absences negatively effect customer service, result in lost productivity and higher wage costs, and may involve safety issues if there are not enough employees on the sales floor.  (Burns Dep. at pgs. 39:25-40:7, available at Ex. J).

30.  Following her Decision-Making Day Coaching, plaintiff incurred unapproved absences on February 13 and 14, 2003, and May 29 and 30, 2003.  (Associate Attendance Report run on June 9, 2003, available at Ex. I).[6]  Plaintiff further incurred three more approved absences during this period.  (Id.).

31.  In May 2003, economic conditions forced Wal-Mart Store # 2561 to implement a reduction in its workforce ("RIF").  (Burns Dep. at pgs. 44:23-46:7, available at Ex. J).  The Wal-Mart District Manager directed Store Manager Pete Burns to first consider Associates on the requisite 90-day probationary period and Associates who had received Decision-Making Day Coaching within the past year for RIF terminations.  (Ex. J at pgs. 46:8-48:9).

32.  During the RIF terminations, Wal-Mart became aware that plaintiff had incurred more unapproved absences since her Decision-Making Day Coaching, in violation of Wal-Mart's Attendance/Punctuality Policy.  (See Associate Attendance Report run on June 9, 2003, available at Ex. I).  On June 7, 2003, therefore, Wal-Mart terminated plaintiff for

---

[6]  Plaintiff's attendance report shows that she had unapproved absences May 8, 2003 through May 10, 2003.  These absences, however, are, in fact, approved medical leave absences due to plaintiff's "URI [presumably, 'Upper Respiratory Infection']/Laryngitis" condition.  (See Request for Leave of Absence form dated May 13, 2003, available at Ex. L).

continued violation of Wal-Mart Attendance/Punctuality Policy.  (Burns Dep. at p. 50:19-24, available at Ex. J; see also Exit Interview Form dated June 7, 2003, available at Ex. R).

        33.    Wal-Mart recommended plaintiff for re-hire on her exit interview form.  (Exit Interview Form dated June 7, 2003, available at Ex. R).

        34.    Wal-Mart did not terminate plaintiff due to her asthma or due to any medical condition.  (Burns Dep. at p. 50:19-21, available at Ex. J).

        35.    Plaintiff testified that she does not believe that Wal-Mart should have placed any limits on the number of times she called out sick from work.  (Pl.'s Dep. at p. 38:19-22, available at Ex. A).  When asked if she believed there should have been any limits on the number of times plaintiff called out sick, plaintiff answered, "[n]ot for my asthma, I don't."  (Id.).

        36.    Plaintiff testified that at the end of May 2003, she was absent from work due to marital problems that caused her emotional distress.  (Pl.'s Dep. at p. 65:13-66:5, available at Ex. A).[7]  Plaintiff did not request a formal leave of absence for this period of absences.  (Ex. A at p. 68:10-19).

---

[7]    Plaintiff also testified that following the birth of her daughter in 1993, she began taking prescription anti-depressants.  (Pl.'s Dep. at p. 40:4-25, available at Ex. A).  By August 2002, plaintiff was taking 100 mg of the anti-depressant Zoloft on a daily basis.  (Pl.'s Medical Records dated August 17, 2002 and August 26, 2002 at pgs. D 002; D 019, available at Ex. D).

| | |
|---|---|
| Dated:  January 13, 2006 | s/David S. Fryman<br>David S. Fryman<br>Lorena E. Ahumada<br>Attorney I. D. Nos. 57623 and 91630<br><br>Attorneys for Defendant<br>Wal-Mart Stores, Inc. |

OF COUNSEL:
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103-7599
(215) 665-8500

## CERTIFICATE OF SERVICE

I, David S. Fryman, hereby certify that on this 13th day of January, 2006, a true and correct copy of the foregoing Statement of Material Facts and accompanying exhibits of Defendant Wal-Mart Stores, Inc. were filed electronically and are available for viewing and downloading from the ECF system. I further certify that I caused a true and correct copy of the same to be served via Federal Express, overnight mail, upon the following:

> Sean P. Duff, Esquire
> Patberg, Carmody, Ging & Filippi
> 527 Court Place
> Pittsburgh, PA  15219

Dated:  January 13, 2006                          s/David S. Fryman
                                                  David S. Fryman