**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DARLENE JACKSON, | : | |
| | : | |
| Plaintiff, | : | CIVIL DIVISION |
| | : | |
| v. | : | NO.: 05-33 (Erie) |
| | : | |
| WAL-MART STORES, INC., | : | |
| | : | |
| Defendant. | : | |

**APPENDIX TO STATEMENT OF MATERIAL FACTS
OF DEFENDANT WAL-MART STORES, INC.**

**TABLE OF CONTENTS**

Exhibit A:     Deposition of Plaintiff Darlene Jackson

Exhibit B:     Hourly Associate Information Sheet

Exhibit C:     Associate's Commendation Form, dated December 28, 2000

Exhibit D:     Plaintiff's Medical Records

Exhibit E:     Doctors Notes, dated August 2002, December 2002, and May 2003

Exhibit F:     Deposition Transcript of Lisa Dolecki, dated November 16, 2005

Exhibit G:     Matrix of Essential Job Functions, dated November 6, 2000

Exhibit H:     Attendance/Punctuality Policy

Exhibit I:     Associate Attendance Report, dated June 9, 2003

Exhibit J:     Deposition Transcript of Pete Burns, dated November 16, 2005

Exhibit K:     Handbook Acknowledgment, dated November 14, 2000

Exhibit L:     Requests for Leave of Absence, dated January 30, 2003 and May 13, 2003

Exhibit M:        Performance Appraisals, dated October 9, 2001 and October 7, 2002

Exhibit N:        Coaching for Improvement Form, dated February 15, 2003

Exhibit O:        Coaching for Improvement Form, dated November 27, 2002

Exhibit P:        Associate Attendance Report, dated February 15, 2003

Exhibit Q:        Note from Plaintiff to Wal-Mart, dated February 20, 2003

Exhibit R:        Exit Interview, dated June 7, 2003

David S. Fryman
Lorena E. Ahumada
Attorney I. D. Nos. 57623 and 91630

Attorneys for Defendant
Wal-Mart Stores, Inc.

OF COUNSEL:
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103-7599
(215) 665-8500

# EXHIBIT A

DARLENE JACKSON VS WAL-MART STORES, INC., DEPOSITION OF DARLENE JACKSON, 9/15/05

*Page 1 to Page 108*

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

AKF Reporters, Inc.
436 Boulevard of the Allies
Pittsburgh, PA  15219-1314
Phone:  1-888-253-3376
FAX:  1-412-261-2537

## Page 1

(1) IN THE UNITED STATES DISTRICT COURT FOR THE
(2) WESTERN DISTRICT OF PENNSYLVANIA

- - - -

(3)
(4) DARLENE JACKSON,          )
(5)                          )
(6)      Plaintiff,   )
(7)      -vs-              ) Civil Action
(8) WAL-MART STORES, INC.,   ) No. 05-33 (Erie)
(9)                          )
(10)                         )
(11)     Defendant.   )
(12)

- - - -

(13)
(14) DEPOSITION OF:   DARLENE JACKSON

- - - -

(15)
(16)   DATE:     September 15, 2005
(17)             Thursday, 8:53 a.m.
(18)
(19) LOCATION:   AKF Reporters, Inc.
                 150 East Eighth Street
                 Suite 2
(20)             Erie, Pennsylvania
(21)
(22) TAKEN BY:   Defendant
(23)
(24) REPORTED BY:   Kristina Kircher
                    Notary Public
(25)                AKF Reference No. KK89821

## Page 2

(1)      DEPOSITION OF DARLENE JACKSON,
(2) a witness, called by the Defendant for examination,
    in accordance with the Federal Rules of Civil
(3) Procedure, taken by and before Kristina Kircher, a
    Court Reporter and Notary Public in and for the
(4) Commonwealth of Pennsylvania, at the offices of AKF
    Reporters, Inc., 150 East Eight Street, Suite 2,
(5) Erie, Pennsylvania, on Thursday, September 15, 2005,
    commencing at 8:53 a.m.
(6)

- - - -

(7)
(8) APPEARANCES:
(9)    FOR THE PLAINTIFF:
       Sean Duff, Esq.
(10) PATBERG, CARMODY, GING & FILIPPI
     504 State Street, Suite 200
(11) Erie, PA  16501
     814-874-0558
(12)
(13)
     FOR THE DEFENDANT:
(14) Lorena E. Ahumada, Esq.
     BALLARD SPAHR ANDREWS & INGERSOLL
(15) 1735 Market Street, 51st Floor
     Philadelphia, PA  19103
(16) 215-864-8213
(17)
(18)

* I N D E X *

(19)
(20) Examination by Ms. Ahumada  - - - - - - - - - {_}
(21) Certificate of Court Reporter  - - - - - - - - {_}
(22) Errata Sheet - - - - - - - - - - - - - - - - {_}
(23) Notice of Non-Waiver of Signature - - - - - - {_}
(24)
(25)

## Page 3

(1)
(2)

* INDEX OF EXHIBITS *

(4) Deposition Exhibit 1 - - - - - - - - - - - - - {_}
(5) Deposition Exhibit 2 - - - - - - - - - - - - - {_}
(6) Deposition Exhibit 3 - - - - - - - - - - - - - {_}
(7) Deposition Exhibit 4 - - - - - - - - - - - - - {_}
(8) Deposition Exhibit 5 - - - - - - - - - - - - - {_}
(9) Deposition Exhibit 6 - - - - - - - - - - - - - {_}
(10) Deposition Exhibit 7 - - - - - - - - - - - - - {_}
(11) Deposition Exhibit 8 - - - - - - - - - - - - - {_}
(12) Deposition Exhibit 9 - - - - - - - - - - - - - {_}
(13) Deposition Exhibit 10 - - - - - - - - - - - - - {_}
(14) Deposition Exhibit 11 - - - - - - - - - - - - - {_}
(15) Deposition Exhibit 12 - - - - - - - - - - - - - {_}
(16) Deposition Exhibit 13 - - - - - - - - - - - - - {_}
(17) Deposition Exhibit 14 - - - - - - - - - - - - - {_}
(18) Deposition Exhibit 15 - - - - - - - - - - - - - {_}
(19) Deposition Exhibit 16 - - - - - - - - - - - - - {_}
(20) Deposition Exhibit 17 - - - - - - - - - - - - - {_}
(21)
(22)
(23)
(24)
(25)

## Page 4

(1)      DARLENE JACKSON,
(2)      having been duly sworn,
(3)      was examined and testified as follows:
(4)      - - - -
(5)      EXAMINATION
(6)      - - - -
(7) BY MS. AHUMADA:
(8) Q.   Okay, good morning.  I introduced myself to you
(9)      earlier.  My name is Lorena Ahumada, and I
(10)     represent Wal-Mart in the lawsuit that you
(11)     filed against them today.  We're here to take
(12)     your deposition which means I'm going to ask
(13)     you a series of questions.
(14)         Have you ever been deposed before?
(15) A.  No, I have not.
(16) Q.  What that means is that everything we're saying
(17)     is going to be transcribed by the court
(18)     reporter, so it's important that we not speak
(19)     over one another.  So please wait until I've
(20)     finished a question before you answer, and I'll
(21)     do the same, I'll wait until you finish your
(22)     answer before I ask another question?
(23)         And also, because it is being
(24)     transcribed, it's important that you give me
(25)     verbal responses, so don't shrug your shoulders

## Page 5

(1) or say, yeah, because it doesn't really come on
(2) the record as what your answer really is.
(3)    Do you understand that?
(4) A. Yes, I do.
(5) Q. All right, and if at any point you don't
(6) understand one of my questions, let me know,
(7) and I'll rephrase it. So if you do answer one
(8) of my questions, I'm going to assume that you
(9) understood it. Is that okay?
(10) A. That's okay.
(11) Q. Great. And if you answer a question and you
(12) feel you want to correct it or clarify it, let
(13) me know, and we'll go back, and you can state
(14) what, how you want to clarify that, okay?
(15) A. Okay.
(16) Q. Also, if you want to take a break at any point,
(17) let me know, and we'll do that. If I'm in the
(18) middle of a question or a series of questions,
(19) I'll just wait until the end of that before we
(20) go ahead and take a break. But this is not an
(21) endurance test. At any point you want to take
(22) a break, just let me know.
(23)    Is that all right?
(24) A. Yes, it is.
(25) Q. Is there any reason why you think you would not

## Page 6

(1) be able to answer truthfully today?
(2) A. No, there is not.
(3) Q. For example, are you on any medications that
(4) you think might affect your ability to answer
(5) truthfully?
(6) A. No, I do not -- I am not.
(7) Q. Are you taking any medicines today?
(8) A. Yes, I am on Zoloft.
(9) Q. You're on Zoloft. And what is your dosage of
(10) Zoloft?
(11) A. 200 milligrams.
(12) Q. Are you under a doctor's prescription for
(13) Zoloft?
(14) A. Yes, I am. And I'm on an inhaler too.
(15) Q. And how often do you take the inhaler?
(16) A. Twice a day.
(17) Q. Do you think the Zoloft or inhaler will prevent
(18) you from answering truthfully?
(19) A. No.
(20)    MR. DUFF:    Let her finish her
(21) question. That's okay.
(22) BY MS. AHUMADA:
(23) Q. Did you review any documents before getting
(24) ready for today's deposition?
(25) A. No, I did not.

## Page 7

(1) Q. Just for the record, if you could, state and
(2) spell your full name for us.
(3) A. Darlene Jackson, Darlene Jackson, D-a-r-l-e-n-e
(4) J-a-c-k-s-o-n.
(5) Q. And do you also use the name Vera Jackson?
(6) A. Yes, I do. That's my first given name.
(7) Q. State your full name.
(8) A. It's Vera Darlene Jackson, V-e-r-a. I don't
(9) even use it. Sometimes it's hard to remember
(10) how to spell it; D-a-r-l-e-n-e J-a-c-k-s-o-n.
(11) Q. Great. What is your address?
(12) A. 7650 Royann Drive, R-o-y-a-n-n, Drive,
(13) Fairview, Pennsylvania, 16415.
(14) Q. And what is your Social Security number?
(15) A. I have to look that up. I don't know that by
(16) heart.
(17) Q. Sure. Take your time.
(18) A. 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.
(19) Q. And what is your date of birth?
(20) A. April 18th, 1961.
(21) Q. And where were you born?
(22) A. Dunkirk, New York.
(23) Q. Can you spell it for us?
(24) A. No, I cannot. I'm sorry.
(25) Q. Are you married?

## Page 8

(1) A. Yes, I am.
(2) Q. Okay, what is your husband's name?
(3) A. Paul Scott Jackson.
(4) Q. And does he reside with you?
(5) A. Yes, he does.
(6) Q. Does he have a job?
(7) A. He's self-employed.
(8) Q. And what does he do?
(9) A. He's a truck driver.
(10) Q. Okay, do you have any children?
(11) A. Yes, we do.
(12) Q. How many?
(13) A. Two.
(14) Q. And their names?
(15) A. Phillip Scott Jackson and Rebecca Lynn Jackson.
(16) Q. Do they live with you?
(17) A. Yes, they do.
(18) Q. Do you have any other dependents?
(19) A. No, I do not.
(20) Q. Do you have a criminal record?
(21) A. No, I do not.
(22) Q. Have you filed other lawsuits no matter what
(23) the issue?
(24) A. No, I have not.
(25) Q. This is your first lawsuit?

Page 9

(1) A.  Yes, it is.

(2) Q.  Where did you go to high school?

(3) A.  General McLane High School in Edinboro.

(4) Q.  Did you graduate?

(5) A.  Yes, I did.

(6) Q.  Did you go to college?

(7) A.  No, I did not.

(8) Q.  Do you have any other training or certificates

(9)     or licenses?

(10) A.  No, I do not.

(11) Q.  Tell me the places that you've worked prior to

(12)     working at Wal-Mart, and if that's an extensive

(13)     list, then just go back 10 years.

(14) A.  I didn't work any place before Wal-Mart in 10

(15)     years, but there was a couple other places

(16)     before that; the Bel-Aire in Erie.

(17) Q.  Okay, and what did you do there?

(18) A.  Housekeeping.

(19) Q.  And when did you work there?

(20) A.  My son was born in '86, I think it was. I'm

(21)     going back. I'm trying to remember. '85 to

(22)     '86, because I had to quit because of having an

(23)     accident with my pregnancy.

(24) Q.  And where did you work after that?

(25) A.  Wal-Mart.

Page 10

(1) Q.  Wal-Mart, okay. So you weren't terminated from

(2)     Bel-Aire?

(3) A.  No.

(4) Q.  You left on your own because of medical

(5)     reasons?

(6) A.  Medical.

(7) Q.  Okay, I'm going to show you initial disclosures

(8)     that were filed by you. We could enter this

(9)     into the record. We have to see --

(10)     MR. DUFF:    It's part of it. If you

(11)     want to attach it, we both have copies.

(12)     MS. AHUMADA:    Great. I'd rather not.

(13) BY MS. AHUMADA:

(14) Q.  These are the initial disclosures that you

(15)     filed in this case. Are you familiar with this

(16)     document?

(17) A.  Yes, I am.

(18) Q.  Okay, here, you've listed people that you

(19)     believe have information that's related to the

(20)     lawsuit that you filed against Wal-Mart. I

(21)     want to ask you, what does Doctor Michael

(22)     Spellacy --

(23) A.  Spellacy.

(24) Q.  Spellacy, what information does he have related

(25)     to your lawsuit?

Page 11

(1) A.  My asthma.

(2) Q.  Is he your physician?

(3) A.  Yes, he is.

(4) Q.  And Doctor Gerald Beck?

(5) A.  He's done my asthma. He's my gynecologist.

(6)     He's done things with that and helped me out

(7)     when Michael's been gone.

(8) Q.  How about the Hamot Medical Center? What

(9)     information would they have?

(10) A.  They have all my records of going in for asthma

(11)     attacks.

(12)     I'm sorry, it's Hamot Medical Center; is that

(13)     right?

(14) A.  Yes.

(15) Q.  Okay, and what information would Pete Burns

(16)     have?

(17) A.  He's the general manager at Wal-Mart, and he's

(18)     the one that told me everything was okay, not

(19)     to worry about anything.

(20) Q.  And Brenda Robinson?

(21) A.  I work for Brenda Robinson right now. She's a

(22)     friend. I've known her since we were 12 years

(23)     old.

(24) Q.  I'm sorry, you say you work for her?

(25) A.  She's got disability, and I go in and take her

Page 12

(1)     to her appointments and things like that.

(2) Q.  You assist her?

(3) A.  Yes, I do.

(4) Q.  Okay, and what information would she have

(5)     related to the claims of your lawsuit?

(6) A.  She knows all my background and everything of

(7)     medical when we were growing up and everything,

(8)     when the asthma occurred around, and she does

(9)     have a science degree.

(10) Q.  And Lisa Dolecki?

(11) A.  She's the one that fired me at Wal-Mart.

(12) Q.  And what information do you think that she has

(13)     related to this claim?

(14) A.  Why she fired me.

(15) Q.  And Sharon Harbaugh?

(16) A.  Harbaugh, she is a lady at Wal-Mart that had

(17)     missed as many or, if not, more days than I

(18)     did, and she is still employed at Wal-Mart.

(19) Q.  Now, is that the correct spelling?

(20) A.  I'm not sure on the spelling. I'm really not.

(21)     MR. DUFF:    It was something I came up

(22)     with. It could be wrong.

(23) BY MS. AHUMADA:

(24) Q.  Would this person be the same as Sharon

(25)     Harbaugh which I believe I have the spelling

Page 13

(1)   of, H-a-r-b-a-u-g-h?
(2) A.   Could be, yes.
(3) Q.   But you're not sure?
(4) A.   I'm not sure if that's the spelling or not.
(5) Q.   Is she currently employed at Wal-Mart?
(6) A.   Yes, she is.  She's still working there.
(7) Q.   And you've listed Bobbi, last name unknown.
(8)   What information would she or he have?
(9) A.   She.  She is the one that hired me.  She knew
(10)   that I had asthma right from the beginning.
(11)   She's no longer with the 23rd Street Wal-Mart.
(12)   I don't know where she's at.
(13) Q.   And Scott Jackson?
(14) A.   That's my husband.  He goes by his middle name
(15)   too.
(16) Q.   Okay, have you spoken with anyone else besides
(17)   the people that you've listed here about your
(18)   lawsuit against Wal-Mart?
(19) A.   A couple of my, oh, customers asked why I'm not
(20)   with them anymore, and I've told them why.
(21) Q.   Do you know the customers' names?
(22) A.   No, I do not.
(23) Q.   And what did you tell them?
(24) A.   I just told them that I'm no longer with
(25)   Wal-Mart because they fired me because of

Page 14

(1)   medical reasons.  And the reason -- there was
(2)   one other gentleman that told me that they
(3)   fired me because of my mouth, and that's why I
(4)   decided to take and have the lawsuit.
(5) Q.   Do you know who that customer was?
(6) A.   No, I do not know his name.
(7) Q.   And what did you interpret that to mean, fired
(8)   due to your mouth?
(9) A.   I took it as they fired me because I had a
(10)   mouth on me or something.
(11)   I don't understand the term mouth on me.  What
(12)   does that mean?
(13) A.   Talking out of turn or something.
(14) Q.   Do you know why Wal-Mart would believe that you
(15)   were talking out of turn?
(16) A.   No, I do not.
(17) Q.   Are there any other medical providers that you
(18)   have seen related to --
(19) A.   The accident.
(20) Q.   -- any medical conditions that are not listed
(21)   here?
(22) A.   Yes.  But he's no longer.  He's retired.
(23) Q.   Who was that?
(24) A.   Hrinda.  I don't know his first name, Doctor
(25)   Hrinda.

Page 15

(1) Q.   Do you know how to spell that?
(2) A.   No, I do not.
(3) Q.   And where does Doctor Hrinda work?
(4) A.   He's had an office out in Edinboro -- I mean,
(5)   excuse me, Fairview.  I don't know why I said
(6)   Edinboro.
(7) Q.   And how long has it been since you've seen
(8)   Doctor Hrinda?
(9) A.   Oh, since I started seeing Doctor Spellacy,
(10)   because he retired.  That's been eight years, I
(11)   think, eight or nine years.
(12) Q.   Okay, are you seeing any other medical
(13)   providers for any other condition?
(14) A.   No, I'm not.
(15) Q.   Have you authorized your current medical
(16)   providers and/or Doctor Hrinda to release your
(17)   medical records to us?
(18) A.   Yes, I have.
(19)       MR. DUFF:   I don't know if we've
(20)   given you authorizations.  I'm not saying we
(21)   won't, but I don't know at this point we've
(22)   provided them with any written authorizations.
(23)   I've received some medical records, and we may
(24)   be willing to give you authorizations.  But
(25)   just to correct that, I don't think we've

Page 16

(1)   handed them anything in writing.
(2) BY MS. AHUMADA:
(3) Q.   Okay, on your initial disclosures, the form
(4)   that's in front of you, you've indicated some
(5)   documents that you believe are related to the
(6)   claims that you've filed.
(7)       Have you released all -- given all
(8)   these documents, excuse me, to Wal-Mart in this
(9)   matter?
(10) A.   I don't know if Mr. Duff has or not.
(11) Q.   Okay, when did you start working at Wal-Mart?
(12) A.   2000.
(13) Q.   Do you remember the month?
(14) A.   November.
(15) Q.   And who was involved in your hiring?
(16) A.   Bobbi.
(17) Q.   Is that who you interviewed with?
(18) A.   No.  And I cannot remember that lady's name
(19)   that I interviewed with.
(20) Q.   Do you know if that person is still employed at
(21)   Wal-Mart?
(22) A.   I do not.
(23) Q.   Who notified you that you were hired?
(24) A.   I believe Bobbi.  I'm not sure.  I think that's
(25)   who it was, Bobbi.

Page 17

(1) Q.  And when you say Bobbi, could that possibly be
(2)      Bobbi Chitester?
(3) A.  I never knew her last name.  In the three years
(4)      I was there, I never knew her last name.
(5) Q.  When you were hired, what was your position at
(6)      Wal-Mart?
(7) A.  Toy -- I guess it was toy representative.  I
(8)      stocked the shelves in the toys department.
(9) Q.  Did your position change at any point?
(10) A.  Yes, it did.
(11) Q.  What did it change to?
(12) A.  It went to shoes.
(13) Q.  And when did that occur?
(14) A.  Right after the Christmas holiday.
(15) Q.  Did you work full time or part time?
(16) A.  Full time.
(17) Q.  When you were in the toy department, who was
(18)      your supervisor?
(19) A.  Joe.  I mean, do you want his supervisor over
(20)      him too, or do you want --
(21) Q.  No; who you reported to, your direct
(22)      supervisor.
(23) A.  I'm sure it was Joe.
(24) Q.  Do you know Joe's last name?
(25) A.  No, I do not.

Page 18

(1) Q.  When you were in the shoe department, who was
(2)      your direct supervisor?
(3) A.  Bob.  And I do not know his last name either.
(4) Q.  Did you at any point move from the shoe
(5)      department?
(6) A.  Yes, to cashier.
(7) Q.  Okay, do you recall when that occurred?
(8) A.  When there became an opening, and I think that
(9)      was like two or three months.  I was in shoes,
(10)      and then I went right up to cashier.
(11) Q.  And who was your supervisor in the cashier
(12)      department?
(13) A.  They have CSMs, and whoever was a CSM on
(14)      duty that day.
(15) Q.  And what does CSM mean?
(16) A.  I'm not sure how -- what the CSM means.  I only
(17)      know it by CSM.
(18) Q.  What is the role of a CSM?
(19) A.  They make sure that we have enough cash in our
(20)      drawers.  They make up the schedules.  Excuse
(21)      me, that's about all I can remember.
(22) Q.  Okay, so it would be a rotating list of people
(23)      that would be a CSM that would be your direct--
(24) A.  Yes.  There's like four of them, if I'm not
(25)      mistaken.

Page 19

(1) Q.  Do you know any of their names?
(2) A.  One was Debbie, Sharon, and Mary.
(3) Q.  Did you move to any other position after the
(4)      cashier position?
(5) A.  Yes, I went into the fitting room.
(6) Q.  And who was your supervisor there?
(7) A.  If I'm not mistaken, I think it was Denise, but
(8)      I'm not sure.
(9) Q.  Do you know Denise's last name?
(10) A.  (Witness shakes head from side to side.)  At
(11)      Wal-Mart it's everything is by a first-name
(12)      basis.  Nobody hardly knew anybody's last name.
(13) Q.  Okay, and from the fitting room, did you move
(14)      to any other positions?
(15) A.  I was going back to cashier when I was fired.
(16) Q.  Did you go back to the cashier position?
(17) A.  I was on cashier, I think, for a week.
(18) Q.  And the same, it was a rotating list of CSMs?
(19) A.  Yes, it was.
(20) Q.  Now, when you were at the toy department, what
(21)      exactly were your duties?
(22) A.  My duties were stocking shelves, helping
(23)      customers, and making sure that all those
(24)      shelves -- everything was moved, inventory was
(25)      moved down so we had enough stuff on those

Page 20

(1)      shelves for people to buy.
(2) Q.  And in the shoe department, what were your
(3)      duties?
(4) A.  The same exact thing except for shoes.
(5) Q.  Okay, and as a cashier, what were your duties?
(6) A.  I cashed out of the customer.  That's about all
(7)      really.  You help the customer too.
(8) Q.  And in the fitting room?
(9) A.  Fitting room was you counted how many items the
(10)      customer had.  You give them a number, let them
(11)      go into the fitting room, make sure they bring
(12)      the clothes out, answer the telephone, relay
(13)      messages.
(14) Q.  Relay messages, what does that mean?
(15) A.  Over the loudspeaker, you say:  Toys, you have
(16)      a call on Line 1.  Or if it's for a manager,
(17)      you get on the walkie-talkie, and you tell them
(18)      what line that they have.
(19) Q.  Is the fitting room associate the only person
(20)      that does this, taking incoming calls and
(21)      relaying them out to the floor?
(22) A.  Sometimes the customer service desk.  If the
(23)      fitting room is busy and you can't get to it,
(24)      they'll grab it.
(25) Q.  Okay, when you started working at Wal-Mart, did

Page 21

(1)    you receive a copy of the associate handbook?
(2) A.    Yes, I did.
(3) Q.    Do you recall receiving that handbook more than
(4)    once?
(5) A.    No.  I just remember once.
(6)        MS. AHUMADA:    I'm going to mark this
(7)    as Jackson 1.
(8)            - - - -
(9)    (Exhibit 1 marked for identification.)
(10)            - - - -
(11) BY MS. AHUMADA:
(12) Q.    What you have in front of you is marked Jackson
(13)    1.  Can you tell me what this is?
(14) A.    It's a piece out of the handbook.
(15) Q.    Is that your signature down at the bottom?
(16) A.    Yes, it is.
(17) Q.    I'll mark this as -- I'm sorry, can you tell us
(18)    the date on that?
(19) A.    11-14-2000.
(20)        MS. AHUMADA:    Okay, I'm going to mark
(21)    this as Jackson 2.
(22)            - - - -
(23)    (Exhibit 2 marked for identification.)
(24)            - - - -
(25) BY MS. AHUMADA:

Page 22

(1) Q.    And I ask that you hold onto each of the marked
(2)    exhibits, and you can keep them to the side
(3)    after you're done with them.
(4) A.    Okay.
(5) Q.    Do you recall what this document is?
(6) A.    They handed us a paper, did not give us the
(7)    book.  They just gave us this out of the book.
(8) Q.    Is that your signature?
(9) A.    Yes, it is.
(10) Q.    And the date of that is correct, 4-03-01?
(11) A.    Yes, it is.
(12) Q.    Do you recall what the associate handbook
(13)    stated with regard to attendance?
(14) A.    Yes, I do.  And that's why I brought it to
(15)    their attention, that I have asthma and that
(16)    certain smells do set the asthma off, and they
(17)    said that that was okay.
(18) Q.    Okay, let's parse that out.  You stated you
(19)    told someone.  Who did you tell?
(20) A.    I told Bobbi and Keith.  That was the manager
(21)    that was there when I started.
(22) Q.    I'm sorry, do you know Keith's last name?
(23) A.    No, I do not.  But he is over at Harbor Creek.
(24)    He's assistant manager now.
(25) Q.    And at what point did you inform either Bobbi

Page 23

(1)    and/or --
(2) A.    The day that I was hired, 11-14-2000.
(3) Q.    When you received the first or the second
(4)    handbook?
(5) A.    The first.
(6)        MR. DUFF:    Wait a minute.  The ones I
(7)    have both have the same date on them.
(8)        MS. AHUMADA:    Sorry.
(9)        MR. DUFF:    They all have 4-3.  As
(10)    long as she has one, that's okay.
(11) A.    Yeah, I do.
(12) BY MS. AHUMADA:
(13) Q.    So when you received it on the 2000 date, the
(14)    handbook that you have in front of you as
(15)    Jackson 1 --
(16) A.    Ah-huh.
(17) Q.    -- at that point, you told either Bobbi or
(18)    Keith?
(19) A.    I told both of them.
(20) Q.    And exactly what did you tell them?
(21) A.    I told them that I have asthma.  Certain smells
(22)    do set the asthma off.  And they said that we
(23)    will deal with it when it happens, that I could
(24)    do the inhaler when I needed it.  And they told
(25)    me that I had to keep my inhaler with me at all

Page 24

(1)    times in my pocket or have it in a container or
(2)    something, and I did do that.
(3) Q.    Now, what specifically do you recall the
(4)    handbook stated with regard to attendance?  You
(5)    sort of skipped over that question.
(6) A.    Oh, I cannot remember because it's been so long
(7)    ago.  Alls I know is it said that there was so
(8)    many attendance you were allowed to miss, but
(9)    you had to have a doctor's excuse.  I had a
(10)    doctor's excuse almost every time I was absent.
(11) Q.    Do you recall the associate handbook indicating
(12)    that attendance is important and coming to work
(13)    on scheduled days and times is an important --
(14) A.    Yes.  And that's why I let them know that I
(15)    have the asthma, and I get infections and stuff
(16)    when I end up having a bad asthma attack.
(17) Q.    Do you recall at any point getting a more
(18)    detailed attendance policy that was different
(19)    and apart from what was included in the
(20)    handbook?
(21) A.    No, I do not.  I don't remember.
(22)        MS. AHUMADA:    Okay, I'll mark this as
(23)    Jackson 3.
(24)            - - - -
(25)    (Exhibit 3 marked for identification.)

## Page 25

(1)          - - - -
(2) BY MS. AHUMADA:
(3) Q.  This is the Wal-Mart corporate policy on
(4)       attendance and punctuality policy. If you turn
(5)       to the last page, is that your signature?
(6) A.  Yes, it is.
(7) Q.  Having looked at this document -- take your
(8)       time to look at it, and let me know when you're
(9)       done.
(10) A.  Now, I do have dyslexia. I do.
(11) Q.  Okay, what does that mean for you?
(12) A.  I have a bad -- I can't read very well, and I
(13)       can't --
(14) Q.  Can you read it if we give you time to look at
(15)       this document?
(16) A.  It will take me awhile.
(17) Q.  Are you generally familiar with this document?
(18) A.  Yes. They went over everything with me. I
(19)       don't know if they hit everything and stuff and
(20)       that's why I -- when I signed it and stuff.
(21) Q.  But you did review it?
(22) A.  Yeah.
(23) Q.  You did understand what was in the policy
(24)       before you signed it?
(25) A.  Yes, I did.

## Page 26

(1) Q.  Do you recall being told either verbally or
(2)       when you read this yourself that associates
(3)       should not have more than three unapproved
(4)       absences in a rolling six-month period?
(5) A.  Yes. But all my absences were approved by the
(6)       managers.
(7) Q.  When you say they were approved, what do you
(8)       mean?
(9) A.  Pete always told me -- and these were his exact
(10)       words -- Don't worry about it; we understand
(11)       your problem.
(12) Q.  Okay.
(13) A.  And when I did start working there in the toys
(14)       department, there was a time that I was sick
(15)       for a whole week, and Keith said that that was
(16)       okay. They knew my problem too.
(17) Q.  Okay, did you ever make a request to take
(18)       medical leave while you worked at Wal-Mart?
(19) A.  Yes, I did. I think there was a couple times
(20)       that my doctor had me take medical leave
(21)       because there was no voice -- I was having
(22)       problems getting the asthma under control.
(23) Q.  Do you recall when those requests were made?
(24) A.  I remember one time being when I was stuck by a
(25)       cactus. I think it was June 14th, but I don't

## Page 27

(1)       remember the year. It is the year that Pete
(2)       started.
(3) Q.  Okay, now, when you say that you made requests,
(4)       are you familiar with the official request
(5)       policy?
(6) A.  Yes. There was a form that my doctor had to
(7)       sign and everything, and we did do that.
(8) Q.  Okay, do you recall how many times you made the
(9)       request? You stated two or three.
(10) A.  It was like two or three times, and it was due
(11)       to the asthma.
(12) Q.  And okay, were all these requests related to
(13)       your own medical needs?
(14) A.  Yes. I forgot. There was a time that I had to
(15)       have a request for my daughter. She had her
(16)       tonsils out, and it had to be extended a little
(17)       bit longer.
(18)       When you made each of those -- and I'm going to
(19)       call them official requests --
(20) A.  Okay.
(21)       An official request, I mean, you filled out a
(22)       form and submitted it. Do you understand that?
(23) A.  Yes, I do.
(24) Q.  Do you agree we should call it that, an
(25)       official request?

## Page 28

(1)          MR. DUFF:    I just want to clarify. I
(2)       think she testified the doctor filled out the
(3)       form, just so we're not saying one is
(4)       definitely one thing.
(5)          MS. AHUMADA:    Thank you.
(6) BY MS. AHUMADA:
(7) Q.  A form that you filled out by a doctor that you
(8)       gave to Wal-Mart would be an official request?
(9) A.  Yes. The one for my doctor, it was a medical
(10)       release for a child. It was not made out by a
(11)       doctor. It was made out by me. And I don't
(12)       remember who signed it, but there was a manager
(13)       that signed it.
(14) Q.  Okay, each of the times you asked for the
(15)       medical leave and you made an official
(16)       request--
(17) A.  Yes.
(18) Q.  -- were those requests granted?
(19) A.  Yes, they were.
(20) Q.  Okay.
(21)          - - - -
(22)    (Exhibit 4 and 5 marked for identification.)
(23)          - - - -
(24) A.  There were more than this.
(25) BY MS. AHUMADA:

### Page 29

(1) Q.  Okay, are these your signatures on the bottom
(2)  of each of these?
(3) A.  Yes, it is.
(4) Q.  And it's your contention that there are more
(5)  than these two?
(6) A.  Yes, there is.
(7) Q.  Do you have a copy?
(8) A.  No, I do not.
(9) Q.  Were you granted a copy?
(10) A.  I can't remember if I was or not.
(11)      MR. DUFF:    Can I see the second one?
(12)      THE WITNESS:    There's 4 and 5.
(13) BY MS. AHUMADA:
(14) Q.  You state there are other medical request
(15)  forms?
(16) A.  Yes, there is.
(17) Q.  How many others?
(18) A.  I'm pretty sure there are two other ones.
(19) Q.  Do you recall when they were, what date?
(20) A.  No, I don't.  This doesn't even have – when I
(21)  was stuck by the cactus, there was a form made
(22)  out for that.  And I was stuck from the cactus
(23)  at Wal-Mart, and it was workman's comp and
(24)  everything.
(25) Q.  Did you fill out a request for leave of

### Page 30

(1)  absence, or did you fill out a worker's comp
(2)  form?
(3) A.  I think I did both if I remember right.
(4) Q.  Okay, and what was the other occasion that is
(5)  not here?
(6) A.  There was another asthma, no voice.
(7) Q.  Okay, but you do recall these two exhibits?
(8) A.  Yes, I do.
(9) Q.  And one is dated 5-15-03?
(10) A.  Yes.
(11) Q.  And the other is dated 1-30-03?
(12) A.  Oh, okay.  Yes, okay.
(13) Q.  Now, earlier we looked at the attendance
(14)  policy.  Do you recall if these absences that
(15)  were made pursuant to the official medical
(16)  requests, were those counted against you in the
(17)  attendance policy?
(18) A.  Yes, the one for my daughter was.  Lisa counted
(19)  that against me.
(20) Q.  When you say counted against you, I want to
(21)  make sure we have the same definition.  What
(22)  does that mean?
(23) A.  She counted it against me because I had to take
(24)  a longer time because of my daughter being –
(25)  having an infection and stuff, and she said

### Page 31

(1)  that it was not acceptable.
(2) Q.  Were you – excuse me, I'm sorry.
(3) A.  And I said that Pete signed the papers, that it
(4)  was fine, and he says she didn't care.
(5) Q.  Were you reprimanded?
(6) A.  Yes, she reprimanded me.
(7) Q.  What reprimand did you receive?
(8) A.  A verbal reprimand.  That was just verbal at
(9)  that time.
(10) Q.  And what did she state?
(11) A.  She said that my absences were unexcused.  She
(12)  gave me the dates.  And I said:  Wait a minute.
(13)  Those were excused by management.
(14)      And she said:  I don't have – those
(15)  are unexcused by me.
(16) Q.  And the absences we're discussing here are
(17)  for–
(18) A.  For my daughter.
(19) Q.  – January 30th, 2003?
(20) A.  January, yes – February.  I signed the paper
(21)  on the 30th, but I was out the second – these
(22)  were the times I was out, okay?
(23) Q.  Okay.  So you were out on February 4th, and you
(24)  returned on February 6th?
(25) A.  The 4th is when I asked for the paper.  I

### Page 32

(1)  returned – return dates would have been the
(2)  14th.  Down at the bottom there is when I
(3)  returned.
(4) Q.  So that's February 14th, 2003?
(5) A.  Yes.
(6) Q.  Okay, so I just want to make sure we're correct
(7)  on this, so the days that you took off from
(8)  work were –
(9) A.  From the 4th until the 14th.
(10) Q.  Okay, just to clarify the record, that's
(11)  February 4, 2003, through February 14th, 2003?
(12) A.  Yes.
(13) Q.  And you believe that all of these dates were
(14)  counted against you for the attendance
(15)  punctuality policy?
(16) A.  Yes.
(17) Q.  And why do you think that they were counted
(18)  against you with respect to the attendance and
(19)  punctuality policy?
(20) A.  Because Lisa said they were.
(21) Q.  And Lisa is Lisa Dolecki?
(22) A.  Yes.
(23) Q.  And you stated that she gave you a verbal
(24)  reprimand?
(25) A.  Yes, she did.

Page 33

(1) Q.  You didn't receive anything in writing?

(2) A.  No, I did not.  That was just the verbal at

(3)      that time.

(4) Q.  Okay, and the lawsuit that you filed against

(5)      Wal-Mart, you've stated that you have a

(6)      disability.  What is your disability?

(7) A.  Well, I have the two.  I have the dyslexia, and

(8)      I have the asthma.  And my asthma is called

(9)      allergic reaction asthma.

(10) Q.  And what does that mean?

(11) A.  Certain smells, certain things, can set it off.

(12)     Like right now, the golden rods out.  Golden

(13)     rod is one of them that sets it off.

(14) Q.  Is that a plant?

(15) A.  Yes, it is.

(16) Q.  Okay, let's discuss the asthma.  My questions

(17)     now are dealing with your asthma.

(18) A.  Yes.

(19) Q.  You've also stated dyslexia, but I'm going to

(20)     cover asthma first.

(21) A.  Okay.

(22) Q.  Did you ever request an accommodation be made

(23)     for you with regard to your asthma when you

(24)     were working at Wal-Mart?

(25) A.  Yes.  My doctor did.

Page 34

(1) Q.  And when you say your doctor did, what do you

(2)      mean?

(3) A.  As far as -- I did not read the note, but as

(4)      far as I know, he asked if they could

(5)      accommodate me by my absentees and getting the

(6)      inhaler into me as soon as possible.  That's

(7)      why they let me carry the inhaler with me.

(8) Q.  So they granted you the accommodation of

(9)      letting you carry the inhaler?

(10) A.  Yes.

(11) Q.  And the other request was what?

(12) A.  With absentees, there was going to be problems

(13)     with absentees.

(14) Q.  And you said your doctor.  Which doctor --

(15) A.  I'm not sure which one.

(16) Q.  Let me finish my question before you start.

(17)     Please give me the name of the doctor that made

(18)     this accommodation request related to your

(19)     asthma and attendance?

(20) A.  I'm not sure if it was Spellacy or Beck.  I'm

(21)     not sure which one it was.

(22) Q.  Did you also request this accommodation with

(23)     regard to attendance?

(24) A.  Yes, I did, myself.  I asked them.

(25) Q.  Who did you ask?

Page 35

(1) A.  Bobbi, Pete.  And before Pete came, it was

(2)      Keith.

(3) Q.  And exactly what did you ask them?

(4) A.  I told them that I had asthma, that there was

(5)      problems with the smells and stuff.  They told

(6)      me: Okay, if you need your inhaler, use it,

(7)      but just let somebody know where you're at at

(8)      all times.

(9)      I did use the inhaler.  There was a

(10)     couple times they did have to call an ambulance

(11)     because the inhaler did not work.

(12) Q.  You also stated you asked an accommodation be

(13)     made with regard to absences.  What

(14)     accommodation did you request?

(15) A.  I asked them.  I myself told them that there is

(16)     going to be some times that I have -- when I

(17)     have an asthma attack, there is an infection.

(18)     I do lose my voice.  There is times that I

(19)     can't get it under control.  Is the absentee

(20)     going to be a problem?

(21)     And they said no, because they know

(22)     that I have a problem.

(23) Q.  Okay, I just want to make clear just so I

(24)     understand.  And please, I don't want to put

(25)     words in your mouth, so tell me if this is

Page 36

(1)      correct or not.

(2)      When you say you requested an

(3)      accommodation with regard to attendance, are

(4)      you saying that you requested that they give

(5)      you leeway --

(6) A.  Yes.

(7) Q.  -- with regard to the attendance policy?

(8) A.  Yes, I did.

(9) Q.  Do you know if you used that word leeway or

(10)     what other words you might have used?

(11) A.  I don't remember what words I used.

(12) Q.  And again, you asked Bobbi and Pete to make

(13)     this accommodation for you?

(14) A.  First, I asked Keith.

(15) Q.  Okay.

(16) A.  Keith was the first one because he was my first

(17)     management.  You know what?  I'm not sure that

(18)     I told Pete, but I figured it was in my record

(19)     and stuff, that he would know.

(20) Q.  So you asked Keith to give you leeway with

(21)     regard to attendance?

(22) A.  Yes, and he agreed to.

(23) Q.  Did you ask anyone else?

(24) A.  No, I did not.

(25) Q.  And what did Keith tell you in response?

Page 37

(1) A.  He said that would be fine.

(2) Q.  Now, did you request any other accommodation

(3)     you made?

(4) A.  No, I did not.

(5) Q.  I'm going to use the word leeway in attendance,

(6)     and do you understand what I mean by that, that

(7)     you wanted to have -- you didn't want Wal-Mart

(8)     to adhere to the strict attendance and

(9)     punctuality policy; you wanted leeway?  Is that

(10)     the proper way?

(11) A.  Yes.

(12) Q.  Is that how you described the accommodation you

(13)     requested?

(14) A.  Yes.  But I didn't use the word leeway.

(15) Q.  Okay, but that's what you meant?

(16) A.  Yes.

(17) Q.  Okay, now, when you asked for the leeway in

(18)     whatever words you might have used, what

(19)     exactly did you mean?  What kind of

(20)     accommodation did you want in terms of

(21)     attendance?

(22) A.  I don't know how to answer this one.  I really

(23)     don't.

(24) Q.  Just try, and if you need to take a minute,

(25)     that's fine.

Page 38

(1) A.  I really don't.

(2) Q.  Let me ask it another way.  So if you wanted

(3)     leeway with regard to attendance, what does

(4)     that mean to you?

(5) A.  That they wouldn't punish me for the missed

(6)     days for the asthma if I had a doctor's excuse.

(7) Q.  How many absences do you think would have been

(8)     reasonable for Wal-Mart to allow you to have?

(9) A.  See, that's a variable thing, because sometimes

(10)     my asthma doesn't go off; sometimes it does.

(11)     It's just a variable thing.  I mean, they

(12)     understood that we couldn't tell when one was

(13)     going to happen.

(14)     MR. DUFF:     And she also answered.

(15)     Let me put an objection to the extent it calls

(16)     for a conclusion as to what is reasonable.

(17)     It's a jury issue.

(18) BY MS. AHUMADA:

(19) Q.  Do you think there should have been any limits

(20)     on the number of times you could have called

(21)     out sick?

(22) A.  Not for my asthma, I don't.

(23) Q.  Now, earlier you said that a doctor provided a

(24)     note indicating that you needed accommodation

(25)     with regard to attendance?

Page 39

(1) A.  Yes.

(2) Q.  And with regard to an inhaler?

(3) A.  Yes.

(4) Q.  Do you have that doctor's note?

(5) A.  No.  I'm not sure if it's in the papers that I

(6)     gave you or not, if the doctor had a copy or

(7)     not.

(8)     MR. DUFF:     I haven't looked through

(9)     the paperwork in a while.  I can certainly make

(10)     a request for it.  I'm sure it's within the

(11)     prior request.  Like I said, authorizations

(12)     might be something we could work out.

(13) BY MS. AHUMADA:

(14) Q.  Do you have any evidence that anyone at

(15)     Wal-Mart knew about your disability?  And by

(16)     disability, I'm just referring to the asthma.

(17) A.  Yes, everybody did.

(18) Q.  Do you have any evidence of that, anything you

(19)     could show me?

(20) A.  No.

(21) Q.  Do you recall what Bobbi told you with regard

(22)     to your disability?

(23) A.  She said that it was fine, because the one

(24)     thing, why it did come up too is because I was

(25)     doing a drug test, and I wanted them to know

Page 40

(1)     right away too.  And I told them right away

(2)     about the Zoloft that I was on.  I think I was

(3)     on Prozac at that time.

(4) Q.  Is the Zoloft for your asthma?

(5) A.  No, it is not.

(6) Q.  And what is that for?

(7) A.  I had post-partum depression after my daughter

(8)     was born.

(9) Q.  And is the Prozac for your asthma?

(10) A.  No.  That's the Zoloft and Prozac both are an

(11)     anti -- I don't know what they call it.  It's

(12)     for moods.  I mean not, sir moods but

(13)     depression.  That's what I was looking for.

(14) Q.  And when did you begin taking the Zoloft?

(15) A.  Well, it was Prozac first, it was.

(16) Q.  And when did you start taking Prozac?

(17) A.  My daughter was -- she's 12 now.  She was like

(18)     three months old.

(19) Q.  What year was she born?

(20) A.  '93.

(21) Q.  And the month?

(22) A.  February.

(23) Q.  And so you first started taking it three months

(24)     after she was born?

(25) A.  Yes, I did.

### Page 41

(1) Q.  And when did you start taking the Zoloft?

(2) A.  They switched to Zoloft because the Prozac
(3)      wasn't working, so they went to Zoloft.  I'm
(4)      not sure when that started.

(5) Q.  Okay, are you currently seeing a doctor for
(6)      your asthma?

(7) A.  Yes, I am, Doctor Spellacy.

(8) Q.  And is that who you saw during the time you
(9)      worked at Wal-Mart for your asthma?

(10) A.  Yes, it was.

(11) Q.  So the Zoloft and the Prozac that you had --
(12)     you were taking during the time you worked at
(13)     Wal-Mart; is that correct?

(14) A.  Yes.

(15) Q.  Was there any other medication that you took
(16)     that was specific to your asthma?

(17) A.  They were trying different inhalers on me.
(18)     They were.  But I can't remember all the
(19)     inhalers and stuff; trying to find something
(20)     that would work.
(21)            And they did give me an asthma pill.
(22)     But I don't remember which one that was, but it
(23)     was everything that they were trying to get to
(24)     work on me and stuff.

(25) Q.  When did you develop the asthma?

### Page 42

(1) A.  Oh, gosh, I'm pretty sure it was after my son
(2)      was born.  And he was born in '86, but I can't
(3)      tell you exactly when or anything like that.

(4) Q.  But it was sometime in 1986?

(5) A.  Yeah, 1986.  It could have been 1987.  Well,
(6)      no.  It had to have been 1987, because he was
(7)      born December of '86, so it had to have been
(8)      '87.

(9) Q.  Okay, the medications that you have taken for
(10)     the asthma, has that improved your symptoms?

(11) A.  No, it has not.

(12) Q.  While you were working at Wal-Mart, were you
(13)     taking any medications for the asthma that
(14)     improved the symptoms?

(15) A.  No.  Couldn't find anything.

(16) Q.  Are you taking anything today that improves
(17)     your symptoms?

(18) A.  They can't find nothing.

(19) Q.  Okay, so when you would take an inhaler, what
(20)     would be the effect of the inhaler?  What would
(21)     that do in terms of easing symptoms, if any?

(22) A.  It would let me breathe again, but then
(23)     sometimes if I didn't get to it quick enough,
(24)     it wouldn't work, and we'd have to take
(25)     different measures.  Sometimes caffeine would

### Page 43

(1)      help, but if that didn't help, then there was a
(2)      couple times they had to call the ambulance.

(3) Q.  When you say there was a couple times they had
(4)      to call the ambulance, can you tell me who they
(5)      is?  Is this at Wal-Mart?

(6) A.  Yes.  I can't remember who it was that called.
(7)      It was management.  I know it was management at
(8)      that time.

(9) Q.  So while you were working at Wal-Mart,
(10)     ambulances, more than one, were summoned to
(11)     assist you?

(12) A.  Yes.  I think there was three times, but out of
(13)     those three, one was because of an asthma
(14)     attack because of being stuck by a cactus.  I
(15)     had an allergic reaction to the cactus.

(16) Q.  Can you tell me what the other two times were?

(17) A.  Asthma attacks that were so severe I couldn't
(18)     get out of them.

(19) Q.  Do you recall when those attacks occurred?

(20) A.  I don't remember the dates on them and
(21)     everything.

(22) Q.  And what position were you working at Wal-Mart?

(23) A.  Which time?

(24) Q.  Well, let's start with the first time.

(25) A.  The cactus, that was cashier.

### Page 44

(1) Q.  The cactus incident was the first time an
(2)      ambulance was summoned for you?

(3) A.  I'm pretty sure that's the first time.

(4) Q.  And what was the second time?

(5) A.  The second time was the last two asthma
(6)      attacks.  I think there was like a year in
(7)      between each one of them.

(8) Q.  Okay, can you tell me what positions you were
(9)      working?

(10) A.  Cashier.

(11) Q.  So each of these occurrences happened while you
(12)     were a cashier?

(13) A.  All three of them, yes.

(14) Q.  And is this the first time you were a cashier
(15)     or the second time, as you recall?

(16) A.  The first time.  Those were all first.  You
(17)     know?  I do remember, it wasn't cashier on both
(18)     of those.  It was fitting room on one of them.

(19) Q.  Knowing that one incident occurred while you
(20)     were -- of the two times, not the cactus
(21)     incident, one of the occurrences was a cashier,
(22)     while you were working as a cashier; the other
(23)     occurrence while you were working in the
(24)     fitting room --

(25) A.  Yes.

depo@akf.com    AKF Reporters, Inc.
Pittsburgh - Erie    Page 41 to Page 44
www.akf.com

BSA     DARLENE JACKSON VS WAL-MART STORES, INC., DEPOSITION OF DARLENE JACKSON, 9/15/05     XMAX(12/12)

### Page 45

(1) Q.  – does that help you narrow down the dates for
(2)  me?
(3) A.  No.  I don't remember the dates.
(4) Q.  Do you remember the year?
(5) A.  No, I do not.
(6) Q.  When did you leave Wal-Mart – excuse me, when
(7)  were you terminated from Wal-Mart?
(8) A.  I think June 14th, '03.  I know it was June
(9)  something.  You have a copy of the – both of
(10)  you have a copy of the termination letter that
(11)  I got.
(12) Q.  And earlier you stated you started working in
(13)  November 2000 at Wal-Mart?
(14) A.  Yes.
(15) Q.  Having those two dates, November 2000 and June
(16)  of 2003, does that help you narrow down dates?
(17) A.  No, it does not.
(18) Q.  While you were working at Wal-Mart, were you
(19)  able to walk?
(20) A.  Yes.
(21) Q.  For how long could you do that?
(22) A.  As long as my shift.  There was a couple of
(23)  times I – there was a time that I did get
(24)  hurt.  I was in a cast, walking cast.  It was
(25)  like a brace cast, and I was assisting in toys.

### Page 46

(1)  There was another time I was in toys
(2)  for Christmastime.  I was cashiering and toys
(3)  at the same time.  I was in a foot cast, but I
(4)  did everything I was supposed to do and
(5)  everything.
(6) Q.  During the time you worked at Wal-Mart, were
(7)  you able to run?
(8) A.  No.  You don't run in Wal-Mart, I'm sorry.
(9) Q.  If you needed to get from A to B quickly, would
(10)  you walk quickly?
(11) A.  Yes, I could.  I could get out of breath real
(12)  easy because of the asthma, but you wouldn't
(13)  need to take and do an inhaler or anything for
(14)  that unless it got real bad.  But I was able to
(15)  do it.
(16) Q.  And you had your inhaler with you when you
(17)  worked at Wal-Mart?
(18) A.  Yes, I did.
(19) Q.  Now, during the period that you worked in
(20)  Wal-Mart – and I don't mean while you were
(21)  actually on the job, but you were able to care
(22)  for yourself, and by that, I mean your personal
(23)  hygiene, were you able to get yourself ready
(24)  for work in the morning?
(25) A.  Yes, I was.

### Page 47

(1) Q.  During the period that you worked at Wal-Mart,
(2)  were you able to drive?
(3) A.  Yes, I was.
(4) Q.  During the time you worked at Wal-Mart, were
(5)  you able to lift things?
(6) A.  Yes, I was.
(7) Q.  Do you know how much you could lift?
(8) A.  I was able to lift – there was no limitation.
(9)  I did whatever I needed to do.  Even if it took
(10)  going over what I could do, I would do it.
(11) Q.  Did you do that because you were told to lift
(12)  heavy things, or was it because you wanted to
(13)  get the job done?
(14) A.  I wanted to get the job done.
(15) Q.  Now, again, during the time period that you
(16)  worked at Wal-Mart, were you able to speak?
(17) A.  There were a couple of times that my asthma did
(18)  take and affect my vocal cords to the point
(19)  where I had no voice.  They still wanted me to
(20)  work.  I worked as much as I possibly could.
(21)  Customers would come up to me and say:  What
(22)  are you still doing here?  You can't even talk
(23)  and help us.
(24) Q.  Do you remember in what position you were
(25)  working at the time?

### Page 48

(1) A.  There was times in the cashier, fitting room,
(2)  and in toys.
(3) Q.  What are your restrictions with regard to the
(4)  asthma?
(5) A.  There is no restrictions.  The only thing is I
(6)  have to watch, like I said, smells, but you
(7)  can't – certain perfumes set you off.  There's
(8)  – they can't give me a limitation because
(9)  they'd have to put me in a bubble or something.
(10) Q.  Can you give me a list of triggers for your
(11)  condition?
(12) A.  It varies.  It's different kinds of perfumes,
(13)  different kinds of plants.  I don't know what
(14)  does it.
(15) Q.  Okay, is there anything specific about Wal-Mart
(16)  and the environment there that would trigger
(17)  your condition?
(18) A.  The perfumes, a lot of the perfume smells and
(19)  the plants.  I'm pretty sure, if I'm not
(20)  mistaken, my doctor did ask them if they could
(21)  put me on a register that would not have the
(22)  plants, and they said no, that they can't do
(23)  that.  They can't tell the customers they can't
(24)  bring the plants.
(25)  So I had to turn my light on every

### Page 49

(1)     time a plant would come through, and they would
(2)     scan it. Half the time, the girls wouldn't get
(3)     there, and I would scan it anyways because just
(4)     to get the customer through. I did not want
(5)     the customer to wait.
(6) Q.  And you said, I'm sorry, that one of your
(7)     physicians made this request?
(8) A.  Yes.
(9) Q.  Do you recall which position?
(10) A. No, I don't know which one it was.
(11) Q. Do you happen to have a copy of the doctor's
(12)    note?
(13) A. No. I gave everything to them. I was never
(14)    planning on doing this to them. I gave
(15)    everything. I was honest with them. I gave
(16)    them copies, and I did not take copies. I
(17)    trusted them.
(18) Q. Were you ever made to work in the perfume
(19)    department?
(20) A. No. They did not have -- that's one place that
(21)    they would not have me go.
(22) Q. Were you ever made to work in the plants
(23)    department, if there is one?
(24) A. Yes, there is a plant department. I did not
(25)    work back there, but I worked around that area.

### Page 50

(1)     That's where the toy area is.
(2) Q.  Would you say that the environmental conditions
(3)     in the Wal-Mart store triggered your asthma
(4)     more than, say, at home?
(5) A.  No. It was -- I've been taken out of my home
(6)     by ambulance, I have, so it's -- it wasn't just
(7)     one area place that had that happen to me.
(8) Q.  So on the days that would you call out sick
(9)     from work, would you stay at home?
(10) A. Yes, I would.
(11) Q. Would your condition improve at home?
(12) A. There was times, no, it did not.
(13) Q. Do you recall every telling anyone at Wal-Mart
(14)    that you could do your jobs without an
(15)    accommodation?
(16) A. No, I do not.
(17)       MS. AHUMADA:    We'll mark this.
(18)       - - - -
(19)    (Exhibit 6 marked for identification.)
(20)       - - - -
(21) BY MS. AHUMADA:
(22) Q. And this is Jackson 6. Is this your signature
(23)    at the bottom of the page?
(24) A. Yes, it is.
(25) Q. And what is the date?

### Page 51

(1) A.  11-6-2000.
(2) Q.  Do you recall filling out this form?
(3) A.  No, I do not.
(4) Q.  But that is your signature?
(5) A.  Yeah. But I don't remember -- oh, this is when
(6)     I went in to have the test done, the urinary
(7)     test done, for employment.
(8) Q.  Okay, and do you recall the circumstances
(9)     surrounding you being given this form?
(10) A. No, I do not.
(11) Q. Do you agree that you checked off that, yes, I
(12)    have the ability to perform all of the above
(13)    functions with or without reasonable
(14)    accommodation?
(15) A. They had me -- this is when I talked to them
(16)    about the asthma to Bobbi. She said: Just
(17)    mark that. But it was underneath -- they
(18)    understood and everything, to mark yes, that I
(19)    could do that, because we didn't know what
(20)    would happen at that time, if it would set off
(21)    the asthma or not, what I could do or not.
(22) Q. And what does that mean, you didn't know or we
(23)    didn't know if -- I don't want to misstate what
(24)    you said.
(25) A. Well, like I don't know if a person would come

### Page 52

(1)     through my line with a perfume that would set
(2)     my asthma off or anything. We didn't know what
(3)     could set it off, so they just said: Go ahead,
(4)     mark yes. And I did.
(5) Q.  Did you feel that -- well, you know, earlier
(6)     you had said that you had made request for
(7)     accommodations?
(8) A.  And I asked them.
(9) Q.  Okay, is there anything on this form indicating
(10)    that you needed some other sort of
(11)    accommodation? I just don't see it here.
(12) A. I don't see it here either.
(13) Q. That's fine. I'm going to show you another
(14)    exhibit --
(15)       - - - -
(16)    (Exhibit 7 marked for identification.)
(17)       - - - -
(18) BY MS. AHUMADA:
(19) Q. -- Jackson 7. Do you agree that that's your
(20)    signature at the bottom?
(21) A. Yes.
(22) Q. Do you agree that it's dated --
(23) A. That's not my signature.
(24) Q. It's not your signature?
(25) A. That is not my signature. Look at the Ds.

## Page 53

(1)     Look at that, look.  That is not my signature.
(2) Q.  Okay, so you're stating that you didn't sign
(3)     this form?
(4) A.  No, I did not.
(5) Q.  Do you recall ever seeing this form?
(6) A.  No, I do not.
(7) Q.  And it's related to your job in jewelry, shoes,
(8)     and food service?
(9) A.  Yeah.  I don't remember this format all.
(10) Q. So what you're stating to me is that is not
(11)    your signature at the bottom?
(12) A. That is not mine.  I mean, the D, the J,
(13)    everything, none of it is the same.
(14) Q. Would you have any knowledge of who signed that
(15)    for you?
(16) A. No.  And that's not even my -- look at my --
(17)    look at -- okay, wait a minute here.
(18)        MR. DUFF:    That's okay.
(19) BY MS. AHUMADA:
(20) Q. If that's your answer, that's okay.  I just
(21)    want your answer.  So it's not your signature,
(22)    that's what you're testifying to?
(23) A. Yes.
(24) Q. Would you have any knowledge of who signed
(25)    that, if anyone?

## Page 54

(1) A.  No.
(2) Q.  And you don't recall looking at that document
(3)     prior to today?
(4) A.  No, I don't.
(5) Q.  Now, it's the same form that was previously
(6)     marked as Jackson 6?
(7) A.  Yes.
(8) Q.  Do you recall seeing that form more than once?
(9) A.  No.  I only seen this form once, the day that I
(10)    went in to have my urinary thing taken.
(11) Q. Okay, all right.
(12) A. They were throwing so many papers at you too.
(13)    They say:  Sign this, sign this, sign this.
(14)    There was times you didn't have time to read
(15)    half the stuff, but this is blowing me away.
(16)        MS. AHUMADA:    Okay, I'm going to mark
(17)    this as 8.
(18)            - - - -
(19)    (Exhibit 8 marked for identification.)
(20)            - - - -
(21) BY MS. AHUMADA:
(22) Q. Take a moment to review those.
(23) A. Oh, these were the -- I remember these.
(24) Q. And what are these forms?
(25) A. These forms are asking you what time you can

## Page 55

(1)     work and what times you can't work.
(2) Q.  And do you agree this is your signature at the
(3)     bottom of each of these seven pages?
(4) A.  Yep.  Yes, it is.
(5) Q.  Do you recall informing Wal-Mart that you could
(6)     work the times that you've listed on these
(7)     forms?
(8) A.  Yes, I do.
(9) Q.  And what did this mean?
(10) A. These were dates -- time times around my
(11)    children's schedules and stuff.
(12) Q. Okay, so when you completed these forms, is it
(13)    fair to say that you expected to work these
(14)    times?
(15) A. Yes.
(16)        MR. DUFF:    Object to the form.  Did
(17)    she expect to work all of those times?  I mean,
(18)    she's indicating 15 hours a day.
(19)        MS. AHUMADA:    Right.
(20) BY MS. AHUMADA:
(21) Q. But you expected to be available to work during
(22)    these times?
(23) A. Yes.
(24) Q. And do you think it's fair to say that Wal-Mart
(25)    expected you to be available to work during

## Page 56

(1)     these times?
(2) A.  Yes, except for when my asthma was acting up.
(3) Q.  Okay, do you think the days that you did call
(4)     in sick, it caused any inconveniences --
(5) A.  I know it did.
(6) Q.  Let me finish the question.  Did it cause any
(7)     inconveniences to the other associates that you
(8)     were working with?
(9) A.  Yes, I know it did.  They all understood.
(10)    There were other girls that were sick too that
(11)    were out as much, if not more.  They
(12)    accommodated them, and they're still working
(13)    there.
(14) Q. Okay, what inconveniences did you think had
(15)    caused -- were caused to the other associates?
(16)    Excuse me.
(17) A. One less cashier to run the register.
(18) Q. Do you think it caused any inconveniences to
(19)    Wal-Mart customers?
(20) A. In a way, yes.
(21) Q. How so?
(22) A. That they weren't able to get out quick enough.
(23)    There was one less register.
(24) Q. Okay.
(25) A. But can I say something on this?  Any time they

## Page 57

(1) needed me to come in when I was sick, I would
(2) come in on my days off and everything.
(3) Q. What do you mean by that?
(4) A. If — say I had a day off, and I was sick a
(5) couple days down the road. I would go in for
(6) them. They would call, say: Hey we're
(7) short-handed. Would you come in?
(8)     I said: Yes. I always would go in
(9) any time that they needed extra help. I was in
(10) there working early shifts, everything, trying
(11) to make it easier. And I never took my sick
(12) pay, at any time did I take my sick pay.
(13) Q. What does that mean?
(14) A. I did not — I felt I inconvenienced them, I
(15) should not get paid. There's time that they do
(16) — there's sick time that they give you. I
(17) would not take it.
(18) Q. And why wouldn't you take it?
(19) A. Because I felt that I inconvenienced them.
(20) Q. Okay, do you recall being told by anyone at
(21) Wal-Mart that your attendance was unacceptable?
(22) A. Not until Lisa Dolecki came.
(23) Q. Do you know when that was?
(24) A. Like two months before — two or three months
(25) before I was fired.

## Page 58

(1) Q. And you were terminated from Wal-Mart in June
(2) 2003, we said?
(3) A. Yes.
(4) Q. So you believe she started some several months
(5) before that?
(6) A. Yes.
(7) Q. So beginning of 2003?
(8) A. Something like that, yes.
(9) Q. And that was the first time anyone had
(10) indicated to you that attendance was a problem?
(11) A. Yes.
(12) Q. Do you recall receiving performance evaluations
(13) while you worked at Wal-Mart?
(14) A. Yes, I do.
(15) Q. How many times were you reviewed for
(16) performance?
(17) A. I think once or twice if I'm not mistaken. I'm
(18) not very sure on that.
(19)     - - - -
(20)     (Exhibit 9 marked for identification.)
(21)     - - - -
(22) BY MS. AHUMADA:
(23) Q. Look at that form, and let me know when you've
(24) scanned it.
(25) A. I can't make out the writing here. I can't.

## Page 59

(1) Q. Okay, we can go through it, but let's look at
(2) the bottom of that second page. Is that your
(3) signature at the bottom?
(4) A. Yes, it is.
(5) Q. And is that dated 10-9-2001?
(6) A. Yes, it is.
(7) Q. Do you see the section that's marked areas of
(8) improvement?
(9) A. For improvement? Yes.
(10) Q. Excuse me, yes, for improvement. Do you see
(11) that it lists attendance as one of the areas of
(12) improvement?
(13) A. Yes, I do.
(14) Q. Do you agree? Do you see that?
(15) A. Yes.
(16) Q. And this is a performance evaluation that you
(17) received as a cashier; is that correct?
(18) A. Yes.
(19) Q. Okay, when you signed that form, do you recall
(20) reviewing it?
(21) A. Yes.
(22) Q. Do you recall what you were told with regard to
(23) attendance, if anything?
(24) A. Nothing. I was — I remember signing. That's
(25) my IPH up, and that's my writing there. And

## Page 60

(1) that's the only thing that they were worried
(2) about was my IPH.
(3) Q. What is IPH?
(4) A. It's the scanning, how fast you scan things and
(5) get items through.
(6) Q. So you wanted to increase that or Wal-Mart
(7) wanted you to increase that?
(8) A. I wanted to increase that because mine was very
(9) low.
(10) Q. Were you told that you needed to increase it?
(11) A. Yes, I was.
(12)     - - - -
(13)     (Exhibit 10 marked for identification.)
(14)     - - - -
(15) BY MS. AHUMADA:
(16) Q. If you need to take a break at any point, let
(17) me know, okay?
(18) A. No. That's okay.
(19) Q. This is a sales floor associate performance
(20) appraisal form, and it's marked Jackson 10.
(21) Have you had a chance to look at the document?
(22) A. Yes.
(23) Q. Is that your signature at the bottom of the
(24) second page?
(25) A. Yes, it is.

### Page 61

(1) Q. And is it dated 10-7-2002?

(2) A. Yes.

(3) Q. Do you agree that it lists attendance for an

(4)    area of improvement?

(5) A. Yes, it does.

(6) Q. I'm sorry, go ahead.

(7) A. I don't remember missing four days that time,

(8)    but again, it was not brought to my attention.

(9)    That's why there is the comment there. If it

(10)    was brought to my attention, I would have said

(11)    make attendance better, but I was underneath

(12)    the understanding that that was not going to be

(13)    held against me.

(14) Q. Did you review this form before you signed it?

(15) A. Yes, I did.

(16) Q. Okay, do you recall which managers you met with

(17)    when you were given these appraisals?

(18) A. This here was Gail.

(19) Q. And that's Jackson 9?

(20) A. Yes. This one here, I do not remember who did

(21)    that one.

(22) Q. But you didn't discuss attendance with them?

(23) A. No. Nothing was said about attendance.

(24) Q. Do you recall ever receiving written warnings

(25)    due to attendance?

### Page 62

(1) A. After Lisa Dolecki came.

(2) Q. Who gave you the written warning?

(3) A. She did.

(4) Q. And that's Lisa Dolecki?

(5) A. Yes.

(6) Q. What did she tell you?

(7) A. I can't remember exactly what was said, but I

(8)    do know that she was upset with my absentees

(9)    and stuff. And I said that everybody else has

(10)    been okay with it, with my asthma and stuff.

(11)    It's been -- and I've talked to Pete. Pete

(12)    said: Don't worry about it.

(13)    And she said: Well, I'm your

(14)    advisor. I'm worried about it. And I was very

(15)    upset with her.

(16) Q. Okay.

(17) A. I felt like she was attacking me.

(18) Q. Do you recall how many absences you had

(19)    incurred before she gave you the written

(20)    warning?

(21) A. No, I don't. But I know that year was very bad

(22)    for me.

(23) Q. Do you recall what year that was?

(24) A. It was '83 when I -- or I mean 2003 when I was

(25)    let go. I had a car accident in May, and I

### Page 63

(1)    ended up having a little nervous breakdown

(2)    because I was having some family problems. My

(3)    doctor did tell them that I needed to take some

(4)    time off.

(5) Q. Which doctor?

(6) A. Doctor Beck. And I don't know if that was

(7)    Gerald or if that was his daughter. And her

(8)    name is Mawry. Don't ask me how to spell that

(9)    one.

(10) Q. Doctor Beck is Mawry, Beck?

(11) A. Okay, Gerald Beck is my gynecologist, but his

(12)    daughter is in with him now.

(13) Q. Okay.

(14) A. And her name is Pam Beck Mawry, but I don't

(15)    know how to spell the last name.

(16) Q. So either Doctor Pam Beck Mawry or Doctor Beck

(17)    treated you for a nervous breakdown?

(18) A. It wasn't a total nervous, but I was having

(19)    some problems.

(20) Q. Okay, and when was that? What year?

(21) A. It was that May.

(22) Q. May 2003?

(23) A. Yes. And then right in between there, I had

(24)    another serious asthma attack.

(25) Q. In between what?

### Page 64

(1) A. That whole month. It was the beginning of the

(2)    month, I had the accident, then the asthma, and

(3)    then at the end of the month is -- because I

(4)    was so nervous about losing my job because I

(5)    asked Pete. I said: Pete, Lisa has already

(6)    reprimanded me about this.

(7)    He told me: Don't worry about it.

(8)    You're going to be okay. Just take care of

(9)    yourself.

(10) Q. And by take care of yourself, what did you

(11)    understand that to mean?

(12) A. I took it as to get well, make sure you're

(13)    going to be okay, don't worry about your job;

(14)    your job is here when you get better and get

(15)    back to work.

(16) Q. Okay, did you give Wal-Mart doctor's notes with

(17)    regard to the car accident?

(18) A. I was taken by ambulance into the hospital. I

(19)    had to spend the night over. I had two days --

(20)    the next two days were my days off, and then I

(21)    was able to go right back to work.

(22) Q. So you didn't take any days off for that car

(23)    accident?

(24) A. I was on my way to work when the accident

(25)    happened.

### Page 65

(1) Q.  And that was in May of 2003?

(2) A.  Yes.

(3) Q.  Did you bring in a doctor's note when you came

(4)      back to work after your two days off?

(5) A.  No. I called and told them where I was at and

(6)      stuff, and they said not to worry about

(7)      anything. And I did show him the paperwork

(8)      from the emergency room. He didn't take it or

(9)      anything. I did show it to him, but I did not

(10)     keep it.

(11) Q.  And when you say he, do you mean Pete Burns?

(12) A.  Pete Burns, yes.

(13) Q.  And the time you had the nervous condition in

(14)     May, did you take off days from work for that?

(15) A.  I went in. I was supposed to work. When I

(16)     was talking to Pete and Georgie. She was in

(17)     the room with me.

(18)     First, I started talking to Georgie

(19)     because Pete was in a meeting, told what was

(20)     going on, gave her the doctor's excuse. Pete

(21)     came in, and that's when he told me not to

(22)     worry about anything, just to take care of

(23)     myself and get better.

(24) Q.  Okay, now, you said it was due to personal

(25)     reasons you had this nervous condition?

### Page 66

(1) A.  Yes.

(2) Q.  Can you tell me what that is, the personal

(3)      reasons?

(4) A.  My husband and I were having some marital

(5)      problems.

(6) Q.  And what were your symptoms?

(7) A.  Shaky, blood pressure was sky-high. I can't

(8)      remember everything that was --

(9) Q.  Okay, and I apologize if you told me this

(10)     already, but exactly how many days do you

(11)     recall being out of work from Wal-Mart the days

(12)     that you were scheduled to work, you didn't go

(13)     to work due to this nervous condition?

(14) A.  I'm not sure. I'm not real sure on how many

(15)     days. I don't think it was that many days.

(16)     But when I did go back to work, I was

(17)     working, and I kept working and working, and I

(18)     started shaking, sweaty, just having problems

(19)     concentrating and stuff; called the doctor and

(20)     told him what was going on.

(21)     My heart was racing and things. They

(22)     said: Get down here immediately. I told Lisa

(23)     what was going on, and she said, go, get down

(24)     there and stuff. And my blood pressure was

(25)     sky-high, and they said: You need to just go

### Page 67

(1)      home and take it easy for the rest of the day.

(2)      The next day, I went back in.

(3) Q.  To work?

(4) A.  To work. I worked for the time that I -- I

(5)      started 15 minutes early. I was scheduled to

(6)      go in at, I think, 11:30, but they were calling

(7)      for cashiers because they needed help.

(8)      And I said to Lisa: I can ring in --

(9)      right now, I'm here.

(10)     She said: Go ahead. And then about

(11)     1 o'clock, she said -- they come got me, turned

(12)     off my light, and took me back in the room and

(13)     said I was gone. And I was escorted down to my

(14)     locker and escorted off the premises. And I

(15)     felt like a criminal.

(16) Q.  And do you recall when that was?

(17) A.  The 7th, I think, of June, the 7th or the 14th,

(18)     something like that. I'm not sure what day it

(19)     was. It's on my papers.

(20) Q.  Okay, now, earlier you had said first in May

(21)     you had a car accident, and then there was the

(22)     nervous condition?

(23) A.  No; asthma problem, and then the end of May was

(24)     the nervous problem.

(25) Q.  Okay, I'm sorry. Let's go through that time

### Page 68

(1)      line again. So first in early May --

(2) A.  Early May, I had the accident.

(3) Q.  Okay.

(4) A.  Then I had an asthma attack. But I was only

(5)      out for a day or so because I was able to get

(6)      it under control. And then I had the

(7)      breakdown.

(8) Q.  And that was late May, early June?

(9) A.  Late May.

(10) Q.  Okay, for any of these conditions, the car

(11)     accident, the asthma, the nervous breakdown,

(12)     for lack of a better term, did you make

(13)     official requests for medical leave?

(14) A.  The note for the nervous breakdown.

(15) Q.  Did you fill out the form that we had looked at

(16)     earlier?

(17) A.  No; because Pete said it was okay for just

(18)     that, my doctor's excuse if I remember right.

(19)     I'm not sure.

(20) Q.  Now, you said that Lisa Dolecki issued a

(21)     written warning regarding attendance?

(22) A.  Yes.

(23) Q.  Okay, let me show you another exhibit.

(24)     - - - -

(25)     (Exhibit 11 marked for identification.)

BSA                DARLENE JACKSON VS WAL-MART STORES, INC., DEPOSITION OF DARLENE JACKSON, 9/15/05    XMAX(18/18)

Page 69

(1)          - - - -
(2) BY MS. AHUMADA:
(3) Q.   Do you know what this form is?
(4) A.   Yes.
(5) Q.   And what is it?
(6) A.   This is when my father-in-law passed away, this
(7)      is.
(8) Q.   I'm sorry, when did your father-in-law pass
(9)      away?
(10) A.  2003, seven days after their birthday, 12 --
(11)     the 7th of December, 2003.
(12) Q.  I'm sorry, that date again?
(13) A.  December 7th, 2003.
(14) Q.  Okay, now, earlier we had said you were
(15)     terminated from employment June of 2003?
(16) A.  Excuse me, it was 2002, excuse me.  I can't
(17)     remember --
(18) Q.  Do you agree that this is your signature at the
(19)     bottom of the page?
(20) A.  Yes, it is.
(21) Q.  Do you agree that the date of this form is
(22)     February 15, 2003?
(23) A.  Yes.
(24) Q.  Do you still believe this is related to the
(25)     time that your father-in-law passed away?

Page 70

(1) A.   Yes, because it's the 12th, the 8th through the
(2)      12th.  12-8 and 12-9 was the time.  And those
(3)      were supposed to be bereavement times, and they
(4)      put it on here.  And I even brought it to her
(5)      attention, and she would not change it.
(6) Q.   Did you notify anyone on 12-8 through 12-9,
(7)      2002, that you were calling out of work because
(8)      your father-in-law passed away?
(9) A.   Yes, I did.
(10) Q.  Do you know what Wal-Mart's policy is with
(11)     regard to bereavement leave?
(12) A.  Yes, you get three days.
(13) Q.  Is it for all family members?
(14) A.  Yes, it is.
(15) Q.  Does it include --
(16) A.  And adopted family members and father-in-laws.
(17)     The only thing it doesn't extend to is like
(18)     aunts and stuff like that, like close.  But my
(19)     father-in-law was considered close family
(20)     member.
(21) Q.  Did you fill out any form with regard to this
(22)     leave?
(23) A.  They don't have a form do that.  And Pete and
(24)     Mike even came to my father-in-law's funeral.
(25) Q.  And who is Mike?

Page 71

(1) A.   He was one of the assistant managers.
(2) Q.   Do you recall when you received this coaching
(3)      for improvement form?
(4) A.   Yes, I do.  And I even brought that to her
(5)      attention, that date.  I signed it.  I told her
(6)      to put the comment in, and she said she
(7)      wouldn't because she considered those unexcused
(8)      absences.
(9) Q.   Okay.
(10) A.  But Pete knew that my father-in-law died.  She
(11)     -- it wasn't right.
(12) Q.  Okay, did she say anything else when she gave
(13)     you this form and asked you to sign it?
(14) A.  She just told me to try not to miss any more
(15)     days, and I told her -- this is when I was
(16)     upset with her.
(17) Q.  I'm sorry, what does that mean?
(18) A.  When I took and was talking to her and told her
(19)     everybody else didn't have a problem with it
(20)     until she started there.
(21) Q.  Okay.
(22) A.  And when she started there, everybody -- she
(23)     was having a problem and nobody else was.
(24) Q.  Okay, when you say she was having a problem,
(25)     what do you mean?  A problem with what?

Page 72

(1) A.   With the absentees.
(2) Q.   With your absentees?
(3) A.   Yes.
(4) Q.   Whereas before, your other managers and
(5)      supervisor hadn't had a problem?
(6) A.   No; except for what was on these papers here,
(7)      but they didn't bring it to my attention.
(8) Q.   Okay, do you agree that this form states that
(9)      the behavior performance that is expected of
(10)     you is to not call off until 8-17-2003?
(11) A.  Yes.
(12) Q.  Did you review this form when you signed at the
(13)     bottom?
(14) A.  Yes.
(15) Q.  Do you know if this form is also known as a
(16)     decision-making day form?
(17) A.  No, I do not.
(18) Q.  Have you ever called it a D-day coaching?
(19) A.  Yes.  I think this was when I was supposed to
(20)     write a letter, if I'm not mistaken, and then
(21)     they give you a day off with pay.  They do.
(22) Q.  And did you take that day off with pay?
(23) A.  Yes.  It's mandatory.  I don't know if this was
(24)     it or if it was another time.
(25) Q.  Okay, did you write a letter with regard to

Page 73

(1) this?
(2) A. Yes, I did.
(3) Q. Okay, do you know who you gave the note to?
(4) A. To Lisa. I had to. I think it was Lisa or
(5) Charles, one of the two. I don't know which
(6) one was in.
(7) Q. Who is Charles?
(8) A. Charles is another assistant manager.
(9) Q. And his last name?
(10) A. Smith, it says here.
(11) Q. Do you recall what you stated in your --
(12) A. No, I do not.
(13)         - - - -
(14) (Exhibit 12 marked for identification.)
(15)         - - - -
(16) BY MS. AHUMADA:
(17) Q. Is that your signature at the bottom?
(18) A. Yes, it is.
(19) Q. And is this dated 2-20-2003?
(20) A. Yes.
(21) Q. Do you recall writing this?
(22) A. Yes, I do. And like I said, I, Darlene
(23) Jackson, will try hard, will try. And I should
(24) have underlined try.
(25) Q. And do you agree that it says that you

Page 74

(1) understand it's an inconvenience to the
(2) associates and the customers?
(3) A. Yes, I do. And I've already stated that I knew
(4) it was an inconvenience to them.
(5) Q. Okay, do you recall receiving any other written
(6) coachings, written warnings?
(7) A. I don't remember -- I remember there was -- I
(8) had to write down a statement because I
(9) accidentally picked up a bloody -- I don't know
(10) if it was a Kleenex or what it was. I thought
(11) it was a Kleenex, and I just discarded it. And
(12) I wasn't thinking because I was so busy and
(13) everything. I used the bacteria stuff, but it
(14) was all written down and stuff, and I did sign
(15) that.
(16) Q. Was it a warning, a written warning?
(17) A. No, it wasn't. It was just something I had to
(18) write up. But that was the only thing I know
(19) of that I remember.
(20) Q. Sure.
(21)         - - - -
(22) (Exhibit 13 marked for identification.)
(23)         - - - -
(24) A. I know what this is.
(25) BY MS. AHUMADA:

Page 75

(1) Q. Is that your signature at the bottom of the
(2) first page?
(3) A. Yes.
(4) Q. Okay, and you just said you know what this is.
(5) What is it?
(6) A. It's a check that bounced.
(7) Q. Do you recall receiving this?
(8) A. Yes, I do.
(9) Q. Can you tell me the circumstances surrounding
(10) that?
(11) A. I thought there was enough cash, and my husband
(12) and I both had the account and stuff. He took
(13) some money out. I didn't know he did. And
(14) that's why. He took an ATM out and --
(15) Q. Okay, I want to show you another exhibit.
(16)         - - - -
(17) (Exhibit 14 marked for identification.)
(18)         - - - -
(19) BY MS. AHUMADA:
(20) Q. If you need to take a break, you can.
(21) A. I'm going to need one.
(22)     MS. AHUMADA:    Let's do that. We'll
(23) take a break.
(24)         - - - -
(25) (There was a recess in the proceedings.)

Page 76

(1)         - - - -
(2) BY MS. AHUMADA:
(3) Q. This is Jackson 14.
(4) A. 14.
(5) Q. Okay, do you know what this form is?
(6) A. Oh, yeah. This is what Sean had me -- I'm
(7) pretty sure this is.
(8) Q. Do you agree that it says an ADA intake
(9) questionnaire, EEOC Pittsburgh Area Office at
(10) the top?
(11) A. Yes.
(12) Q. Does that refresh your recollection of what
(13) this is?
(14) A. Yes, it does.
(15) Q. Good. Did you fill out this form?
(16) A. I spoke to Sean and his office --
(17)     MR. DUFF:    You don't have to tell her
(18) about anything you told me.
(19)     THE WITNESS:    Okay.
(20) BY MS. AHUMADA:
(21) Q. But you filled out this questionnaire or you
(22) supplied information for your attorney to fill
(23) it out?
(24) A. Yes.
(25) Q. Did you review all these answers before you

Page 77

(1)      signed?
(2) A.   Yes, I did.
(3) Q.   And is it correct to the best of your
(4)      knowledge?
(5) A.   Yes, it is.
(6) Q.   Okay.
(7)              ----
(8)      (Exhibit 15 marked for identification.)
(9)              ----
(10) BY MS. AHUMADA:
(11) Q.  Do you recognize this document?
(12) A.  Yes, I do.
(13) Q.  Do you agree that this is the -- this is your
(14)     signature at the bottom of the page?
(15) A.  Yes, it is.
(16) Q.  Okay, and this is a charge of discrimination
(17)     filed with the Pennsylvania Human Relations
(18)     Commission?
(19) A.  Yes, it is.
(20) Q.  Did you fill in this form?
(21) A.  Yes, I did.
(22) Q.  And so you reviewed this form before you signed
(23)     it?
(24) A.  Yes.
(25) Q.  And it's true and correct to the best of your

Page 78

(1)      knowledge?
(2) A.   Yes, it is.
(3) Q.   I just want to correct one thing that's on this
(4)      charge.  It states here that you were employed
(5)      during the period of June 14, 2001, to June 7,
(6)      2003.  Do you still believe that those are the
(7)      dates?
(8) A.   It's November.  It's supposed to be November.
(9) Q.   Of what year?
(10) A.  2002.
(11) Q.  That you started working at Wal-Mart?
(12) A.  Yes.  The dates are wrong here.
(13) Q.  Okay, if you said it was November 2000, does
(14)     that --
(15) A.  Yes.
(16) Q.  Is it November 2000 then?
(17) A.  Yes.
(18) Q.  Okay, all right.
(19) A.  November 14th, 2000, is my first day that I
(20)     started.
(21)             ----
(22)     (Exhibit 16 marked for identification.)
(23)             ----
(24) BY MS. AHUMADA:
(25) Q.  Now, this is the Complaint that you filed

Page 79

(1)      against Wal-Mart?
(2) A.   Yes.
(3) Q.   Are you familiar with this document?
(4) A.   Yes, I am.
(5) Q.   And did you give your attorney permission to
(6)      fill out this Complaint?
(7) A.   Yes, I did.
(8) Q.   And if I could get you to look at Page 11 --
(9)      excuse me, not Page 11 -- Page 5, Paragraph 11.
(10)     Have a look at that, and let me know when
(11)     you've read it.
(12) A.  Yes.
(13) Q.  Okay, on how many occasions do you recall
(14)     leaving early due to your asthma?
(15)     Does that include like 15 minutes early?  How
(16)     early do you want?
(17) Q.  Well, when you didn't complete a full shift.
(18) A.  Oh.
(19) Q.  And you can give me a range of times.
(20) A.  Three.
(21) Q.  Okay.
(22) A.  Four maybe.
(23) Q.  Is your answer three to four?
(24) A.  Three to four, yes.
(25)     MR. DUFF:    Let me state something on

Page 80

(1)      the record.  As I'm looking at this, it says
(2)      November 2002.  I may have -- the year might be
(3)      wrong.  It might be from the beginning of her
(4)      employment is what I think I was saying, but it
(5)      says what it says.
(6)          MS. AHUMADA:    Okay, okay.
(7) BY MS. AHUMADA:
(8) Q.   And here it says again, on certain occasions,
(9)      ambulance were summoned to the Wal-Mart store
(10)     to remove you due to asthma?
(11) A.  Yes.
(12) Q.  We discussed this earlier.  Again, how many
(13)     times was that?  I think you had said three; is
(14)     that correct?
(15) A.  Three.  One was because of the cactus, because
(16)     of the allergic reaction.
(17) Q.  Is that not related to the asthma then?
(18) A.  Well, I had an asthma attack, and my throat
(19)     swelled shut and everything.  So that's how bad
(20)     it was.  It was severe.
(21) Q.  Let's discuss that incident.  I don't think
(22)     we've covered it as full as we did the other
(23)     two.
(24)     So you were working as a cashier; is
(25)     that correct?

Page 81

(1) A.  Yes.

(2) Q.  And someone was purchasing a cactus?

(3) A.  Yes.

(4) Q.  And you pricked your finger?

(5) A.  It fell over and hit my hand.  I didn't know I

(6)      was allergic to it.  I didn't know people could

(7)      be allergic to a cactus.

(8) Q.  You had an allergic reaction?

(9) A.  Yes.

(10) Q.  Who did you tell you were having this allergic

(11)     reaction?

(12) A.  Mike Cesosel (phonetic).  But he's no longer

(13)     with them.

(14) Q.  And what action did Mike take, if any?

(15) A.  Called management.

(16) Q.  And what did management do?

(17) A.  We went over and showed it to the pharmacist.

(18)     The pharmacist said to get some Benadryl.  I

(19)     got the Benadryl, took a couple of Benadryl,

(20)     and then the Benadryl didn't work.

(21)          And about 15 minutes later, my throat

(22)     started swelling shut, and I was on a register

(23)     at that time when it started to swell shut, and

(24)     I couldn't breathe.

(25) Q.  And up until that period, you didn't know you

Page 82

(1)      were allergic to this cactus?

(2) A.  No, I did not.

(3) Q.  And an ambulance was summoned for you?

(4) A.  Yes, it was.

(5) Q.  Now, you said you attribute this to asthma, is

(6)      that correct, or is this two separate things

(7)      that occurred, first you had an allergic

(8)      reaction and then you had an asthma attack?

(9) A.  Because of me being – the allergic reaction,

(10)     asthma, it set the asthma off.

(11) Q.  What were your symptoms?

(12) A.  Swelled finger, hives up the arm.  My throat

(13)     swelled shut, couldn't talk, nothing.  They

(14)     said if they didn't get there soon enough, I

(15)     would have died.

(16) Q.  How many days did you take off for that?

(17) A.  I was off for a long time because of the toxins

(18)     and everything.

(19) Q.  Do you recall how many days?

(20) A.  No, I do not.  But that's one of the papers

(21)     that are not there.

(22) Q.  So you did make a request for medical leave

(23)     following this?

(24) A.  Yes, I did, yes.

(25) Q.  And I know we've asked you this before, but

Page 83

(1)      just to clarify, it's not in the forms that

(2)      I've given you today?

(3) A.  Yes.

(4) Q.  But you do recall filling out a form and having

(5)      a physician fill it out?

(6) A.  Yes.

(7) Q.  And if I could just have your attention to

(8)      Paragraph 12, let me know when you've read

(9)      that.

(10) A.  Yes, that's the accident.

(11) Q.  Okay, early, you had stated you were on your

(12)     way to work, so you missed that day of work

(13)     because of the accident?

(14) A.  Yes.

(15) Q.  The next two days, you were recovering, but you

(16)     were not scheduled to work?

(17) A.  Yes.

(18) Q.  And is it correct that you came back to work on

(19)     the third day following the accident?

(20) A.  Yes.

(21) Q.  If you could look at Paragraph 13, let me know

(22)     once you read it.

(23) A.  Yes, I see that.

(24) Q.  Here, it says that you suffered great

(25)     difficulty and were forced to leave.  I just

Page 84

(1)      want to clarify what that statement means.  You

(2)      were forced to leave work from Wal-Mart, is

(3)      that what you mean?

(4)          MR. DUFF:   Are you asking if she was

(5)      forced to leave by somebody?

(6)          MS. AHUMADA:   Yeah, that's the

(7)      question, because I don't understand what that

(8)      paragraph says.

(9) BY MS. AHUMADA:

(10) Q.  Did someone make you leave work on –

(11) A.  Well, my doctor wanted to see me right away.

(12)     That's the day that I had the problem.

(13) Q.  But no one at Wal-Mart told you to leave work

(14)     that day?

(15) A.  Lisa said I should get to a doctor and should

(16)     go.

(17) Q.  Okay, when you say that you were suffering

(18)     great difficulty, what is that attributed to?

(19) A.  That was the heart pounding fast and the high

(20)     blood pressure and everything.

(21) Q.  That was the nervous condition that we

(22)     discussed earlier?

(23) A.  Yes.

(24) Q.  Were you ever diagnosed with anything due to

(25)     that?

BSA

DARLENE JACKSON VS WAL-MART STORES, INC., DEPOSITION OF DARLENE JACKSON, 9/15/05

XMAX(22/22)

**Page 85**

(1)A. No, I was not, no. They just said there was a
(2) lot of pressure that I was under at that time.
(3)Q. Okay, now, with regard to the car accident, did
(4) that have any effect on your asthma?
(5)A. No.
(6)Q. And with regard to the nervous condition, did
(7) that have any effect on your asthma?
(8)A. I do not remember if I ended up with an asthma
(9) attack on that one or not.
(10)Q. And who did you speak to about leaving work
(11) early on May 29th, 2003?
(12)A. First to one of the CSMs. I don't remember
(13) which one it was, and she said that we had to
(14) go to Lisa and talk to Lisa.
(15)Q. And what did Lisa tell you?
(16)A. She said if that's what the doctor said, you
(17) should go.
(18)Q. But the words forced to leave, no one at
(19) Wal-Mart scooted you out the door. They
(20) recommended you go to the doctor. Is that what
(21) that means?
(22)A. Yes, because I called the doctor and asked her
(23) if I should do something or what.
(24)Q. Okay, earlier you had told me that you also
(25) have dyslexia.

**Page 86**

(1)A. Yes.
(2)Q. Did that cause you to ever miss days from work
(3) at Wal-Mart?
(4)A. No. But it did cause me to sign some things
(5) that I did not understand.
(6)Q. And what things are those?
(7)A. Some of the papers in here.
(8)Q. Can you give me specifics?
(9)A. Well, this.
(10)Q. When you say this, can you tell me what?
(11)A. Document 6.
(12)Q. Okay, and that's the Wal-Mart matrix of
(13) essential job function form.
(14)A. Yes, No. 1 and 2.
(15)Q. You don't recall signing the acknowledgment or
(16) receiving the —
(17)A. I didn't understand it, but I signed it anyway.
(18)Q. When you say you don't understand it, what does
(19) that mean?
(20)A. Some things were jumbled to me.
(21)Q. Were they — did you make it known to anyone
(22) that you had dyslexia?
(23)A. Yes, I did. And they said just: Read it to
(24) the best of knowledge, because we're not
(25) allowed to read it to you.

**Page 87**

(1)Q. Okay, now, were you surprised when you were
(2) terminated from employment at Wal-Mart?
(3)A. Yes, I was, because I was told by Pete that
(4) everything was okay and not to worry about
(5) anything.
(6)Q. Okay, who told you you were terminated?
(7)A. Lisa Dolecki.
(8)Q. What did she tell you the reason was you were
(9) terminated?
(10)A. Absentees.
(11)Q. Is that all?
(12)A. That was it.
(13)Q. Now, what are you looking for out of this
(14) lawsuit? What do you hope to gain, if
(15) anything?
(16)A. My dig — I can't even pronounce it.
(17)Q. Take your time.
(18)A. It's a word that I've never been able to
(19) pronounce. But I just want to be able to go
(20) back into — I haven't been able to go back
(21) into Wal-Mart since this happened.
(22) Every time I go into Wal-Mart, I have
(23) an anxiety attack because I feel what they did
(24) to me was wrong. And Lisa was just trying to
(25) climb the ladder because everybody else was

**Page 88**

(1) okay with it, and I feel she really didn't
(2) understand.
(3)Q. Okay.
(4)A. And that really — it makes me emotional
(5) because Wal-Mart was the place I loved to shop.
(6) I loved that place. It was my second home.
(7) That's why, when they needed help, I'd go in
(8) and help them.
(9) This is very emotional because they
(10) don't know what they did to me when they did
(11) that to me. I know I have problems and
(12) everything. I know the asthma was a hard thing
(13) to deal with and stuff.
(14) But do they realize how hard it was
(15) for me to breathe? And I would work even if I
(16) was sick or not. When I was having problems,
(17) it took my doctor to say: If you don't take
(18) this time off, you're going to end up in the
(19) hospital and have more problems.
(20)Q. Now, you just stated — take your time if you
(21) need to. Let me know when you're ready.
(22)A. Go ahead.
(23)Q. Now, you've just told me that, when you shop at
(24) Wal-Mart, you have anxiety attacks. How often
(25) do you shop at Wal-Mart?

BSA            DARLENE JACKSON VS WAL-MART STORES, INC., DEPOSITION OF DARLENE JACKSON, 9/15/05            XMAX(23/23)

## Page 89

(1) A.  I have not been able to go there since I got my
(2)      last paycheck.
(3) Q.  Okay, so that one time that you went to get
(4)      your last paycheck, you had an anxiety attack?
(5) A.  Excuse me, there was one other time I did go in
(6)      to shop for my nephew's birthday, and that was
(7)      when I had the anxiety attack.
(8) Q.  Do you know when that was?
(9) A.  No, I don't.  It was shortly after.  It was
(10)     like two months after.  I think his birthday is
(11)     in August.
(12) Q.  Are you able to shop at other stores?
(13) A.  Yes.  I'm able to go to Target and stuff like
(14)     that and have no problems with it and
(15)     everything.
(16) Q.  Did you see anyone about your anxiety attack
(17)     that you had?
(18) A.  I had called my doctor and told him.
(19) Q.  And what did your doctor tell you?
(20) A.  That's when they upped my Zoloft to 200
(21)     milligrams.
(22) Q.  I'm sorry, does that mean that it was
(23)     increased?
(24) A.  Yes.
(25) Q.  Is your Zoloft still at 200 milligrams?

## Page 90

(1) A.  Yes, it is.
(2) Q.  Were you diagnosed with any condition related
(3)      to that anxiety attack?
(4) A.  No.  I do have anxiety when I run into Lisa or
(5)      Pete other places.
(6) Q.  How often do you run into them?
(7) A.  I haven't ran into them in a while.  Lisa was
(8)      just a couple of weeks ago, but I haven't ran
(9)      into Pete in a long time.
(10) Q.  Did you speak with Lisa Dolecki?
(11) A.  No, I did not.
(12) Q.  And you said it's been awhile since you've seen
(13)     Pete.  When was the last time you spoke with
(14)     Pete?
(15) A.  The last day I was in getting my paycheck.
(16) Q.  Is that the last time you also saw him?
(17) A.  Yes -- no.  Excuse me, I saw him at a
(18)     restaurant.  I was walking out, and he was
(19)     walking in.
(20) Q.  And did you speak with him then?
(21) A.  No, we did not.
(22) Q.  Besides the anxiety attack that you had when
(23)     you went back to Wal-Mart, have you had any
(24)     other emotional problems or issues related to
(25)     your lawsuit?

## Page 91

(1) A.  No.
(2) Q.  Okay, what kind of economic damages have you
(3)      had?
(4) A.  Well, second income.  We almost lost our home.
(5)      A couple times our utilities have been to the
(6)      point where they were going to cancel them.
(7) Q.  Were they ever turned off?
(8) A.  No.
(9) Q.  Now, earlier you had told me that you had had a
(10)     nervous condition while you worked at Wal-Mart
(11)     related to personal matters related to your
(12)     marriage; is that correct?
(13) A.  Yes.
(14) Q.  And then prior to that, you also told me that
(15)     after the birth of your second child —
(16) A.  Yes.
(17) Q.  — you had post-partum issues?
(18) A.  Post-partum depression.
(19) Q.  Have any of those conditions worsened since
(20)     you've been terminated from Wal-Mart?
(21) A.  Well, the Zoloft went up.
(22) Q.  But you were on Zoloft prior?
(23) A.  Yes.  But I was only on 50 milligrams.
(24) Q.  Okay, I'm sorry.  So you went from 50
(25)     milligrams of Zoloft to 200?

## Page 92

(1) A.  Yes.
(2) Q.  Did your doctor give you any diagnosis?
(3) A.  No.
(4) Q.  Earlier you had said depression.  Is that a
(5)      diagnosis that you've received in the past?
(6) A.  Yes.
(7) Q.  Are you still being treated for depression?
(8) A.  Yes.  I'm still on the Zoloft.
(9) Q.  And the Zoloft, just to clarify, is not related
(10)     to the asthma?
(11) A.  No, it is not.
(12) Q.  Have you had any other health problems that are
(13)     related to the claims that you filed against
(14)     Wal-Mart?
(15) A.  No.  Are you speaking about having asthma
(16)     attacks since I've worked at Wal-Mart?
(17) Q.  No; any other condition that you attribute to
(18)     the fact that you were terminated.
(19) A.  No.
(20) Q.  Are you also seeking to compensate for loss of
(21)     any benefits?
(22) A.  You mean insurance benefits, my insurance and
(23)     stuff?
(24) Q.  Yes.
(25) A.  I haven't really thought about — I just — I

Page 93

(1) didn't think about any of that. Yeah, because
(2) we have no insurance.
(3) Q. Did you have insurance when you worked at
(4) Wal-Mart?
(5) A. Yes, I did.
(6) Q. And did that cover just yourself?
(7) A. No. It covered my whole family, my son, my
(8) daughter, my husband and I.
(9) Q. Now, you said that your husband was
(10) self-employed?
(11) A. Yes.
(12) Q. Does he have insurance through his company?
(13) A. No, he does not.
(14) Q. Now, after you were terminated from Wal-Mart,
(15) did you look for other jobs?
(16) A. No, I did not, not right away.
(17) Q. Why?
(18) A. Anxiety, the anxiety. I did put in one
(19) application at one place, and they told me that
(20) they couldn't hire me.
(21) Q. And what place was that?
(22) A. Dollar General.
(23) Q. I'm sorry, what is that?
(24) A. Dollar General.
(25) Q. And where did they say that they couldn't hire

Page 94

(1) you?
(2) A. They just didn't give a reason.
(3) Q. Have you submitted any other applications for
(4) employment?
(5) A. I'm working now.
(6) Q. Okay, and when did you start working for -- I'm
(7) sorry, I forgot that.
(8) A. For Brenda.
(9) Q. Brenda, and her last name?
(10) A. Robinson.
(11) Q. Brenda Robinson, when did you start working for
(12) Brenda Robinson?
(13) A. Oh, about two months ago, two or three months
(14) ago.
(15) Q. Was that the beginning of July, the end of
(16) July?
(17) A. I think the end of -- middle of July, if
(18) I'm not mistaken.
(19) Q. So in the period of June 2003 when you were
(20) terminated from your employment until July,
(21) sometime in the middle of July of 2005, you did
(22) not have any employment?
(23) A. No, I did not.
(24) Q. And during that time period, you only applied
(25) at one place of employment, and that was Dollar

Page 95

(1) General?
(2) A. Yes.
(3) Q. Which I take to be just a convenient store? Is
(4) that what that is?
(5) A. Almost like a thrift convenient store. I'm not
(6) sure what it is.
(7) Q. What kind of position were you looking for
(8) there?
(9) A. Cashier.
(10) Q. And again, that was the only application that
(11) you submitted in that period?
(12) A. Yes.
(13) Q. Did you look through want ads? Did you look
(14) for other employment opportunities?
(15) A. I looked. But every time I looked, I just -- I
(16) said: I don't want to go through this again.
(17) Q. You didn't want to work that period?
(18) A. No. It was like anxiety took over. It was
(19) like, I can't do this.
(20) Q. So what changed in July of 2005?
(21) A. Brenda became disabled. She had to quit her --
(22) she owned her own business, and I just -- she
(23) needed rides to places and things. And she got
(24) through CRI. Don't ask me what the initials
(25) stand for, but she gets -- I work through them

Page 96

(1) for her.
(2) Q. Okay, and what is the name of the company?
(3) A. CSI, I think it is.
(4) Q. And you are their employee?
(5) A. Or CIS? See, they give me my paycheck, but
(6) she's my boss. So I don't know how that works.
(7) Q. But you get a paycheck from CSI or CIS? We're
(8) not sure of the name.
(9) A. Yes.
(10) Q. And they have you go to Brenda's home and take
(11) care of Brenda?
(12) A. No. Brenda does the hiring and firing, and she
(13) does the interview and everything and the
(14) paperwork and stuff. She does everything,
(15) but--
(16) Q. And what do you do? What are your job duties?
(17) A. A take her to her appointments. Now, it's just
(18) limited because there's some times I just can't
(19) get to places because she knows my husband and
(20) everything; appointments, helped her with her
(21) daughter, helped her clean her home, did her
(22) dishes, but that was -- that's all that you
(23) really do.
(24) Q. Is this a full-time job?
(25) A. No.

### Page 97

(1) Q. How many hours do you work a week?

(2) A. Sometimes I can work a 40-hour week. Sometimes
(3) it could be one day a week. Sometimes it could
(4) be two hours, three hours.

(5) Q. And how are you paid? Hourly?

(6) A. Yes.

(7) Q. So if you only work one day, you're just paid
(8) for that one day?

(9) A. Yes.

(10) Q. If you worked 40 hours, you're paid for every
(11) one of those 40 hours?

(12) A. Yes.

(13) Q. So each of your paychecks could be different in
(14) the amount of the paycheck?

(15) A. Yes.

(16) Q. And what is your hourly rate?

(17) A. Eight twenty-five.

(18) Q. Now, what was different about this position —
(19) let me rephrase that.

(20)     Earlier you had said you had anxiety
(21) about applying for other positions, so that's
(22) the reason that you didn't apply for positions.
(23) What was different about this position that let
(24) you get over that anxiety?

(25) A. Brenda knows me. Brenda knows what my

### Page 98

(1) limitations are. She knows what I can and
(2) can't do. I didn't have to go through and
(3) explain everything to her. She knows that I'm
(4) dyslexic. She knows that I have the asthma.
(5) She knows the post-partum depression. She's
(6) been through it all with me.

(7) Q. Have you started any businesses with your
(8) husband?

(9) A. No, I have not.

(10) Q. Do you work at all for his business?

(11) A. No, I do not. Some paperwork, but I don't get
(12) paid.

(13) Q. And I'm sorry, what is it that he does again?

(14) A. He's a truck driver.

(15) Q. Okay, so if you help out with paperwork and so
(16) forth, you don't get compensated for that?

(17) A. No.

(18)     MS. AHUMADA:    If we could just take a
(19) break, I'm going to review my notes for a
(20) minute.

(21)     - - - -

(22) (There was a recess in the proceedings.)

(23)     - - - -

(24) BY MS. AHUMADA:

(25) Q. Now, earlier we had discussed that you had

### Page 99

(1) received a D-day coaching, and the day that you
(2) received that was February 15th, 2003?

(3) A. Yes.

(4) Q. And earlier we had looked at an attendance
(5) policy that you were given. It's titled
(6) Wal-Mart Corporate Policy Attendance and
(7) Punctuality. It is there if you want to pull
(8) it out. It's one of your exhibits. You just
(9) had it.

(10) A. Did I? Okay, thank you.

(11) Q. And that's Jackson 3.

(12) A. Yes.

(13) Q. Okay, if you look at the last page, do you
(14) agree that you were given this form just a
(15) couple days after you received the D-day
(16) coaching?

(17) A. Yes.

(18) Q. And at that time, Lisa Dolecki, did she review
(19) with you Wal-Mart's policy with regard to
(20) attendance?

(21) A. Yes.

(22) Q. And do you remember being told that you could
(23) not call out on unexcused absences until August
(24) 17, 2003?

(25) A. Yes. And I asked her what that meant,

### Page 100

(1) unexcused absence, and I asked if that
(2) pertained to doctors' excuses or not. And she
(3) did not answer me.

(4) Q. And the last exhibit we have --

(5)     - - - -

(6) (Exhibit 17 marked for identification.)

(7)     - - - -

(8) BY MS. AHUMADA:

(9) Q. The last exhibit we have is a document you
(10) mentioned earlier, your exit interview. Is
(11) that your date -- excuse me, your signature and
(12) the date, 6-7-03, at the bottom of the page?

(13) A. Yes.

(14) Q. What did Lisa explain to you when she gave you
(15) this form?

(16) A. She just told me I was terminated because of
(17) too many absences.

(18) Q. And do you know what a rolling six-month period
(19) means?

(20) A. Yes, I do.

(21) Q. What does it mean?

(22) A. You have six months. You can't have so many
(23) absences in those six months. Then the next
(24) six months, you have so many absences you're
(25) allowed to have.

Page 101

(1) Q. So is it fair to say that once a six-month
(2)    period has elapsed, from any -- any unexcused
(3)    absences you have at that point are cleared?
(4) A. Yes.
(5) Q. Once you start incurring new absences within
(6)    the new six-month period, those are towards the
(7)    policy. Do you agree?
(8) A. Yes.
(9) Q. So if you called in sick, let's say, sometime
(10)    in 2003, eight months later, you call in sick,
(11)    and do you agree that the previous call-out
(12)    does not count towards the new rolling
(13)    six-month period?
(14) A. That's what I understood what it means.
(15) Q. Okay, all right.
(16) A. I do have one -- something to say.
(17)    MR. DUFF: Go ahead.
(18) A. Okay? I forgot what I was doing to say.
(19)    MR. DUFF: I do have a question, one
(20)    or two questions.
(21)    MS. AHUMADA: Let me finish.
(22)    MR. DUFF: I'm sorry I thought you
(23)    were done.
(24)    MS. AHUMADA: I'm getting there I'm
(25)    very close.

Page 102

(1) BY MS. AHUMADA:
(2) Q. Of all the answers that you've given me, is
(3)    there anything that you want to clarify?
(4) A. Not that I can think of.
(5) Q. Okay, now, because Wal-Mart received your
(6)    medical records and other responsive documents
(7)    yesterday, we have reserved the right to call
(8)    you back for another deposition. Your attorney
(9)    has agreed to that. Do you understand?
(10) A. Yes, I do.
(11)    MS. AHUMADA: Okay, great. That's
(12)    it. Mr. Duff?
(13)    - - - -
(14)    EXAMINATION
(15)    - - - -
(16) BY MR. DUFF:
(17) Q. I just have one question, Darlene. Are you
(18)    able to predict when you might have an asthma
(19)    attack?
(20) A. No, I cannot predict.
(21) Q. Okay, and when you were terminated, was the
(22)    fact -- was the coaching form regarding the
(23)    insufficient funds check? Was that mentioned
(24)    at all?
(25) A. When I was terminated?

Page 103

(1) Q. Yes.
(2) A. No, it was not.
(3)    MS. AHUMADA: Okay, those are all the
(4)    questions I have.
(5)    THE WITNESS: There is one thing I
(6)    did want to ask her or say. I don't understand
(7)    what they mean by unexcused absence. When I
(8)    gave them my absentees, they said they were
(9)    excused. They were accepted. Why is there a
(10)    question on my absentees then if those ones
(11)    that I do have excuses for, there's questions
(12)    about?
(13)    MR. DUFF: She's not required to
(14)    answer questions here.
(15)    THE WITNESS: Okay, well, I just
(16)    wanted to --
(17)    MR. DUFF: We'll get to all that.
(18)    - - - -
(19)    RE-EXAMINATION
(20)    - - - -
(21) BY MS. AHUMADA:
(22) Q. I just have one follow-up question. Did you
(23)    ever ask anyone at Wal-Mart to explain to you
(24)    what an unexcused absence was?
(25) A. Yes. They said that it was one that we don't

Page 104

(1)    give an okay to. We don't accept. And all the
(2)    ones that I had were accepted.
(3) Q. And what do you mean they were accepted?
(4) A. Pete said that everything was okay, that not to
(5)    worry about it, that these were a legal excuse.
(6) Q. What do you mean legal excuse?
(7) A. Legal absence.
(8) Q. I'm not sure I understand the term legal. The
(9)    opposite of that would be illegal. Is that
(10)    what you mean?
(11) A. Well, they were excused. They weren't
(12)    unexcused. They were excused. They were okay
(13)    to have.
(14) Q. When you were given your performance reviews,
(15)    did you have any questions about what an
(16)    unexcused absence was?
(17) A. No. But the things there too, it doesn't say
(18)    unexcused. It says absence. It doesn't say
(19)    unexcused absence. It just says absence.
(20)    MS. AHUMADA: Okay, I have no further
(21)    questions.
(22)    THE WITNESS: Okay.
(23)    MR. DUFF: I don't either, and we
(24)    will read.
(25)    - - - -

## Page 105

(1)   (The proceedings were concluded at 11:08 a.m.)

(2)       - - - -

(3)

(4)

(5)

(6)

(7)

(8)

(9)

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

## Page 106

(1) COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE

(2) COUNTY OF ALLEGHENY          )  SS:

(3)    I, Kristina Kircher, a Court Reporter and

(4) Notary Public in and for the Commonwealth of

(5) Pennsylvania, do hereby certify that the witness,

(6) DARLENE JACKSON, was by me first duly sworn to

(7) testify to the truth; that the foregoing deposition

(8) was taken at the time and place stated herein; and

(9) that the said deposition was recorded

(10) stenographically by me and then reduced to printing

(11) under my direction, and constitutes a true record of

(12) the testimony given by said witness.

(13)    I further certify that the inspection, reading

(14) and signing of said deposition were NOT waived by

(15) counsel for the respective parties and by the

(16) witness.

(17)    I further certify that I am not a relative or

(18) employee of any of the parties, or a relative or

(19) employee of either counsel, and that I am in no way

(20) interested directly or indirectly in this action.

(21)    IN WITNESS WHEREOF, I have hereunto set my hand

(22) and affixed my seal of office this 27th day of

(23) September, 2005.

(24)

        _____

(25)        Notary Public

## Page 107

(1) COMMONWEALTH OF PENNSYLVANIA  )    E R R A T A
    COUNTY OF ALLEGHENY      )    S H E E T

(2)

    I, DARLENE JACKSON, have read the foregoing

(3) pages of my deposition given on Thursday, September

   15, 2005, and wish to make the following, if any,

(4) amendments, additions, deletions or corrections:

(5) Page/Line  Should Read      Reason for Change

(6)

(7)

(8)

(9)

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

    In all other respects, the transcript is true and

(20) correct.

(21)
        _____
                DARLENE JACKSON
(22)

    Subscribed and sworn to before me this

(23) _____ day of _____, 2005.

(24) _____
        Notary Public

(25)    AKF Reference No. KK89821

## Page 108

(1)    AKF REPORTERS, INC.
        Jones School Square
(2)      150 East Eighth Street
         Erie, PA  16501
(3)       (814) 453-5700
(4)
    September 27, 2005
(5)
    TO: Sean Duff, Esq.
(6)
(7)    RE: DEPOSITION OF DARLENE JACKSON
(8)    NOTICE OF NON-WAIVER OF SIGNATURE
(9)    Please have the deponent read her deposition
    transcript.  All corrections are to be noted on the
(10) preceding Errata Sheet.
(11)    Upon completion of the above, the Deponent must
    affix her signature on the Errata Sheet, and it is to
(12) then be notarized.
(13)    Please forward the signed original of the
    Errata Sheet to Lorena Ahumada, Esq., for attachment
(14) to the original transcript, which is in her
    possession.  Send a copy of same to all counsel, and
(15) also a copy to me.
(16)    Please return the completed Errata Sheet within
    thirty (30) days of receipt hereof.
(17)
(18)
(19) Kristina Kircher
    Court Reporter
(20)
(21)
(22)
(23)
(24)
(25)

# EXHIBIT B

# Hourly Associate Information Sheet

In order to ensure compliance with those laws and regulations requiring us to file annual statistical reports concerning the make-up of our workforce, we request your assistance in completing the following form. This information is requested solely for reporting purposes and will not be used in any decision affecting your continued status as an Associate of Wal-Mart Stores, Inc. (After the Associate fills out this form, enter the information in Time and Attendance and retain the form in the Associate's personnel file at the store.)

\* Do not fill in this information, it will be filled in by the Personnel Manager

Social Security Number __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__  \*Store Number __2561__    \*Associate ID Number __495__

Last Name: __Jackson__    First Name: __Darlene__    Middle Initial __V__
(Please write your name __exactly__ as it appears on your social security card)

First name as it should appear on name badge: __Darlene__

Address: __7650 Royann Dr.__

City: __Fairview__    State: __Pa.__    Country: __Erie__    Zip Code: __16415__

Home Phone: __474-2375__    Alt. Phone: _____    Work Phone X: _____

Birth Date: __4-18-61__    \*Hire Date: __11-14-05__

Federal Dependents: __0__    (As appears on your W-4)

EEOC Code: __1__    (1-White, 2-Black, 3-Hispanic, 4-Asian or Pacific Island, 5-American Indian or Alaskan Native)

State Dependents: __0__    Sex: __F__    (Male/Female)

Actual Marital: __V__    Tax Marital: __M__    (S – Single, M – Married, H – Head of Household)

Language Code: __E__    (E - English, S - Spanish, F - French)

\*Associate Type: __F__    (Full-time, Peak-Time, Temporary)    \*Division Number: __1__

\*Department Number: __7__    \*Job Code: __201__    \*Pay Rate: __6__

Emergency Information:

Name: __P. Scott Jackson__    Name: __Ron Jackson__
Address: __7650 Royann Dr.__    Address: __4692 Duncan Rd__
City: __Fairview__    State: __Pa.__    City: __Erie__    State: __16506__
Zip: __16415__ Phone: __474-2375 or    Zip: __16506__ Phone: __833-4743__
__450-2253__

In the event my employment with Wal-Mart Stores, Inc. is terminated for any reason, the following person will always know where I can be reached or what my forwarding address will be. DO NOT include your spouse or a member of your immediate family.

Name: _____

Address: _____

City: _____    State: _____

Zip: _____    Phone: _____

# EXHIBIT C

WMP-32 (REV. 7/94)

## ASSOCIATE'S COMMENDATION FORM

NAME: _Darlene Jankson_    SS# _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_    STORE # _2561_
DATE HIRED: _11/14/2000_    POSITION: _Sales Clerk_

This form is to be used to recognize any action for which an associate should be commended.  Please give all the details, including dates.

_Darlene was hired as a free time temporary for the_
_holiday. We have decide to continue her employment_
_in the shoe dept part time + shared with division 1_
_as cashier._
_If a free time position should become available_
_in shoes and her work performance continues_
_to be above standard, we will give her the_
_opportunity to take that increase in status._

If a change in position occurs, please fill out the following:

POSITION:       FROM: _Sales Clerk (201)_       TO: _____
DEPARTMENT:     FROM: _7 · toys_                 TO: _25 and Checkout_
SALARY:         FROM: _$6.00_                    TO: _$6.26_
STATUS:         FROM: _X_ F   P   T  _Λ_        TO: _X_ F   P   T
** F = FULL TIME ** P = PART TIME ** T = TEMPORARY **

ASSOCIATE SIGNATURE _Darlene Jackson_        DATE: _12·28·00_
MANAGER'S APPROVAL _Lisa Doll_               DATE: _12-28-00_
EFFECTIVE DATE _12-29-00_

COPIES TO ASSOCIATE'S PERSONNEL FILE

# EXHIBIT D

## PRIMARY CARE PARTNERS

| | |
|---|---|
| 7-01 dani | Called Pt and told her negative strep — stated "I went to Dr. Beck and I have pneumonia" Blueberg MJ |

| | |
|---|---|
| 140 | ☐ OFFICE CANCELLED<br>☐ RESCHEDULED APPOINTMENT<br>☐ PATIENT CANCELLED<br>☑ NO SHOW | R FOOT injury / Hamot ER 12-12 Ex MJ |

| | |
|---|---|
| 4/02 | ® eyelid upper swollen x 2d<br>⊕ itch ⊕ pain ⊖ watery, ⊖ d/c<br>Dr Satterwald 1-15-02 at 10:30 |

---

**PATIENT: JACKSON, DARLENE**   **DOB: 4-18-61**   **DATE: 1-14-01**   **DR. SPELLACY**

40 YO presents to the office today w/c/o rt eye pain particularly in the RU lid which has been present for 2 days.  It is swollen and she states it started like little blisters which have since resolved and it is painful w/occas blurred vision. No itchiness. No watery eyes. No discharge from the eye.

PE: HEENT: Unremarkable. EYES were PERRLA, EOMI.  Sclera was clear.  No discharge noted.  The eyelid on the RU was erythematous and uncomfortable to palpation.

ASSESSMENT/PLAN: Questionable sty vs underlying herpetic infection of the lid w/questionable hx of blisters.  I am going to refer to Ophthalmology for further eval.  In the meantime I will start her on Garamycin Ophthalmic Solution to be used as directed.  If there are any other problems, she should call. Otherwise we will see this pt back prn.

Michael Spellacy, DO _____     rsb

---

**WHILE YOU WERE OUT**  To **Spellacy-**     4-18-61

Date **8-20-02**  Time **230** AM PM M **Jackson, Vera Darlene**

From _____  PHONE (___) **474- 2375**

**LEFT THIS MESSAGE** Needs Release to work slip.
By 7:00 am. Tomorrow.
Was in Hamot - and released yesterday
And was advised to get 1 wk appt
But she will need a work Release
Dr Discharge paper said normal routine
But needs to ____ it site can return
to work.

Reply: _____  Dr. Signature (aware Dr spellary out)

8/20/02
Has been ____
____ ____
Needs ____ ____
____ Release out to
be return to
work ____ to
935-0371 ____
Williamsville ____

---

D 001

DATE                                    PRIMARY CARE PARTNERS

**WHILE YOU WERE OUT** To _Spellacy_
Date _8-21-02_  Time _830_ (AM) PM  M _Darlene Jackson_
From _____  PHONE (___) _474-2375_
**LEFT THIS MESSAGE** _Need Dr's release to_
_go back to work - Needs faxed_
_to Walmart - needs to know if_
_its done_                                    INIT: _BB_

Reply: _____
_____ Dr. Signature _____ OK → _MH_ _____

8-26-02  WT 244½ #  HT 64 in   BP 138/80
presents for Hosp flu Chest pains.
Pain is totally gone now.                    BB

cc: recheck from hospital × 1 wk
      Aug 16 - 19th - chest pains radiated down ① arm
                                          tingling in ① arm
Admits SOB, chills, clammy, pale, dizziness
Sx resolved now 8-26 - no problems

PMH: Asthma , Depression , Gestational DM × 9 yr ago - no longer has
      Ø CAD, stroke, HTN, CA, hyperlipidemia

FH: BRCA - Great Aunt
mother - DM, skin CA, heart problems
father - unsure
Allergies - erythromycin - anaphylaxis
              dermabond - anaphylaxis
              rest unsure
              Bee Stings - anaphylaxis, blood poisoning
              Peanuts - anaphylaxis
Meds: Zoloft 100mg
        Inhalers - Aerobid

D 002

Jackson                                         MH

ATE

PRIMARY CARE PARTNERS

**PATIENT: JACKSON, DARLENE**     **DOB: 4-18-61**     **DATE: 8-26-02**     **DR. SPELLACY**

41 YO who presents to the office today w/the above-noted c/o being in the hosp admitted for CP to r/o cardiac, and apparently did r/o, although I do not have any reports at this point; I will get them and review them once here. She states she had a Stress Test which was found to be neg. They did note she was slightly anemic but did not start her on anything. The rest of her hx is as noted above; it was reviewed and is correct.

PE: HEENT: Unremarkable. NECK: Supple w/o nodes or bruits. HEART: RRR w/o ectopy or murmur. LUNGS: CTA bil. ABD: Soft. EXTR: Reveal no edema.

ASSESSMENT/PLAN: Atypical CP, unsure of etiology, however, she did r/o for cardiac. I will obtain records making sure that a FLP was done as well as an anemia profile. Pending the results of that, I will make further recommendations. I did give her info today on iron deficiency, anemia and diet to start. Call if there are any other questions or concerns. Otherwise we will see this pt back in 1-2 mos for a gen f/up.

Michael Spellacy, DO _____ rsb

5/9/03     Wt - 240#          Temp 97.6/0

C/o asthma / chest is tight
"No air"
Sx off on x 2 weeks - inhalers    J. Sciallo cpm
were helping - but Ø now.
Cough prod green mucous

**PATIENT: JACKSON, VERA**     **DOB: 4-18-61**     **DATE: 5-9-03**     **SPELLACY**

2 YO who presents to the office today stating that for the last 2 wks she has been sick w/cough, over the last 24-48 hrs she lost her voice, and now is having a harder time breathing. She has a hx of allergies. She has a hx of asthma. She is currently taking Advair 250/50, 1 puff bid, Albuterol q 4 hrs w/minimal relief. She also has Azmacort but she is not using that at present. Outside of that, she states her 2 kids have been sick as well. Otherwise she does have a hx of recurrent UR problems around this time of yr and this could questionably be allergies.

PE: HEENT: Reveals TMs to be clear. Nares patent. Pharynx unremarkable.   NECK: Supple w/o nodes or bruits. HEART: RRR. LUNGS: Revealed decreased breath sounds throughout. Neb treatment was given and she did have clearer lung fields and better air flow.

ASSESSMENT/PLAN:

1. Acute exacerbation of asthma.
2. Seasonal allergies, triggering #1.

Plan at this point is Albuterol neb given to the pt to take home to use q 4 hrs. I want her to start using her Azmacort 2 puffs bid. Along w/this, continue the Advair. She can use her Albuterol inhaler, just prn at this point. More imptly, I offered Prednisone but she states she gets sick on this so we will try to get her through this w/nebs. Also I am going to give her Allegra 60 mg bid to take for allergy symptoms. If her symptoms progress or do not improve, consider ER vs further treatment.

Michael Spellacy, DO _____ rsb

AME: Jackson,
Darlene



D 003

DATE                    PRIMARY CARE PARTNERS

**WHILE YOU WERE OUT** To (Spellacy)      4-18-61
Date 5-13-03 Time 2:15 AM (PM) M Jackson, Darlene
From      Self      PHONE (__) 474-2375
**LEFT THIS MESSAGE** Pt. Calling Abt
Allergy test results
done Fri (5-9)
2nd allergy testing takes untilend
of Jun. Pt advised will      INIT.: (SV
Reply be notified when results received - SS
_____ Dr Signature _____

**WHILE YOU WERE OUT** To (Spellacy)    4-18-61
Date 5-16-03 Time 1:40 AM (PM) M Jackson, Darlene (verb) 5/16/03 2:20 p.m.
From      Self      PHONE (__) 474-2375
**LEFT THIS MESSAGE** Calling abt Allergy      pt advised of
Test Results from last Fri.      results.
                                                      K Scrallau

_____ INIT.: (SV

**WHILE YOU WERE OUT** To Spellacy
Date 5-16-03   Time 230 AM (PM) M Darlene Jackson
From      PHONE (__) 474-2375
**LEFT THIS MESSAGE** Pt. asking
① in blood test for allergies
better than "scratch test"? - not as complete
② Pt took allergy pill before going
for lab test Will that      INIT.: KS
Reply affect results? [ no it should not
_____ Dr Signature _____
Pt. informed of above
Jta McCullough LPN

**D 004**

# Primary Care Partners
*Family Medicine & Obstetrics*

7287 West Ridge Road • Fairview, PA 16415
(814) 474-1822 • Fax: (814) 474-3561

Dear ___Dr. Irene___    Date: __5-15-03__

The following lab work you had done is noted below:

✓ **is a normal result,** ✗ **is an abnormal result**

_____Complete Blood Count                    _____Fasting Glucose (<110)

_____Kidney Test                             _____Random Glucose (<200)

_____Liver Test                              _____3 Month Glucose Test_____(Should be < 7%)

_____Thyroid Test                            _____Iron

_____Cholesterol_____Should be_____      _____Stress Test, Holter Monitor, Echocardiogram

_____Bad Cholesterol_____Should be_____  _____Throat Culture

_____Good Cholesterol_____Should be_____ _____Mammogram - Repeat  (1 yr.)

_____Triglycerides_____Should be_____    _____Pap Test - Repeat (1yr.)

_____Prostate (<4.0)                         _____Breathing Test

_____Potassium                               _____Dexascan _____Osteopenia _____Osteoporosis

_____Urine                                   _____Stool for Blood

_____Other                                   _____(_____) MRI, CAT Scan, Ultrasound, X-ray, Other

_____(_____) Biopsy

*************** All of your allergy blood testing ***************
was negative.

_____Please keep your next appointment.

_____Please call the office for an appointment.

_____Enclosed is additional lab work for you.  Please obtain      _____ when able

                                                                 _____ ASAP

                                                                 _____ weeks after starting _____.

                                                                 _____ fasting 8 hrs, 12 hrs

                                                                 _____ 1 week before your next appointment

                                                                 _____ every _____ months

_____Enclosed is the treatment for the above abnormal results.  Instructions:_____

_____

_____Enclosed is the patient education material.

MEDICATION:

_____Continue the same Medication.

_____Discontinue_____

_____Start_____



**Hamot**

D 005

PCP-09 (10/02)

# ACL
a QUEST Diagnostics, Inc. Affiliate

1526 PEACH STREET

ERIE, PA 16501

Mary Ellen Reitz, M.D.
Medical Director

| Patient Name | Client Services Helpline | Billing Helpline | Date Collected | Time Collected |
|---|---|---|---|---|
| JACKSON, DARLENE | (814) 461-2400 | (814) 461-2430 | 05/09/2003 | 5:05 |

Patient Phone Number
314 474-2375

Patient I.D./Social Security Number
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

Referring Physician
SPELLACY, MICHAEL D

450005    32-60-099
PRIMARY CARE PARTNERS
7287 WEST RIDGE ROAD
FAIRVIEW, PA 16415

| Date Received | Date of Report |
|---|---|
| 05/09/2003 | 05/15/2003 |

| Sex | Age | ID Number |
|---|---|---|
| F | 42 | |

| Specimen Number | Accession Number |
|---|---|
| | EI133341L |

| TEST PROCEDURE | TEST RESULT | UNITS | REFERENCE RANGE |
|---|---|---|---|
| ======== FOODS ======== | | | |
| CODFISH (F3) IGE | < 0.35 | KU/L | LESS THAN 0.35 P |
| | 40 | % REF. | P |
| ASM CLASS | CLASS 0 | | |
| CORN (F8) IGE | < 0.35 | KU/L | LESS THAN 0.35 P |
| | 48 | % REF. | P |
| ASM CLASS | CLASS 0 | | |
| EGG WHITE (F1) IGE | < 0.35 | KU/L | LESS THAN 0.35 P |
| | 52 | % REF. | P |
| ASM CLASS | CLASS 0 | | |
| MILK (F2) IGE | < 0.35 | KU/L | LESS THAN 0.35 P |
| | 44 | % REF. | P |
| ASM CLASS | CLASS 0 | | |
| PEANUT (F13) IGE | < 0.35 | KU/L | LESS THAN 0.35 P |
| | 40 | % REF. | P |
| ASM CLASS | CLASS 0 | | |
| SHRIMP (F24) IGE | < 0.35 | KU/L | LESS THAN 0.35 P |
| | 41 | % REF. | P |
| ASM CLASS | CLASS 0 | | |
| SOYBEAN (F14) IGE | < 0.35 | KU/L | LESS THAN 0.35 P |
| | 44 | % REF. | P |
| ASM CLASS | CLASS 0 | | |
| WHEAT (F4) IGE | < 0.35 | KU/L | LESS THAN 0.35 P |
| | 54 | % REF. | P |
| ASM CLASS | CLASS 0 | | |

** SEE RAST INTERPRETATION ON FOLLOWING PAGE **

advise
all

MAY 15 2003

PAGE 1: CONTINUED ON PAGE: 2

D 006

5-15-03 Sent letter to advise (SY)

# ACL

a QUEST Diagnostics, Inc. Affiliate

**CLINICAL LABORATORY REPORT**

1526 PEACH STREET

ERIE, PA 16501

Mary Ellen Reitz, M.D.
Medical Director

| | | | | | |
|---|---|---|---|---|---|
| **Patient Name** | **Client Services Helpline** | **Billing Helpline** | | **Date Collected** | **Time Collected** |
| JACKSON, DARLENE | (814) 461-2400 | (814) 461-2430 | | 05/09/2003 | 15:05 |

**Patient Phone Number**
814 474-2375

**Patient I.D./Social Security Number**
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

**Referring Physician**
SPELLACY, MICHAEL D

450005   32-60-099
PRIMARY CARE PARTNERS
7287 WEST RIDGE ROAD
FAIRVIEW, PA  16415

| | |
|---|---|
| **Date Received** | **Date of Report** |
| 05/09/2003 | 05/15/2003 |
| **Sex** | **Age** |
| F | 42 |
| **Specimen Number** | **ID Number** |
| | |
| | **Accession Number** |
| | EI133341L |

| TEST PROCEDURE | TEST RESULT | UNITS | REFERENCE RANGE |
|---|---|---|---|

GUIDE TO INTERPRETATION OF ALLERGEN-SPECIFIC IGE LEVELS:

| | | |
|---|---|---|
| < 0.35 | KIU/L | - ANTIBODY ABSENT OR UNDETECTABLE LEVEL |
| 0.35 - 0.70 | KIU/L | - ANTIBODY LEVEL LOW |
| 0.71 - 3.50 | KIU/L | - ANTIBODY LEVEL MODERATE |
| 3.51 - 17.5 | KIU/L | - ANTIBODY LEVEL HIGH |
| > 17.5 | KIU/L | - ANTIBODY LEVEL VERY HIGH |

ALLERGEN-SPECIFIC IGE INTERPRETATION OF RESULTS:

| *ASM CLASS | ASM % REF | |
|---|---|---|
| 0 | < 70 | INCREASING |
| 1 | 70 - 109 | LEVELS |
| 2 | 110 - 219 | OF |
| 3 | 220 - 599 | ALLERGY |
| 4 | 600 - 1999 | SENSITIVITY |
| 5 | 2000 - 5999 | |
| 6 | > 5999 | |

*ASM (ALTERNATE SCORING METHOD)- EQUIVALENT TO MODIFIED RAST

| | | | |
|---|---|---|---|
| E, SERUM | 111 | KIU/L | <115 P |
| ======= MOLDS ========= | | | |
| TERNARIA TENUIS (M6) IGE | < 0.35 | KIU/L | LESS THAN 0.35 P |
| ASM CLASS | 52 | % REF. | P |
| | CLASS 0 | | |
| ======= GRASSES ======== | | | |
| CHARD GRASS (G3) IGE | < 0.35 | KIU/L | LESS THAN 0.35 P |
| ASM CLASS | 43 | % REF. | P |
| | CLASS 0 | | |
| ======= WEEDS ========= | | | |
| MMON RAGWEED (W1) IGE | < 0.35 | KIU/L | LESS THAN 0.35 P |
| ASM CLASS | 42 | % REF. | P |
| | CLASS 0 | | |
| BS QUARTERS (W10) IGE | < 0.35 | KIU/L | LESS THAN 0.35 P |
| | 46 | % REF. | P |
| ASM CLASS | CLASS 0 | | |

PAGE 2: CONTINUED ON PAGE: 3

D 007

# CLINICAL LABORATORY REPORT

**ACL**
a QUEST Diagnostics, Inc. Affiliate

1526 PEACH STREET

ERIE, PA 16501

**Mary Ellen Reitz, M.D.**
*Medical Director*

| | |
|---|---|
| **Patient Name** | JACKSON, DARLENE |
| **Client Services Helpline** | (814) 461-2400 |
| **Billing Helpline** | (814) 461-2430 |
| **Date Collected** | 05/09/2003 |
| **Time Collected** | 5:05 |

**Patient Phone Number** 814-474-2375

450005    32-60-099
PRIMARY CARE PARTNERS
7287 WEST RIDGE ROAD
FAIRVIEW, PA 16415

**Patient I.D./Social Security Number** 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

**Referring Physician** SPELLACY, MICHAEL D

| | |
|---|---|
| **Date Received** | 05/09/2003 |
| **Date of Report** | 05/15/2003 |
| **Sex** | F |
| **Age** | 42 |
| **Specimen Number** | |
| **ID Number** | |
| **Accession Number** | EI133341L |

| TEST PROCEDURE | TEST RESULT | UNITS | REFERENCE RANGE |
|---|---|---|---|
| ====== EPIDERMALS ====== | | | |
| DG DANDER (E5) IGE | < 0.35 | KU/L | LESS THAN 0.35 P |
| ASM CLASS | 41 CLASS 0 | % REF. | P |
| AT DANDER (E1) IGE | < 0.35 | KU/L | LESS THAN 0.35 P |
| ASM CLASS | 50 CLASS 0 | % REF. | P |
| ======== TREES ========= | | | |
| IRCH (T3) IGE | < 0.35 | KU/L | LESS THAN 0.35 P |
| ASM CLASS | 39 CLASS 0 | % REF. | P |
| M (T8) IGE | < 0.35 | KU/L | LESS THAN 0.35 P |
| ASM CLASS | 42 CLASS 0 | % REF. | P |
| HITE ASH (T15) IGE | < 0.35 | KU/L | LESS THAN 0.35 P |
| ASM CLASS | 41 CLASS 0 | % REF. | P |
| K (T7) IGE | < 0.35 | KU/L | LESS THAN 0.35 P |
| ASM CLASS | 51 CLASS 0 | % REF. | P |
| PLE (BOX ELDER) (T1) IGE | < 0.35 | KU/L | LESS THAN 0.35 P |
| ASM CLASS | 48 CLASS 0 | % REF. | P |
| === HOUSE DUST MITES === | | | |
| PTERONYSSINUS (D1) IGE | < 0.35 | KU/L | LESS THAN 0.35 P |
| ASM CLASS | 39 CLASS 0 | % REF. | P |
| == HYMENOPTERA VENOMS == | | | |
| CKROACH (I6) IGE | < 0.35 | KU/L | LESS THAN 0.35 P |
| ASM CLASS | 45 CLASS 0 | % REF. | P |

** SEE RAST INTERPRETATION ON FOLLOWING PAGE **

PAGE 3: CONTINUED ON PAGE: 4

D 008

# ACL
a QUEST Diagnostics, Inc. Affiliate

1526 PEACH STREET
ERIE, PA 16501

Mary Ellen Reitz, M.D.
Medical Director

| Patient Name | Client Services Helpline | Billing Helpline | Date Collected | Time Collected |
|---|---|---|---|---|
| JACKSON, DARLENE | (814) 461-2400 | (814) 461-2430 | 05/09/2003 | 15:05 |

Patient Phone Number
814 474-2375

Patient I.D./Social Security Number
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

Referring Physician
SPELLACY, MICHAEL D

450005    32-60-099
PRIMARY CARE PARTNERS
7287 WEST RIDGE ROAD
FAIRVIEW, PA  16415

| Date Received | Date of Report |
|---|---|
| 05/09/2003 | 05/15/2003 |

| Sex | Age | ID Number |
|---|---|---|
| F | 42 | |

| Specimen Number | Accession Number |
|---|---|
| | EI133341L |

| TEST PROCEDURE | TEST RESULT | UNITS | REFERENCE RANGE |
|---|---|---|---|

GUIDE TO INTERPRETATION OF ALLERGEN-SPECIFIC IGE LEVELS:
--------------------------------------------------------

| | | |
|---|---|---|
| < 0.35 | KIU/L | - ANTIBODY ABSENT OR UNDETECTABLE LEVEL |
| 0.35 - 0.70 | KIU/L | - ANTIBODY LEVEL LOW |
| 0.71 - 3.50 | KIU/L | - ANTIBODY LEVEL MODERATE |
| 3.51 - 17.5 | KIU/L | - ANTIBODY LEVEL HIGH |
| > 17.5 | KIU/L | - ANTIBODY LEVEL VERY HIGH |

ALLERGEN-SPECIFIC IGE INTERPRETATION OF RESULTS:
------------------------------------------------

| *ASM CLASS | ASM % REF | |
|---|---|---|
| 0 | < 70 | |
| 1 | 70 - 109 | INCREASING |
| 2 | 110 - 219 | LEVELS |
| 3 | 220 - 599 | OF |
| 4 | 600 - 1999 | ALLERGY |
| 5 | 2000 - 5999 | SENSITIVITY |
| 6 | > 5999 | |

*ASM (ALTERNATE SCORING METHOD)- EQUIVALENT TO MODIFIED RAST

| SCALLOP (RF338) IGE | | | |
|---|---|---|---|
| SCALLOP (RF338) IGE | <0.35 | KU/L | SEE BELOW F |
| | 28 | % REF. | SEE BELOW F |

Guide to Interpretation of Specific IgE Levels:

| | | |
|---|---|---|
| <0.35 | KU/L | Antibody absent or at undetectable level |
| 0.35-0.70 | KU/L | Antibody level low |
| 0.71-3.50 | KU/L | Antibody level moderate |
| 3.51-17.5 | KU/L | Antibody level high |
| >17.5 | KU/L | Antibody level very high |

Allergen-Specific IgE Interpretation of Results

ASM % Ref.    Clinical Significance

PAGE 4: CONTINUED ON PAGE: 5

D 009

# CLINICAL LABORATORY REPORT

**ACL**

a QUEST Diagnostics, Inc. Affiliate

1526 PEACH STREET

ERIE, PA 16501

Mary Ellen Reitz, M.D.
Medical Director

| | | |
|---|---|---|
| Patient Name | Client Services Helpline | Billing Helpline |
| JACKSON, DARLENE | (814) 461-2400 | (814) 461-2430 |

Date Collected: 05/09/2003   Time Collected: 15:05

Patient Phone Number: 814 474-2375

Patient I.D./Social Security Number: 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

Referring Physician: SPELLACY, MICHAEL D

450005    32-60-099

PRIMARY CARE PARTNERS
7287 WEST RIDGE ROAD
FAIRVIEW, PA  16415

Date Received: 05/09/2003   Date of Report: 05/15/2003

Sex: F   Age: 42   ID Number:

Specimen Number:   Accession Number: EI133341L

| TEST PROCEDURE | TEST RESULT | UNITS | REFERENCE RANGE |
|---|---|---|---|
| <70 | None Detected | | |
| 70-109 | Very Low Positive | | |
| 110-219 | Low Positive | | |
| 220-599 | Moderate Positive | | |
| 600-1999 | High Positive | | |
| 2000-5999 | Very High Positive | | |
| >5999 | Extremely High Positive | | |

This test was developed and its performance characteristics
determined by Quest Diagnostics Nichols Institute. It has
not been cleared or approved by the U.S. Food and Drug
Administration. The FDA has determined that such clearance
or approval is not necessary. Performance characteristics
refer to the analytical performance of the test.

| LNUT (F256) IGE | <0.35 | KU/L | SEE BELOW F |
| | 27 | % REF. | SEE BELOW F |

Guide to Interpretation of Specific IgE Levels:

| <0.35 | KU/L | Antibody absent or at undetectable level |
| 0.35-0.70 | KU/L | Antibody level low |
| 0.71-3.50 | KU/L | Antibody level moderate |
| 3.51-17.5 | KU/L | Antibody level high |
| >17.5 | KU/L | Antibody level very high |

Allergen-Specific IgE Interpretation of Results

ASM % Ref.   Clinical Significance

| <70 | None Detected |
| 70-109 | Very Low Positive |
| 110-219 | Low Positive |
| 220-599 | Moderate Positive |
| 600-1999 | High Positive |
| 2000-5999 | Very High Positive |
| >5999 | Extremely High Positive |

PAGE 5: CONTINUED ON PAGE: 6

D 010

## EMERGENCY ROOM HISTORY & PHYSICAL

**DATE SEEN:**  08/16/2002

**PATIENT NO.** 000016092744

**DATE OF BIRTH:**  04/18/1961

**TIME SEEN:** See by me at 0055 on August 17.

**CHIEF COMPLAINT:** Chest pain.

**HISTORY OF PRESENT ILLNESS:** The patient was at work tonight, onset this evening of chest pain, nonexertional. It is an anterior chest pressure with radiation to the left arm, nausea and some vomiting. No history of cardiac problems. There is a family history of cardiac problems, mother had an MI in her 40s.

**PAST MEDICAL HISTORY:** Asthma, otherwise essentially negative. She denies any diabetes mellitus, or cholesterol.

**PAST SURGICAL HISTORY:** She has had a surgical history of a hysterectomy in the past.

**SOCIAL HISTORY:** She is a cashier at Wal-Mart, she is not a heavy drinker.

**REVIEW OF SYSTEMS:** She denies lightheadedness, no neck pain, no trauma, no infectious contacts, no international travel. No pleurisy, no abdominal distention, no diarrhea or urinary changes. No swelling of the extremities, no calf pain or cords, no edema distally. No flank or spine discomfort. ROS otherwise negative.

Nursing history reviewed on this patient.

**CURRENT MEDICATIONS:** Zoloft.

**ALLERGIES:** ERYTHROMYCIN AND DEMEROL.

**PHYSICAL EXAMINATION**

VITAL SIGNS: Normal with the exception of a pulse of 104 and regular and a blood pressure of 164/98, saturations are 97% on room air.

**D 011**

| PATIENT NAME | DICTATED BY | M.R. NO. | ROOM | DISCHARGE DATE |
|---|---|---|---|---|
| **Jackson, Vera Darlene** | John R. Pyles, MD | 30-56-52 | 5-SOS51701 | 08/19/2002 |

| DOCUMENT NUMBER | DATE DICTATED | DATE TRANSCRIBED | TYPE OF REPORT | |
|---|---|---|---|---|
| 834474 | 08/20/2002 | 08/20/2002 | ER HISTORY & PHYSICAL | PAGE 1 OF 3 |

HAMOT MEDICAL CENTER • 201 State Street • Erie, PA 16550 • 814/877-6000

COPY TO: Michael Spellacy, DO
Hamot Medical Center

94%        P.02

RECEIVED AUG 2 2 2002

This is a white female, a 41-year-old, alert without dyspnea or tachypnea.

NECK: No jugular venous distention or thyromegaly of the neck, or rigidity.

HEENT: Normal, moist membranes, good skin turgor, well-hydrated, well-nourished.

CHEST: Chest wall is without pain. Good breath sounds bilaterally without pleurisy or rub.

CARDIAC: Regular with murmur, click or gallop.

ABDOMEN: Soft, without organomegaly, no hepato- or splenomegaly. No bruits. No pain with deep palpation, no rigidity or guarding.

EXTREMITIES: No calf pain, cords or peripheral edema, no pleurisy.

NEUROLOGIC: No focal neurological deficits. Good range of motion, strength, coordination in all extremities. The patient seems to be in no significant distress at the present time.

She was placed on oxygen, given a nitroglycerin sublingual and the pain and anterior chest pressure resolved entirely.

White count 12,400, hemoglobin 11.6. BMP is normal. Portable chest x-ray: Possible cardiomegaly. CPEU x0 is negative. EKG: Normal sinus rhythm, right bundle branch block, and there are no old EKGs to which to compare at the present time.

The patient remained pain free in the emergency department after her treatment and was kept on the monitor and oxygen supplementation: At 0150 I spoke with Dr. Humphrey, the patient will be admitted to their service in stable condition. Nitroglycerin paste was given to the patient to prevent any recurrence of the chest pain.

**IMPRESSION:**
1. Chest pain, rule out coronary artery disease.
2. Elevated blood pressure.
3. History of depression.

The patient is admitted to a monitored unit in stable condition.

**D 012**

| PATIENT NAME Jackson, Vera Darlene | | DICTATED BY John R. Pyles, MD | | M.R. NO. 30-56-52 | ROOM 5-SOS51701 | DISCHARGE DATE 08/19/2002 |
|---|---|---|---|---|---|---|
| DOCUMENT NUMBER 834474 | DATE DICTATED 08/20/2002 | DATE TRANSCRIBED 08/20/2002 | TYPE OF REPORT ER HISTORY & PHYSICAL | | | PAGE 2 OF 3 |

HAMOT MEDICAL CENTER • 201 State Street • Erie, PA 16550 • 814/877-6000

COPY TO: Michael Spellacy, DO
Hamot Medical Center

AUG-22-2002  08:28                                                    94%                    P.03

**CRITICAL CARE TIME:** On this patient 40 minutes.



_____
John R. Pyles, MD

JRP/tra

cc:  Michael Spellacy, DO


**D 013**

| PATIENT NAME | DICTATED BY | | M.R. NO. | ROOM | DISCHARGE DATE |
|---|---|---|---|---|---|
| **Jackson, Vera Darlene** | John R. Pyles, MD | | 30-56-52 | 5-SOS51701 | 08/19/2002 |

| DOCUMENT NUMBER | DATE DICTATED | DATE TRANSCRIBED | TYPE OF REPORT | |
|---|---|---|---|---|
| 834474 | 08/20/2002 | 08/20/2002 | ER HISTORY & PHYSICAL | PAGE 3 OF 3 |

HAMOT MEDICAL CENTER ● 201 State Street ● Erie, PA 16550 ● 814/877-6000

COPY TO:  Michael Spellacy, DO
Hamot Medical Center

**HAMOT MEDICAL CENTER**　　201 STATE STREET • ERIE, PENNSYLVANIA 16550

### DISCHARGE SUMMARY



**ADMITTED:** 08/16/2002

**PATIENT NO:** 000016092744

**DATE OF BIRTH:** 04/18/1961

**DISCHARGED:** 08/19/2002

RECEIVED
HAMOT FAMILY MEDICINE

**BRIEF HISTORY:** The patient is a pleasant 41-year-old asthmatic white female. She has had gestational diabetes. She follows with Dr. Spellacy as an outpatient. She has been stable on Azmacort and p.r.n. Albuterol. She was at work the other day and while voiding developed some sharp excruciating midsternal chest discomfort radiating to the left arm. It persisted, and she was evaluated at Hamot Emergency Room and kept for observation.

**PHYSICAL EXAMINATION:** On examination today the patient is alert, pleasant, afebrile, and in no acute distress. Pain free. No JVD. Lungs clear. Heart regular. Abdomen soft, nontender. No edema.

**LABORATORY AND X-RAY DATA:** On admission revealed a white count of 12, hemoglobin and hematocrit of 11 and 33, and she has had negative isoenzymes x3 sets, other than set #2 being somewhat nonspecific and not correlating very well with her other tests.

**HOSPITAL COURSE:** She has been stable on the monitor without dysrhythmia. Her blood pressures have been fine. She has been pain free since admission. She has been using her puffers intermittently as well.

She underwent, this morning, the initial phase of her stress test and had no problems, and we are awaiting her Thallium.

**DISCHARGE DISPOSITION:** If the Thallium is negative she may go home today with followup with Dr. Spellacy, her primary care physician. Continued risk reduction, discussed detailed diet, exercise, weight loss, follow glucose.

Her asthma is stable and we will follow on treatment and further workup as indicated with any recurrent symptoms.

**DISCHARGE DIAGNOSIS:**
1. Atypical chest discomfort.
2. Asthma, stable.

**D 014**

| PATIENT NAME Jackson, Vera Darlene | DICTATED BY Mary B. Russo-Colt, DO | | M.R. NO. 30-56-52 | ROOM 5-SOS51701 | DISCHARGE DATE 08/19/2002 |
|---|---|---|---|---|---|
| DOCUMENT NUMBER 834300 | DATE DICTATED 08/19/2002 | DATE TRANSCRIBED 08/20/2002 | TYPE OF REPORT DISCHARGE SUMMARY | | PAGE 1 OF 2 |

HAMOT MEDICAL CENTER • 201 State Street • Erie, PA 16550 • 814/877-6000

COPY TO: Mitchell S. Humphrey, DO

**HAMOT MEDICAL CENTER**          201 STATE STREET • ERIE, PENNSYLVANIA 16550

3. Obesity.
4. History of gestational diabetes.

_____
Mary B. Russo-Colt, DO

MBC/ch

cc:  Mitchell S. Humphrey, DO
     Mary B. Russo-Colt, DO
     Michael Spellacy, DO

**D 015**

| PATIENT NAME<br>Jackson, Vera Darlene | | DICTATED BY<br>Mary B. Russo-Colt, DO | | M.R. NO.<br>30-56-52 | ROOM<br>5-SOS51701 | DISCHARGE DATE<br>08/19/2002 |
|---|---|---|---|---|---|---|
| DOCUMENT NUMBER<br>834300 | DATE DICTATED<br>08/19/2002 | DATE TRANSCRIBED<br>08/20/2002 | TYPE OF REPORT<br>DISCHARGE SUMMARY | | | PAGE 2 OF 2 |

HAMOT MEDICAL CENTER • 201 State Street • Erie, PA 16550 • 814/877-6000
COPY TO: Mitchell S. Humphrey, DO

# HAMOT MEDICAL CENTER
201 STATE STREET • ERIE, PENNSYLVANIA • 814-877-6000

11:31    08/17/02
ISOL- N/A

| PATIENT NAME AND ADDRESS | AKA | | MED. REC. NO. | 305852 |
|---|---|---|---|---|
| JACKSON ,VERA | | | | |
| 7650 ROYANN DR | | | | |
| FAIRVIEW    PA  16415- | | | | |

| ADMISSION DATE / TIME | ROOM / BED | TYPE / SERVICE | PATIENT NUMBER |
|---|---|---|---|
| 08/16/02  11:31 | S51701 | S  FAM | 16032744 |

ADM. PHYS.  392191                                  RES.

ATT. PHYS.  392191 HUMPHREY MITCHELL S

REF. PHYS.

| BIRTHDATE | AGE | BRTH PL | SEX | M/S | RACE | FIN. CL. |
|---|---|---|---|---|---|---|
| 04/18/1961 | 41 | NY | F | M | W | E |

FAM. PHYS.  228031                          ADV. DIR.  N   CHANGE TO AD?

ADMITTING DIAGNOSIS    CHEST PAIN

| TELEPHONE | SOCIAL SEC. NUMBER | ADM. SOURCE |
|---|---|---|
| 8144742375 | 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 | RA |

RELIGION   P17 WAYSIDE

GUARANTOR

| JACKSON ,VERA | 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 |
| 7650 ROYANN DR | WAL MART WEST |
| FAIRVIEW    PA | 4950 W. 23RD STREET |
| 16415    814-474-2375 | ERIE    PA  16508- |

REFERRAL SOURCE

EMPLOYER    WAL-MART WEST
4950 W. 23RD STREE ERIE
PA  16508-

OCCUPATION    CASHIER

| PREV. ADM. DATE | LAST ADM. / OP. NAME | ACCIDENT DATE / TIME |
|---|---|---|
| H  11/20/98 | | 00:00 |
| | PA  16415- | 08/16/02 |

EMERGENCY CONTACT    JACKSON ,PAUL
7650 ROYANN DR        FAIRVIEW        PA  16415-        8144742375

NEXT OF KIN    JACKSON ,PAUL    H
7650 ROYANN DR        FAIRVIEW        PA  16415-        8144742375

BLUE CROSS 121        MRT196562126        008003        JACKSON ,VERA

| MA INFO | | COUNTY / BORO / TWP. | VIS. IMP. | HEAR IMP. | SMOKER | ADM. BY | PREVIOUS ADM. NO. |
|---|---|---|---|---|---|---|---|
| 49 | | | N | N | Y | RLB | |

| PRINCIPAL DIAGNOSIS: | **FINAL DIAGNOSIS** | CODE |
|---|---|---|

SECONDARY DIAGNOSIS:

```
R E C E I V E D
AUG 2 2 2002
HAMOT FAMILY MEDICINE
```

COMPLICATIONS:

| **OPERATIVE PROCEDURES** | CODE |
|---|---|

E / PRINCIPAL PROCEDURE:

E / SECONDARY PROCEDURE:

PNT TRANSFERRED TO PHYSICIAN:                    **D 016**

| CHARGE DATE | SPECIAL UNITS | DISCH. STATUS | |
|---|---|---|---|
| CHARGE TIME ☐ AM ☐ PM | ☐ MCICU  ☐ SPICU  ☐ NEON  ☐ | ☐ ROUTINE  ☐ EXPIRED  ☐ AMA  ☐ REHAB FACILITY  ☐ TRANS. HOSP.  ☐ HOME HEALTH CARE  ☐ TR. EXT. CARE | I certify that the narrative descriptions of the principal and secondary diagnoses and the major procedures performed are accurate and complete to the best of my knowledge. |
| S. DESTINATION | | | |
| R REG. | | | |

| MEDISGROUPS | CODER | ANALYZED / ABS | ATTENDING PHYSICIAN'S SIGNATURE | DATE |
|---|---|---|---|---|

A-6-04/05 (REV. 5/95)

## CHART ADMISSION FORM

PHYSICIAN'S DADM 3/9

# HAMOT MEDICAL CENTER

201 STATE STREET • ERIE, PENNSYLVANIA 16550 • 814-877-6000

MR # 305652

| PATIENT NAME | REGISTRATION DATE/TIME | TYPE | CLI/SERV | PATIENT NUMBER |
|---|---|---|---|---|
| JACKSON ,VERA DARLENE | 08/16/02 23:07 | H | ERM | 220732317 |

ADDRESS  7650 ROYANN DR

REG. PHYSICIAN

HOME PHONE  814-474-2375        JOB REL  CODE

FAIRVIEW        PA  16415-

| BIRTHDATE | AGE | BRTH. PL. | SEX | MS | RACE | FIN. CLASS | EMPLOYER NAME | |
|---|---|---|---|---|---|---|---|---|
| 04/18/1961 | 41 | NY | F | M | W | B | WAL-MART WEST | CASHIER |

REF PHY

DISCHARGE DISPOSITION

FAM PHY

PATIENT COMPLAINT

CHEST PAIN

CPU START TIME 0330

NEXT OF KIN   H       814-474-2375
JACKSON ,PAUL
7650 ROYANN DR
FAIRVIEW              PA 16415-

☐ NOTIFIED
☐ UNABLE TO LOCATE
☐ PRESENT

PT  BLUE CROSS 121    MRT196562126    008008    JACKSON ,VERA    I

ADV DIR:

| A INFO | COUNTY/BORO/TWP. | VIS. IMP. | HEAR. IMP. | SMOKER | REG. BY | |
|---|---|---|---|---|---|---|
| | | N | N | Y | XD | YES   NO |

| TIME SEEN | TIME DISCHARGED | ADM. TO RM. NO. | CURRENT MEDS. |
|---|---|---|---|

| TIME | TEMP | PULSE | RESP | B/P | WEIGHT | ALLERGIES |
|---|---|---|---|---|---|---|

HISTORY

TET. HX

X-RAY

PHYSICAL EXAMINATION

A PHYSICIAN HX

LAB

TREATMENT PROCEDURE

OTHER

DIAGNOSIS

DX/PROC. CODES

I certify that the narrative descriptions of the principal and secondary diagnoses and the major procedures performed are accurate and complete to the best of my knowledge.

RN'S SIGNATURE

ATTENDING PHYSICIAN'S SIGNATURE        DATE

ABSTRACT

PATIENT INSTRUCTIONS:        SEE INSTRUCTION SHEET GIVEN FOR:

**D 017**

| OFF DUTY/SCHOOL | ☐ YES ☐ NO | DATE | PATIENT'S SIGNATURE |
|---|---|---|---|

HAMOT MEDICAL CENTER

## AMBULATORY CARE SERVICES

A-5-39 (R 12/01

/C Diagnosis / Procedure: _____

| MEDICATION | DOSAGE | FREQUENCY | SPECIAL INSTRUCTIONS | NEXT DOSE AT |
|---|---|---|---|---|
| *(illegible)* | *(illegible)* | *(illegible)* | *(illegible)* | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| *(illegible)* | *(illegible)* | *(illegible)* | *(illegible)* | |

☐ Coumadin (Warfarin)  Next blood draw _____     Results will be reported to Dr. _____

You should be aware that medications may have more than one name.  Please check with your family doctor or pharmacist prior to taking any additional vitamins, herbal remedies, over the counter medications, or other prescription medications not listed here as some medications have two or more names.

## FOLLOW UP CARE

| PHYSICIAN / AREA TO CONTACT | | DATE / TIME | PHONE NUMBER |
|---|---|---|---|
| Dr. *(illegible)* | ☑ CALL TO SCHEDULE | 1 week | |
| | ☐ CALL TO SCHEDULE | | |
| | ☐ CALL TO SCHEDULE | | |

Home Health Agency _____     Phone # _____

Rehab Services _____     Phone # _____

| DIET | ACTIVITY / SAFETY |
|---|---|
| REGULAR | ☑ RETURN TO REGULAR ACTIVITY     ☐ BEDREST    ☐ NO HEAVY LIFTING |
| SPECIAL | DRIVE ☐ Yes ☐ No     ☐ UP WITH ASSISTANCE (cane, crutches, walker, etc.) |
| OTHER: | SEXUAL ACTIVITY ☐ Yes ☐ No |
| | SPECIAL INSTRUCTIONS: |

.OUND CARE / OTHER: _____

PATIENT MONOGRAPHS GIVEN/REVIEWED FOR
DISCHARGE MEDICATIONS.

*(illegible)* Patient / Family verbalizes or demonstrates understanding of instructions

X _____
SIGNATURE OF PATIENT / PATIENT REPRESENTATIVE AND DATE

Phone # where patient can be reached _____

X _____
SIGNATURE OF PHYSICIAN / NURSE AND DATE

JACKSON
VERA                    41Y  F
HUMPHREY MITCHELL       04/11/1961
305652
7650 ROYANN DR
FAIRVIEW    PA  16415    S51701
22073231

✦✦ **Hamot**                D 018

PATIENT DISCHARGE INSTRUCTION SHEET

**HAMOT MEDICAL CENTER**          201 STATE STREET • ERIE, PENNSYLVANIA 16550

HISTORY & PHYSICAL



**ADMITTED:** 08/17/2002          PATIENT NO:

**DATE OF BIRTH:** 04/18/1961

**HISTORY OF PRESENT ILLNESS:** This is a 41-year-old, white female with no known cardiac history who presents to the Emergency Room after an acute onset of chest pressure that radiated to her left shoulder. At the time, she was with a group of friends at work, just sitting around and having a good time. Associated findings with this chest pain were diaphoresis, lightheadedness and nausea to the point where she vomited times two. She said the pain lasted for about two minutes at work and was relieved with no intervention but then returned ½ hour later and every ½ hour until she came to the Emergency Room. Her pain was completely relieved with one sublingual nitroglycerin. She is currently on a Nitroglycerin Patch. She states that she has never had any kind of chest discomfort like this in the past and asked me several different times if it could be anxiety. When I asked her if she had reason to be anxious, she couldn't think of any and in fact again said she was laughing and having a good time at work when this all occurred.

She does have a history of asthma and question whether or not this was an asthmatic attack. She used her puffers a few times yesterday during this but said she had no relief. She uses her puffers rarely at home.

**ALLERGIES:** Aspirin, Erythromycin, Darvon, Demerol, Macrodantin, Cipro, Actifed and Neosporin Eye Drops.

**MEDICATIONS:** Medications include Zoloft 100 mg a day and her puffers.

**PAST MEDICAL HISTORY:** Again, asthma and depression. She has had some abdominal hernias in the past.

**PAST SURGICAL HISTORY:** C-section times two, hysterectomy not for cancer but for some postpartum bleeding. She had her gallbladder out and she has had hernia repair times two.

**SOCIAL HISTORY:** She denies any alcohol, tobacco or drugs. She is married and she has two healthy children.

**D 019**

**FAMILY HISTORY:** Fairly significant. Her mother had a myocardial infarction when she was around 50 years old. She is still alive. Her father had a myocardial infarction at age 60 or so. He is still alive.

| PATIENT NAME Jackson, Vera Darlene | DICTATED BY Mitchell S. Humphrey, DO | M.R. NO. 30-56-52 | ROOM | DISCHARGE DATE |
| --- | --- | --- | --- | --- |
| DOCUMENT NUMBER 833063 | DATE DICTATED 08/17/2002 | DATE TRANSCRIBED 08/17/2002 | TYPE OF REPORT HISTORY & PHYSICAL | PAGE 1 OF 3 |

HAMOT MEDICAL CENTER • 201 State Street • Erie, PA 16550 • 814/877-6000

COPY TO: Mitchell S. Humphrey, DO

**HAMOT MEDICAL CENTER**       201 STATE STREET • ERIE, PENNSYLVANIA 16550

She has aunts and uncles who had cerebrovascular accidents and aunts and uncles who have angina. Otherwise, history is fairly unremarkable.

**REVIEW OF SYSTEMS:** Again as described above. She denies any palpitations. She denies feeling anymore short of breath than usual. With all of this, she denies any cough, fever or chills. There has been no trauma to her chest wall. She denies any melena, bright red blood per rectum or any hematuria. She states that her diet is pretty good. There is no abdominal pain. There are no gastroesophageal reflux disease-like symptoms. There is no ankle edema.

## PHYSICAL EXAMINATION

GENERAL: This is an obese, young lady who is tearful at times because her husband didn't drive her to the hospital. She is in no distress. She is alert and oriented.

VITAL SIGNS: Blood pressure 164/98; it has come down somewhat this morning. Her other vital signs are stable.

HEENT: Within normal limits. Pupils are equally round and reactive. The tympanic membranes are clear. Nares are patent. Throat is clear.

NECK: Supple. There is no jugular venous distention. There are no bruits.

HEART: Rate and rhythm are regular. There are no murmurs. There are no rubs.

LUNGS: Clear to auscultation bilaterally. There are no crackles. There are no rhonchi.

ABDOMEN: Soft. She does have some tenderness with palpation to the sites where her hernias are. Otherwise, normoactive bowel sounds.

EXTREMITIES: Good pulses bilaterally. There is no evidence of any edema.

MUSCULOSKELETAL: There is no pain with palpation to the anterior chest wall. Deep tendon reflexes are intact.

**LABORATORY & X-RAY DATA:** Chest x-ray was read as clear with the possibility of cardiomegaly. The electrocardiogram shows normal sinus rhythm with a right bundle branch block. We have no old

**D 020**

| PATIENT NAME Jackson, Vera Darlene | | DICTATED BY Mitchell S. Humphrey, DO | | M.R. NO. 30-56-52 | ROOM | DISCHARGE DATE |
|---|---|---|---|---|---|---|
| DOCUMENT NUMBER 833063 | DATE DICTATED 08/17/2002 | DATE TRANSCRIBED 08/17/2002 | TYPE OF REPORT HISTORY & PHYSICAL | | | PAGE 2 OF 3 |

HAMOT MEDICAL CENTER • 201 State Street • Erie, PA 16550 • 814/877-6000

COPY TO: Mitchell S. Humphrey, DO

**HAMOT MEDICAL CENTER**          201 STATE STREET • ERIE, PENNSYLVANIA 16550

electrocardiogram to compare this to.  CBC shows a white count of 12.4.
H&H are 11.6 and 33.5.   Indices were within normal limits.   Cardiac
enzymes at this point are negative times two.   The basic metabolic panel
is unremarkable with a sodium of 139, potassium 3.9, BUN 8 and
creatinine 0.7.  Glucose is 116.

## ASSESSMENT AND PLAN:

1. This is a 41-year-old female who presents to the Emergency Room with
   acute onset of chest pressure with some radiation.  Other associated
   findings include a strong family history of heart disease.  We will
   rule her out for a myocardial infarction with cardiac enzymes per
   protocol and proceed with an exercise thallium stress test
   afterwards.

2. She has a history of depression.  We will keep her on her Zoloft.

_____
Mitchell S. Humphrey, DO

MSH/pan

cc:  Mitchell S. Humphrey, DO
     Michael Spellacy, DO

**D 021**

| PATIENT NAME Jackson, Vera Darlene | | DICTATED BY Mitchell S. Humphrey, DO | M.R. NO. 30-56-52 | ROOM | DISCHARGE DATE |
|---|---|---|---|---|---|
| DOCUMENT NUMBER 833063 | DATE DICTATED 08/17/2002 | DATE TRANSCRIBED 08/17/2002 | TYPE OF REPORT HISTORY & PHYSICAL | | PAGE 3 OF 3 |

HAMOT MEDICAL CENTER • 201 State Street • Erie, PA 16550 • 814/877-6000
COPY TO: Mitchell S. Humphrey, DO

**Hamot
Heart Institute**

## Exercise Stress with Perfusion Imaging

**Date of Test:** Aug 19 2002                                        **MRN:** IP-305652

**RE:** Vera Darlene Jackson                                          **DOB:** 4/18/61

Dear Dr. Mitchell Humphrey :

Ms. Vera Darlene Jackson underwent exercise stress testing with radionuclide perfusion imaging today to evaluate chest pain.

Under the direct supervision of Dr. John S Gregg, the patient was exercised according to the Bruce Protocol, for 5 minutes and 5 seconds (stage 2) with an estimated workload of 5.8 Mets. The test was terminated because of satisfactory cardiac workload. The patient experienced symptoms of dyspnea. Ms. Jackson did not experience chest pain with stress. The heart rate was 100 bpm at rest and reached 164 with exercise which is 91.6% of predicted maximum. The blood pressure at rest was 160/108 and reached 190/90 at peak exercise which is a normal response. The double product obtained was 31160.

The resting ECG demonstrated sinus rhythm, right bundle branch block and inferior Q waves. The ECG with exercise was negative.

The patient was injected with 8.6mCi of Tc Sestamibi intravenously at rest. The heart was imaged using SPECT acquisition technique per protocol. The patient was injected with 32.3mCi of Tc Sestamibi at peak stress. The heart was then imaged by gated SPECT acquisition technique. In summary, the perfusion images were normal. There was no cavity dilation. Gated wall motion was normal. The left ventricular ejection fraction is visually estimated to be 60%.

**Summary**
1. Negative ECG with exercise at moderate workload.
2. No chest pain with stress.
3. Normal blood pressure response with accelerated chronotropic response.
4. No Dysrrhythmia seen with stress.
5. Normal myocardial perfusion scan with normal LV wall motion.

Dr. Humphrey, thank you for the opportunity to participate in the care of Vera Darlene Jackson. Please advise if we can provide any further information.

Sincerely,


Dr. David M. Strasser                                        Dr. John S Gregg


cc:     Dr. Michael Spellacy



HAMOT MEDICAL CENTER  ●  201 State Street  ●  Erie, PA 16550  ●  814/877-6000                 **D 022**

AUG-19-2002   20:49              814 877 5699                     99%           TOTAL P.02

# EXHIBIT E

## CERTIFICATE TO RETURN TO WORK/SCHOOL

Name: _Arlene Jackson_

Has been under my care on _____

Will be able to return (to work/school) on _8/21/C_

Limitations/Remarks: _No restrictions_

_____

Dr. _____

**Primary Care Partners**
**Family Medicine & Obstetrics**

7287 W. Ridge Road
Fairview, PA 16415
(814) 474-1822 • Fax: (814) 474-3561

**Brian J. N. Stark, DO**
**Michael A. Spellacy, DO**
**Mary B. Russo-Coit, DO**

TOTAL P.02

000064

DEC-03-2002  19:10    BAYVIEW MEDICAL PRACTICE    814 459 4641    P.01/01

GERALD E. BECK, M.D., P.A.
DEA #_____    LIC. # MD 007040-E
MICHELE L. POLON, D.O.
DEA #_____    LIC. # OB 010818-L
PAMELA S. BECK, D.O.
DEA #_____    LIC. # OB 040230-L
510 CRANBERRY STREET, SUITE 200
ERIE, PA 16507
(814) 459-3141

NAME _____ Mike McDonald _____

ADDRESS _____    DATE _____

ILLEGAL IF NOT SAFETY BLUE BACKGROUND

Please excuse
Jorlene Jackson from
work 3 & 4 Dec 02

Thanks

FILL _____ TIMES

LABEL

SUBSTITUTION PERMISSIBLE

IN ORDER FOR A BRAND NAME PRODUCT TO BE DISPENSED, THE
PRESCRIBER MUST HAND WRITE "BRAND NECESSARY" OR
"BRAND MEDICALLY NECESSARY" IN THE SPACE BELOW.

21OB00044676

TOTAL P.01

# CERTIFICATE TO RETURN TO WORK/SCHOOL

Name: _Vera Jackson_

Has been under my care on _5-8-03_

Will be able to return to work/school on _5-14-03_

Limitations/Remarks: _Please excuse patient for medical reasons._

Dr: _M Spellacy_

**Primary Care Partners**
**Family Medicine & Obstetrics**

7287 W. Ridge Road
Fairview, PA 16415
(814) 474-1822 • Fax: (814) 474-3561

**Brian J. N. Stark, DO**
**Michael A. Spellacy, DO**
**Mary B. Russo-Colt, DO**

# EXHIBIT F

1                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2
DARLENE JACKSON,                    :
3            Plaintiff              :
                                    :
4            v.                     : Case No. 05-33 Erie
                                    :
5  WAL-MART STORES, INC.,           :
             Defendant              :
6

7

8

9            Deposition of LISA DOLECKI, taken before and by

10   Sondra A. Black, Notary Public in and for the

11   Commonwealth of Pennsylvania, on Wednesday, November

12   16, 2005, commencing at 12:05 p.m., at the offices of

13   Patberg Carmody Ging & Filippi, 504 State Street,

14   Suite 200, Erie, Pennsylvania 16501.

15

16

17  For the Plaintiff:

18      Sean P. Duff, Esquire
        Patberg Carmody Ging & Filippi
19      504 State Street, Suite 200
        Erie, PA 16501
20
    For the Defendant:
21
        Lorena E. Ahumada, Esquire
22      Ballard Spahr Andrews & Ingersoll, LLP
        1735 Market Street, 51st Floor
23      Philadelphia, PA 19103

24

25              Reported by Sondra A. Black
             Ferguson & Holdnack Reporting, Inc.

1     A.    Just what I said prior was, if it was something out

2    of the associate's control.  A doctor says, for example, this

3    associate has cancer, needs to go to chemotherapy treatments

4    X, Y, Z dates, maybe Monday, Wednesday, Friday, that's

5    something out of their control.  An associate has an

6    accident, that's something out of their control.

7     Q.    If a person calls in and says, I'm sick, I can't

8    come to work today, would that be approved or unapproved?

9     A.    Unapproved.

10     Q.    Even if they brought in a doctor's excuse after

11    that?

12     A.    A doctor's excuse, as stated in the policy, does not

13    necessarily make it approved.

14     Q.    Ms. Dolecki, you would agree with me that, pursuant

15    to the policy, if a person misses consecutive days for the

16    same reason, that is considered one absence, correct?

17     A.    Correct.

18     Q.    That's correct?

19     A.    Correct.

20     Q.    And that would be true even if it was an unapproved

21    absence, it would be considered one unapproved absence,

22    correct?

23     A.    Correct.

24     Q.    Again, would you agree with me that, as an area

25    manager, you use, to some degree, your own judgment in

14

1    FMLA stand for Family Medical Leave Act?

2        A.    Yes.

3        Q.    Does ADA stand for Americans with Disabilities Act?

4        A.    Yes.

5        Q.    Prior to Ms. Jackson's termination, and if I'm

6    not -- if I'm not mistaken, you met with her and advised her

7    of her termination?

8        A.    I'm sorry, can you repeat that.

9        Q.    Did you met with Ms. Jackson and advise her of her

10   termination?

11       A.    I did do her termination, yes.

12       Q.    Prior to that were you aware of any health problems

13   Ms. Jackson may have had?

14       A.    The one instance I specifically recall was a night I

15   had closed with Ms. Jackson and she was in the fitting room,

16   she had paged me to the fitting room, I went over, she was

17   breathing very laboredly.  I had asked her what was wrong,

18   she told me that a customer came by wearing a very strong

19   perfume and she was having an asthma attack and she needed to

20   go to her locker to get her inhaler.  I said, absolutely, go

21   ahead.

22            Got somebody else to go ahead and cover the fitting

23   room.  To answer the phone calls, and followed her back to

24   her locker. I asked her if she was okay.  If she needed

25   anything.  If she needed me to call someone.  I asked her to

1    sit down and to relax and to take a moment to, you know, take

2    care of what she needed to.  She said she would be fine, she

3    just needed to sit.

4         I went back out to the floor, checked on her again,

5    She was fine.  Came back out, and then later on that evening

6    she said she wanted to leave early, and I told her that would

7    be fine.  Again I asked her if she wanted me to call anybody

8    for her, and she said, no.

9         Q.   Is that the first time you became aware Ms. Jackson

10   had asthma?

11        A.   Yes.

12        Q.   Do you recall when that was in relation to her

13   termination?

14        A.   I don't recall the exact date or time or

15   approximation.

16        Q.   Do you have any idea whether it was in 2002 or 2003?

17        A.   That, I would not be able to tell you.  I'm sorry.

18        Q.   That's fine.  Let me ask you this, Ms. Dolecki:

19   With respect to the entries on Exhibit 4 that indicate FMLA

20   and ADA, do you know what LOA stands for?

21        A.   Leave of absence.

22        Q.   If any employee took a leave of absence, would that

23   FMLA ADA notation come up or is that specific to Ms. Jackson?

24        A.   That would come up on anyone that says LOA.

25        Q.   After you found out Ms. Jackson had asthma, did you

1    the record.

2    MR. DUFF:  I'm asking her if it's as possible -- I

3    asked her if she knew, she said she doesn't know.

4    So, okay.

5  Q. Now, you indicated that the behavior performance

6 expected next time was that Ms. Jackson not call off until

7 August 17th of 2003; is that correct?

8  A. That is correct.

9  Q. And that would have been approximately six months

10 from the date of the coaching, correct?

11  A. Correct.

12  Q. But the policy only provides for punishment based

13 upon absences in a rolling six-month period; is that correct?

14  A. Correct.

15  Q. And you indicated that if she called off at all --

16 let me ask you this:  The next thing down says, "The next

17 level of corrective action if this behavior and performance

18 continues will be termination."  You explained that to

19 Ms. Jackson?

20  A. I'm sorry?

21  Q. Did you explain that to Ms. Jackson?  That she would

22 be terminated if she missed any more work.

23  A. Before that date, yes.

24  Q. So, essentially, she had to go six months without

25 calling off to avoid termination?

1      A.    Correct.

2      Q.    Now, prior to your coaching for improvement session

3   with Ms. Jackson did you meet with any other members of

4   management at Wal-Mart to discuss Ms. Jackson's employment?

5      A.    I'm sorry, I'm not understanding that.  In reference

6   to?

7      Q.    In reference to the coaching session you had

8   February 15th of 2003 with Ms. Jackson, did you meet with any

9   other member of management prior to meeting with Ms. Jackson

10  to discuss her situation?

11     A.    Well, we have weekly meetings with all of management

12  together, and we discuss any issues that we have on-hand

13  prior to doing any coachings or any discussions with an

14  associate.  I always make it a practice to talk with my store

15  manager or the associate who is covering -- like, for

16  example, if the store manager is on vacation, then it would

17  be the person who is in charge.

18     Q.    The meetings you discussed, the weekly meetings of

19  management, is there any minutes of those meetings drawn up?

20     A.    No.

21     Q.    Are there any notes taken?  Is there a secretary to

22  jot down the subjects covered in those meetings?

23     A.    No.   Individually we take our own.

24     Q.    You take your own notes?

25     A.    Correct.

1              C E R T I F I C A T I O N

2

3          I, Sondra A. Black, a Court Reporter and Notary

4     Public in and for the Commonwealth of Pennsylvania, do

5     hereby certify that the foregoing is a true and accurate

6     transcript of my stenographic notes in the

7     above-captioned matter.

8

9

10

11              _Sondra A. Black_

12

13

14

15     Dated: _November 5, 2005_

16

17

18

19

20

21

22

23

24

25

# EXHIBIT G

ENTRY POSITIONS          **WAL-MART STORES MATRIX OF ESSENTIAL JOB FUNCTIONS**          ENTRY POSITIONS

Basic to our success is our commitment to the principles of continuous improvement and teamwork. Continuous improvement means constantly looking for better ways to perform our jobs -- which often means changing what or how we do something. Teamwork means assisting others in their job when directed or when the need arises. This matrix is intended solely to advise applicants of some of the essential functions as defined by the Americans with Disabilities Act (ADA) and should not be construed as all-inclusive. Associates will be required to also perform non-essential functions as assigned unless unable to do so because of a disability. This matrix does not constitute a contract and management reserves the right to change or reassign job duties or combine positions at any time.

| POSITION | Check Out Customer Purchase | Customer Assistance | Flagging/Signing Merchandise | Maintain Records & Logs | Merchandise Stocking | Price Changes | Price Merchandise | Scan Merchandise/Hand-Held Unit | Store Tour | Unload Trucks/Check-In Merchandise | Zone Defense | Lifting/Frequency | Counting | Basic Reading & Writing | Basic Math | Bend; Twist; Squat | Repetitive Hand Action | Fine Manipulation | Work Performed (S) Sitting; (ST) Standing; (W) Walking | Reach/Work Above Shoulder | Reach/Work Below Waist | Pushing/Pulling | Repetitive Foot Actions/Climbing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| People Greeter | | | | | | | | | | | X | S/O | | X | | S | | | ST | | | X | |
| Cashier | X | X | | | | | | | | | X | M/F | X | X | X | X | F | X | ST | | X | X | |
| Hardlines Sales Floor | | X | X | | X | X | X | X | | | X | M/F | X | X | X | X | F | X | ST/W | X | X | X | X |
| Softlines Sales Floor | | X | X | | X | X | X | X | | | X | L/F M/O | X | X | X | X | F | X | ST/W | X | X | X | X |
| Bike/Mower Assembler | | X | X | X | | X | X | | | | | M/F | X | X | X | X | F | X | S/ST/W | X | X | X | X |
| Stocking | | X | X | | X | | X | | X | X | X | MH/C | X | X | | X | F | X | W | X | X | X | X |
| Receiving | | | X | X | X | | X | X | | X | X | MH/C | X | X | X | X | F | X | W | X | X | X | X |
| Maintenance | | X | | | | | | | X | | X | M/F | X | X | X | X | F | X | W | X | X | X | X |

We are glad you are interested in joining the Wal-Mart family and thank you for the time you have taken to submit your application. If you have any questions about the above matrix, please ask the associate conducting this interview to explain any portion that is unclear. After receiving any needed explanation, please indicate below whether you have the ability to perform the listed essential functions of the job for which you are applying.

_____✓_____ Yes, I have the ability to perform all of the above functions with or without a reasonable accommodation.

_____ No, I do not have the ability to perform all of the above functions with or without a reasonable accommodation.

Date: _11-6-00_          Applicant's Signature: _Darlene Jacks_

# EXHIBIT H

**Wal-Mart® Corporate Policy**

# Attendance/Punctuality (Except Div. 05 and Div. 07)

## Policy

**Number: PD-52**

**Effective: 10/19/98**

Regular and punctual attendance is a required and essential function of each Associate's job. We do acknowledge an Associate may have occasion to miss work, and we will accommodate these needs to the extent business demands allow. Below are guidelines for handling excessive absenteeism and tardiness.

## Applies To

All non-exempt (hourly-paid) Associates, regular, full time and peak time.

## Responsibilities

Facility Management will review daily attendance exceptions when Associates do not work their scheduled hours. These exceptions will be assigned either an approved or unapproved reason code and will remain active for a rolling six-month period.

## Rolling Six Month Period

**Definition:** All active attendance exceptions (absences, tardies, etc.) will be tracked for a rolling six-month period. A rolling six-month period is defined as the previous six months from the current date.

**Guidelines:** The total number of unapproved absences or tardies during the rolling six-month period will be the basis for determining if any formal coaching is warranted. Any absence or tardy that is over six-months old will not be used in the calculation of the total number of active absences or tardies. Once six months has passed from the date of an unapproved absence or tardy, that absence or tardy is considered inactive or to have 'dropped off.'

## Absence

**Definition:** Each occasion an Associate has unscheduled time away from scheduled work will be measured as an "absence." An absence occurs whether an Associate uses an income replacement benefit to offset lost work time (i.e. illness protection, personal, or vacation time) or whether the time is made up during that pay period.

**Guidelines:** Associates should not have more than three (3) unapproved absences in a rolling six- (6) month period.

Consecutive days missed due to the same or related illness, injury, or personal business situation are considered recurring and will count as one absence. If an Associate returns to work, attempts to complete his/her approved workday and has a relapse of the same or related illness or injury, it will be considered part of the original absence.

Associates absent more than three consecutive days due to illness or injury should be encouraged to seek medical attention and apply for a Medical Leave. Associates absent more than three consecutive days due to personal business should be encouraged to apply for a Personal Leave. Missed days covered under an approved leave of absence will not be counted as absences.

Procedures:    When an Associate misses a scheduled workday, a record will be kept of each absence by the Attendance Tracking system. Management must assign an approved or unapproved reason code to each absence.

Approved absences are defined as:

- Bereavement leave and emergency volunteer time.
- Emergency situations (i.e. weather, medical emergencies).
- Requested schedule changes that are approved by management one (1) day prior to the change, including leave of absence.

Associates are to personally call the member of Management they report to, or another member of Management, no later than one (1) hour prior to scheduled start time to report each day they will be absent. However, this does not automatically approve the absence.

Associates who are absent for three consecutive scheduled days and fail to report the absence will be deemed to have abandoned their job, which will result in a voluntary termination of employment.

## Tardy

Definition:    A tardy occurs any time an Associate does not report to his/her work area at the scheduled start time.

Guidelines:    Three (3) unapproved tardies equal one unapproved absence.

If an Associate fails to complete 50% or more of their work shift due to unapproved tardiness, the tardy will be treated as an unapproved absence.

Schedule adjustments to avoid overtime situations must be approved in advance.

Procedures:    When an Associate is tardy, a record will be kept of each tardy by the Attendance Tracking system. Management must assign an approved or unapproved reason code to each tardy.

Approved tardies are defined as:

- Requested schedule changes that are approved by management one (1) day prior to the change, including leave of absence.

## No Call/No Show

Associates who have a "no call/no show" absence will immediately advance to a Written Coaching. If an Associate is presently on an active coaching for other issues, he/she would advance to the next level of coaching, up to and including termination.

The "no call/no show" absence will be included in the Associate's total number of unapproved absences. Three (3) consecutive scheduled days of "no call/no show" absences will be considered "Voluntary Termination."

### Leaving Before the End of the Work Schedule

Associates who leave their job without approval before the end of their scheduled shift, will be subject to disciplinary action up to and including termination.

### Exceptions

The following exception applies to both absences and tardies and must not be counted against the Associate's attendance record if management is notified according to guidelines.

- Adjustments accommodating the Family Medical Leave Act (FMLA) or a disability as defined by the Americans with Disabilities Act. Intermittent Leave is allowed as long as the leave falls under FMLA.

- Example: An Associate has a doctor's note for recurring "morning sickness" Associated with pregnancy. If an intermittent leave of absence was filled out, tardies and absences due to morning sickness would be excused under the FMLA.

### Associates Employed Less Than 90 Days

Associates employed less than 90 days and Temporary Associates should be given verbal feedback regarding their excessive absences. The formal coaching process is not required.

Issues of excessive absenteeism should be addressed before an Associate is terminated, allowing them an opportunity to meet Company expectations. However, excessive absenteeism will be grounds for termination.

### Excessive Absenteeism, Tardiness and Leaving Work Early

Regular full-time and peak-time Associates who do not meet the attendance or tardiness guidelines will be subject to disciplinary action up to and including termination.

Facility Managers should verbally advise an Associate when unapproved absences and tardies occur, communicating that continued absences/tardies could advance to a level of Coaching. The formal Coaching for Improvement process should begin once an Associate reaches four (4) unapproved absences in a rolling six-month period based on the following chart:

| Absences | Action |
|----------|--------|
| 1-2 | Verbal Discussion |
| 3 | Verbal Coaching |
| 4 | Written Coaching |
| 5 | Decision Making Day |
| 6 | Termination |

Advancement to the next level of Coaching will occur when additional unapproved absences are accrued in a rolling six-month period.

## Logging Attendance Calls when Associates Call In

Each store should have a designated person and location where Management reports all attendance call-ins. Example: Management reports call-ins/tardies to the Fitting Room Associate who logs attendance exceptions.

Attendance call-ins (tardies, absences, etc.) should be recorded on the Daily Associate Attendance Call-In Log sheet. At the end of each day, Attendance log sheets should be filed in a black binder in the Personnel Office. Attendance log sheets should be retained for a rolling one year period for Management's reference in  assigning reason codes and coaching documentation.

## Record Retention

The attendance record will become a permanent part of the Associate's personnel file. A printout of the previous year's attendance must be placed in the Associate's personnel file. This is to be done at the time of the Associate's annual evaluation. Attendance records will be retained with the personnel file after the Associate leaves the Company.

## Resources

| Personal Contacts | Facility Manager |
| --- | --- |
|  | Facility Personnel Manager |
|  | Regional Personnel Manager |
| Related Policies | Leave of Absence Policy -PD24 |
| Printed Materials | Daily Associate Attendance Call-In Log |

All Material Wal-Mart Stores Inc. Confidential. © 2002.

I understand this policy

Name: _Darlene Nash_    Date: _2-18-03_

# EXHIBIT I

Supervisor:       LISA DOLECKI

Associate:        DARLENE JACKSON
SSN:              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

WAL * MART STORES,
Associate Attendanc. eport          STORE NO: 2561

From:    06/07/20
To:      06/07/20

## Unapproved Attendance Exceptions

### Unapproved Absences

| DATE | DESCRIPTION | REASON CODE | RECURRING | TOTAL ACTIVE ABSENCES (6 Month Rolling) |
|------|-------------|-------------|-----------|------------------------------------------|
| 08/17/2002 | Sick-Unapproved | 70 | | |
| 08/18/2002 | Sick-Unapproved | 70 | | |
| 08/20/2002 | Sick-Unapproved | 70 | | |
| 08/21/2002 | Sick-Unapproved | 70 | | |
| 11/01/2002 | Sick-Unapproved | 70 | * | |
| 12/08/2002 | Other-Unapproved Absence | 75 | | |
| 12/09/2002 | Other-Unapproved Absence | 75 | | |
| 01/03/2003 | Sick-Unapproved | 70 | | |
| 01/29/2003 | Sick-Unapproved | 70 | * | |
| 02/13/2003 | Sick-Unapproved | 70 | | 1 |
| 02/14/2003 | Sick-Unapproved | 70 | | 2 |
| 05/08/2003 | Sick-Unapproved | 70 | | 3 |
| 05/09/2003 | Sick-Unapproved | 70 | | 4 |
| 05/10/2003 | Sick-Unapproved | 70 | * | 5 |
| 05/29/2003 | Sick-Unapproved | 70 | | 6 |
| 05/30/2003 | Sick-Unapproved | 70 | | 7 |

### Unapproved Tardies

| DATE | DESCRIPTION | REASON CODE | ACCRUED ABSENCE | APPLIES TOWARD 3 TARDY ABSENCE |
|------|-------------|-------------|-----------------|--------------------------------|
| 02/28/2003 | Unapproved Tardy | 77 | | Y |

### Unapproved Left Earlys

| DATE | DESCRIPTION | REASON CODE |
|------|-------------|-------------|
| 08/16/2002 | Unapproved Left Early | 78 |

Unapproved Attendance Exceptions Summary:
Timeframe:        12/09/2002 to 06/08/2003
    Active Attendance Exceptions (6 Month Rolling)
    Total Active Unapproved Absences          7
    Total Active Unapproved Tardies           1
    Total Active Unapproved Left Earlys       0
    Total Active Unapproved Worked Shifts     0

Timeframe:        06/07/2002 to 06/07/2003
    Coaching Should not be Based upon the Following:
        (For Management Reference Only)
    Total Unapproved Absences                 13
    Total Unapproved Tardies                  1
    Total Unapproved Left Earlys              1
    Total Unapproved Worked Shifts            0

Supervisor:      LISA IXLEIXI

Associate:      DARLENE JACKSON
SSN:          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

From:     06/07/20
To:       06/07/20

### Approved Attendance Exceptions

#### Approved Absences

| DATE | DESCRIPTION | REASON CODE | RECURRING | TOTAL ACTIVE ABSENCES (6 Month Rolling) |
|------|-------------|-------------|-----------|------------------------------------------|
| 06/12/2002 | Other-Mgr. Approved Absence | 38 | | |
| 08/01/2002 | Other-Mgr. Approved Absence | 38 | | |
| 08/02/2002 | Other-Mgr. Approved Absence | 38 | | |
| 09/05/2002 | Other-Mgr. Approved Absence | 38 | | |
| 10/02/2002 | Other-Mgr. Approved Absence | 38 | | |
| 10/17/2002 | Other-Mgr. Approved Absence | 38 | | |
| 10/25/2002 | Other-Mgr. Approved Absence | 38 | | |
| 10/31/2002 | Other-Mgr. Approved Absence | 38 | * | |
| 11/25/2002 | Other-Mgr. Approved Absence | 38 | | |
| 12/03/2002 | Other-Mgr. Approved Absence | 38 | | |
| 12/04/2002 | Other-Mgr. Approved Absence | 38 | | |
| 12/10/2002 | Other-Mgr. Approved Absence | 38 | | |
| 12/12/2002 | Other-Mgr. Approved Absence | 38 | | |
| 12/13/2002 | Bereavement | 32 | | |
| 12/14/2002 | Bereavement | 32 | | |
| 01/07/2003 | Other-Mgr. Approved Absence | 38 | | |
| 01/08/2003 | Other-Mgr. Approved Absence | 38 | | |
| 02/04/2003 | LOA (FMLA, ADA) | 34 | | |
| 02/05/2003 | LOA (FMLA, ADA) | 34 | | |
| 02/06/2003 | LOA (FMLA, ADA) | 34 | | |
| 02/11/2003 | LOA (FMLA, ADA) | 34 | | |
| 02/12/2003 | LOA (FMLA, ADA) | 34 | | |
| 02/19/2003 | Decision Day | 36 | | |
| 05/14/2003 | LOA (FMLA, ADA) | 34 | | |
| 05/24/2003 | Other-Mgr. Approved Absence | 38 | | |

#### Approved Tardies

| DATE | DESCRIPTION | REASON CODE | ACCRUED ABSENCE | APPLIES TOWARD 3 TARDY ABSENCE |
|------|-------------|-------------|-----------------|--------------------------------|
| 07/18/2002 | Manager Approved Tardy | 41 | | N |
| 12/29/2002 | Manager Approved Tardy | 41 | | N |
| 01/04/2003 | Manager Approved Tardy | 41 | | N |

#### Approved Left Earlys

| DATE | DESCRIPTION | REASON CODE |
|------|-------------|-------------|
| 06/07/2002 | Manager Approved Left Early | 42 |
| 06/24/2002 | Manager Approved Left Early | 42 |
| 07/04/2002 | Manager Approved Left Early | 42 |
| 08/04/2002 | Manager Approved Left Early | 42 |
| 08/06/2002 | Manager Approved Left Early | 42 |
| 08/14/2002 | Manager Approved Left Early | 42 |
| 08/25/2002 | Manager Approved Left Early | 42 |
| 09/15/2002 | Manager Approved Left Early | 42 |

Supervisor: LISA DOLECKI

Associate: DARLENE JACKSON
SSN: 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

11/07/2002   Manager Approved Left Early          42

Approved Left Earlys

| DATE | DESCRIPTION | REASON CODE |
|------|-------------|-------------|
| 11/11/2002 | Manager Approved Left Early | 42 |
| 11/20/2002 | Manager Approved Left Early | 42 |
| 11/27/2002 | Manager Approved Left Early | 42 |
| 01/01/2003 | Manager Approved Left Early | 42 |
| 01/02/2003 | Manager Approved Left Early | 42 |
| 01/04/2003 | Manager Approved Left Early | 42 |
| 01/10/2003 | Manager Approved Left Early | 42 |
| 02/24/2003 | Manager Approved Left Early | 42 |
| 03/22/2003 | Manager Approved Left Early | 42 |
| 04/12/2003 | Manager Approved Left Early | 42 |
| 04/21/2003 | Manager Approved Left Early | 42 |
| 04/25/2003 | Manager Approved Left Early | 42 |
| 04/26/2003 | Manager Approved Left Early | 42 |
| 05/01/2003 | Manager Approved Left Early | 42 |
| 06/07/2003 | Manager Approved Left Early | 42 |

Approved Non-Scheduled Worked Shifts

| DATE | DESCRIPTION | REASON CODE |
|------|-------------|-------------|
| 09/30/2002 | Manager Approved Non-Sched Worked | 43 |
| 11/03/2002 | Manager Approved Non-Sched Worked | 43 |
| 11/27/2002 | Manager Approved Non-Sched Worked | 43 |
| 02/26/2003 | Manager Approved Non-Sched Worked | 43 |
| 04/22/2003 | Manager Approved Non-Sched Worked | 43 |
| 05/31/2003 | Manager Approved Non-Sched Worked | 43 |
| 06/02/2003 | Manager Approved Non-Sched Worked | 43 |
| 06/03/2003 | Manager Approved Non-Sched Worked | 43 |
| 06/04/2003 | Manager Approved Non-Sched Worked | 43 |
| 06/06/2003 | Manager Approved Non-Sched Worked | 43 |

Approved Attendance Exceptions Summary:
Timeframe:      12/09/2002 to 06/08/2003
        Active Attendance Exceptions (6 Month Rolling)
        Total Active Approved Absences        14
        Total Active Approved Tardies          2
        Total Active Approved Left Earlys     12
        Total Active Approved Worked Shifts    7

Timeframe:      06/07/2002 to 06/07/2003
        Coaching Should not be Based upon the Following:
                (For Management Reference Only)
        Total Approved Absences               24
        Total Approved Tardies                 3
        Total Approved Left Earlys            25
        Total Approved Worked Shifts          10

Supervisor:          LISA IXLEDXI

Associate:           DARLENE JACKSON
SSN:                 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

WAL + MART STORES,        .
Associate Attendanc  eport                    STORE NU: 2561

From:        06/07/20 .
To:          06/07/20

LEGEND:

** ABSENCE: Associate did not work scheduled shift
** TARDY: Associate clocked in more than  minutes after scheduled start time
** LEFT EARLY: Associate clocked out 30 minutes or more prior to scheduled leave time
** NON-SCHEDULED WORKED SHIFT: Associate worked a shift not scheduled
** RECURRING: An absence tied/related to a previous absence, counted as part of the original    sence
   (ex. Strep throat: day 1 is an absence! day 2 and 3 are recurring absences, tied to the o    inal absence)
** APPLIES TOWARD 3 TARDY ACCRUED ABSENCE: Tardies which count toward the Unapproved Absence
** ACTIVE ATTENDANCE EXCEPTIONS (Absences, Tardies, Left Early, Non-Sched Worked shifts):       .lculation for three accrued Unapproved tardies
   Attendance exceptions which have occurred in the last six months, and are subject to Coac.  g
   if they are Unapproved

NOTE: Attendance Exceptions are reported for all Job codes in which Associate has worked wit    the Timeframe above

## ** END OF JOB **
Associate Attendance Repo  .
REPORT: sas3341r RUN ON: 06/09/2003 A: 8:10:20

****** WAL-MART STORES, INC. CONFIDENTI    ******

# EXHIBIT J

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3  DARLENE JACKSON,             :
        Plaintiff       :
                          :

4       v.               : Case No. 05-33 Erie
                          :

5  WAL-MART STORES, INC.,     :
        Defendant       :

6

7

8

9          Deposition of PETE BURNS, taken before and by

10   Sondra A. Black, Notary Public in and for the

11   Commonwealth of Pennsylvania, on Wednesday, November

12   16, 2005, commencing at 10:16 a.m., at the offices of

13   Patberg Carmody Ging & Filippi, 504 State Street,

14   Suite 200, Erie, Pennsylvania 16501.

15

16

17  For the Plaintiff:

18     Sean P. Duff, Esquire
      Patberg Carmody Ging & Filippi
19     504 State Street, Suite 200
      Erie, PA 16501
20
   For the Defendant:
21
     Lorena E. Ahumada, Esquire
22     Ballard Spahr Andrews & Ingersoll, LLP
      1735 Market Street, 51st Floor
23     Philadelphia, PA 19103

24

25           Reported by Sondra A. Black
         Ferguson & Holdnack Reporting, Inc.

1          MS. AHUMADA:  Do you understand his question?

2     Q.   For example, if they had three unapproved absences

3 in a row, but they were all due to the same sickness, would

4 that count as one unapproved absence?

5          MS. AHUMADA:  I'm just going to object because that

6          has been asked and it has been answered.  You can

7          answer the question.

8          MR. DUFF:  I don't think I was as specific as I'm

9          being right now as far as unapproved versus

10         approved.

11    A.   It would be one if it was the same exact illness.

12    Q.   Even if that was deemed unapproved, if they were

13 complaining of the same illness over the course of three

14 days, that's one unapproved absence?

15    A.   If it was the same reason.

16    Q.   Yes.  Okay.  Very good.

17    A.   Yes.

18    Q.   Let me ask you this:  If somebody is gone and

19 they're off work, and they come in and they have a doctor's

20 excuse -- if they have an excuse saying that they were ill

21 for a day or two days, does that necessarily make it an

22 approved absence or can that still be marked as an unapproved

23 absence?

24    A.   It could be marked as an unapproved absence.

25    Q.   My understanding is that -- let's see if I have a

1  document here that we can refer to.  That there was a

2  coaching for improvement session on February 15, 2003 with

3  regard to Ms. Jackson.  Do you recall that as you sit here

4  today?

5          MS. AHUMADA:  Do you want a document in front of

6          him?

7          MR. DUFF:  Yes.  I mean, there is a document,

8          "Coaching for Improvement Form, Darlene Jackson,"

9          dated 2/15/03.  It is signed by Charles Smith, Lisa

10         Dolecki, and Darlene Jackson.  I just have a couple

11         questions regarding coaching sessions.

12         MS. AHUMADA:  Are you entering this?

13         MR. DUFF:  I am.

14     Q.    Your signature is obviously not on this.  When there

15  is a coaching session, do they actually -- is it actually a

16  sit-down meeting with the employee or does a form simply go

17  out to them?

18     A.    There is a meeting.

19     Q.    During the meeting there is a discussion of the need

20  for coaching, I would imagine -- let me ask you this first,

21  I'm sorry, Mr. Burns:  Have you ever taken part in such a

22  coaching session?

23     A.    Yes.

24     Q.    Prior to the coaching session is there any meeting

25  between you and the assistant manager who is going to conduct

38

1    the meeting?

2        A.   Sometimes, yes.

3        Q.   Do you recall if there was such a meeting involving

4    yourself before Ms. Jackson's 2/15/03 coaching?

5        A.   I do not recall a meeting.

6        Q.   If there was such a meeting, would you produce any

7    paperwork, notes, minutes of that meeting, anything like that

8    for the file?

9        A.   If they're -- can you -- if there was a meeting that

10    I had?

11        Q.   Yes.  It looks like Ms. Dolecki did the coaching

12    here, and Mr. Smith witnessed it.  If you had met with

13    Ms. Dolecki beforehand -- or in any situation, not just this

14    one, where you meet with somebody prior to a coaching, that

15    is, their supervisor, do you generate any type of paperwork

16    summarizing that meeting?  Anything of that meeting?

17        A.   I would generate any evidence I'd have, either video

18    or anything I have, off our computers.  Minutes or note

19    taking, not usually.

20        Q.   At the top it states, "The following was observed of

21    this associate's behavior and/or performance."  And it says,

22    "The associate has seven absences in a six-month period."

23    And then the dates are 8/17, 8/18, 8/20, 8/21, 11/1, 12/8,

24    12/9, 1/3, 1/29.  Would you agree with me, and I -- strike

25    that.  Never mind.  Let me ask you this:  As a manager,

1    Mr. Burns, what are the difficulties you encounter when an

2    employee does call off work?

3        A.    The difficulties I have is loss of customer service,

4    loss of productivity, could result into higher wage cost.

5        Q.    Are you done?

6        A.    There could be other things, if there's not enough

7    associates on the floor, with safety issues.

8        Q.    How many employees are employed at -- or on duty at

9    Store 2561 at any given time or on a given shift?  Is there

10   more during the day, less at night?  If you can explain that

11   to me.  Just, generally, your staffing requirements, if any.

12       A.    Our staffing requirements vary by volume.

13       Q.    And volume depends on the time of day, I take it?

14       A.    Volume and freight count that night as far as how

15   much freight we may have that night.

16       Q.    At your busiest time, how many employees are working

17   at your Wal-Mart store?

18       A.    I don't know.

19       Q.    Is it more than 30?

20       A.    Yes.

21       Q.    Is it more than 50?  That's a pretty big store from

22   what I understand.

23       A.    When you say "it's busiest times," can you give me a

24   specific time that you're referring to.

25       Q.    Let's say during the day -- peak shopping hours

40

1      A.    Depends what your meaning of conscientious is.  I

2  don't know how to answer -- or it's not --

3      Q.    With respect to the work she did when she was at the

4  store, did you have any -- do you recall having any major

5  difficulty with that or reprimanding her for anything

6  specific with the work she did when she was at work?

7      A.    No.

8      Q.    Now, she was dismissed on or about June 7, 2003.  Do

9  you recall dismissing her at all?

10     A.    I was not in the meeting June 6 or 7, 2003.

11     Q.    There is an exit interview sheet that is within the

12  documents I provided, or were provided to me.  Can you pull

13  that out for me and mark it as 9, I guess.

14          Your signature does appear on this document,

15  Mr. Burns; is that correct?

16          (Deposition Exhibit No. 9 marked for

17           identification.)

18     A.    Yes.

19     Q.    And that was dated 6/9/03, correct?

20     A.    Yes.

21     Q.    Do you sign off on all exit interview sheets?

22     A.    Yes.

23     Q.    Do you recall, in connection with Ms. Jackson's

24  termination, whether you met with any other member of

25  management at Wal-Mart to discuss the reasons therefore or

1    discuss that a termination was going to occur?

2        A.    Yes.

3        Q.    Who did you meet with?

4        A.    I met with my district manager, Margaret Saborsky.

5        Q.    Do you do that before you terminate anyone?  Do you

6    always have to have a meeting with district management or can

7    you -- does that occur at every instance of termination?

8        A.    No.

9        Q.    Was there any specific reason you did meet with her

10   in this regard?

11       A.    Yes.

12       Q.    Why was that?

13       A.    I like to partner up with my DM, especially when

14   there's a reduction of workforce and -- we were directed to

15   partner up with our DMs from a conference call at that time.

16       Q.    Now, this reduction in workforce, was there a

17   company-wide reduction in workforce going on in June 2003?

18       A.    There was a region and division.

19       Q.    So there were layoffs occurring or terminations

20   occurring?

21       A.    Terminations.

22       Q.    And that was in order to reduce the number of people

23   on payroll; is that correct?

24       A.    It's to reduce the amount of labor we need versus

25   our sales at that particular time.

1    Q.   So there was a business reason you wanted to reduce

2    your workforce, reduce your overhead in that regard, or at

3    least corporate did; is that correct?

4    A.   Our region at that time.

5    Q.   Region.  So were you instructed then to begin to

6    proceed with terminations?

7    A.   Yes.

8    Q.   Were you given any specific instructions on how or

9    who to terminate first or last or how to proceed with your

10   terminations?

11   A.   Yes.

12   Q.   Were those written instructions?

13   A.   No.

14   Q.   What were your instructions in that regard?

15   A.   The verbal instructions that we were given were

16   associates that were within their 90-day probationary --

17   90-day probationary period and associates that were on

18   decision-making days.

19   Q.   Now, Ms. Jackson had had a decision-making day in

20   December; is that -- I mean February of '03; is that correct?

21        MS. AHUMADA:  If you don't know the date, you can

22        tell him you don't know the date.

23   A.   I don't know the date.

24   Q.   On the attendance sheet previously marked, "Run on

25   6/9/03" -- if you look at the second page of that.

1          MS. AHUMADA:  Are you referring to Exhibit 4?

2          MR. DUFF:  Exhibit 4, yes.

3      Q.   Second page, dated 2/19/03.  It says, "Decision

4  day."  Do you see that, Mr. Burns?

5      A.   Yes.

6      Q.   Why would decision day be listed on somebody's

7  attendance schedule?

8      A.   Decision day is marked because, for payroll reasons,

9  we must pay the associate when given a decision day to let us

10  know what day or why they were not present that day they were

11  scheduled.

12      Q.   So part of your instructions regarding your

13  reduction in workforce was to terminate those that were on

14  decision days; is that correct?

15      A.   Yes.

16      Q.   So did that mean anybody who had already had a

17  decision day was to be terminated or somebody who was -- the

18  next time they got a decision day was to be terminated?  I'm

19  trying to get an idea there.  Because she hadn't had a

20  decision day since February, it looks like.

21      A.   Can you rephrase the question.

22      Q.   What do you mean by the term "on decision days," or

23  however you termed it?

24          MS. AHUMADA:  Do you understand his question?

25          Because I don't.

47

1      Q.   Let me ask you this:  What were your instructions

2  with respect to termination regarding employees decision

3  days?

4      A.   Our instructions were to look at our staffing to be

5  able to get our wages in line with our sales.  To look at

6  folks or associates that have been at our facility for 90

7  days or less or associates that are currently on a

8  decision-making day.  Somebody that's had a decision-making

9  day in the past year.

10          MS. AHUMADA:  I'm sorry, can we have a follow-up

11          question, just to get this on the record:  This is

12          who you were considering looking at for

13          termination, not that you terminated everyone that

14          was on a 90-day or a decision-day?  Can you

15          clarify.  Is that okay?

16          MR. DUFF:  I'm not particularly interested, but

17          I'll ask the follow-up.

18      Q.   What was the policy there?  Were you to -- what your

19  attorney just explained was that you were just -- those were

20  the people you were to consider first as far as termination?

21      A.   Yes.

22      Q.   And what, from that -- let me ask you this:  In

23  considering those, how did you come to the decision to

24  terminate some as opposed to others?  What went into your

25  decision-making process?

1      A.    My decision, I would get a group of all associates

2    that were in their 90 days and all associates that were on

3    the decision-making day, referring to anyone that has a

4    decision-making day in the past year, those associates are

5    then forwarded to my DM as far as what is the amount of

6    associates that I need to -- need to have terminated to get

7    in line with my wages and approved by my district manager

8    based on reason of either performance or attendance or -- or

9    associates at that time not meeting their responsibilities of

10   their job.

11     Q.    Would you agree that at the end of the day, in

12   consultation with your district manager, you guys used your

13   judgment on determining who would be terminated?  It was your

14   decision?

15     A.    No.

16     Q.    Whose decision was it?

17     A.    It was my -- my district manager, and anybody that

18   she partnered with.

19     Q.    Whose decision was it to terminate Ms. Jackson?  If

20   you know.

21     A.    I don't know.

22     Q.    Did you discuss Ms. Jackson's termination with

23   anyone prior to it actually happening?

24     A.    I discussed potential associates that may be

25   involved in coincidence with the conference call that we got

1    with the assistant manager, Lisa Dolecki, Charles Smith, and

2    whatever assistant managers we had on duty at that time.

3        Q.   Do you recall specifically what was said regarding

4    Ms. Jackson's situation?

5        A.   I do not.

6        Q.   Do you know if, again, your -- do you know if you

7    took any notes of that meeting -- or that conference call I

8    should say, I'm sorry?

9        A.   I do not, no.

10       Q.   Do you know if her health was discussed at all?

11       A.   Her health was not discussed.

12       Q.   So you can't remember what was specifically

13   discussed, but you can remember that that was not discussed?

14       A.   Her health was not discussed.

15       Q.   Were her absences discussed?

16       A.   Her absences were discussed.

17       Q.   Was the reason for her absences discussed?

18       A.   I don't remember.

19       Q.   Did her termination have anything to do with her

20   condition?  Her health?

21       A.   No.

22       Q.   You would agree with me, though -- let me ask you

23   this:  Did it have to do with her absences?

24       A.   Yes.

25       Q.   You would agree with me, wouldn't you, though, that

1           C E R T I F I C A T I O N

2

3       I, Sondra A. Black, a Court Reporter and Notary

4   Public in and for the Commonwealth of Pennsylvania, do

5   hereby certify that the foregoing is a true and accurate

6   transcript of my stenographic notes in the

7   above-captioned matter.

8

9

10

11                          Sondra A Black

12

13

14

15   Dated: December 5, 2005

16                    Notarial Seal
17          dra A. Black, Notary P
         Waterford Twp., Erie Co
18           mission Expires Aug
                  nia Associat
19

20

21

22

23

24

25

# EXHIBIT K

After you have read the contents of this handbook:

**1. Read and sign the Acknowledgment,**

**2. Separate the Acknowledgment at the perforation, and**

**3. Give the signed Acknowledgment to your Manager.**

This handbook is intended solely as a general information guide to let Associates know about the current policies and programs Wal-Mart has in place. The policies and benefits presented in this handbook are for your information and do not constitute terms or conditions of employment. This handbook supersedes all prior handbooks. This handbook is not a contract. From time to time, Wal-Mart may determine that it needs to change some of the policies or programs in this handbook in order to better meet the requirements of our Associates and the Company. If any policies or programs are changed, modified, deleted, or supplemented, Wal-Mart will notify Associates as soon as possible. I acknowledge that I have received and read this Acknowledgment, and that I have had the opportunity to ask my Manager questions about both and that I fully understand the contents of both as they relate to my employment with Wal-Mart. I understand that the information contained in this handbook are guidelines only, and are in no way to be interpreted as a contract.

Signature:

Print Your Name:

Social Security Number: 416 - 56 - 2126

Date: 11-14-00



# Acknowledgment

# EXHIBIT L

# REQUEST FOR LEAVE OF ABSENCE

When you need time away from work, complete and submit this form for approval. Advance notice is requested, but notice of your need to be gone must be provided within 3 days and this form must be completed no later than 15 days from the first scheduled workday missed. Submit completed form for approval/disapproval as follows:
- • Hourly field associates ➔ Facility Manager .
- • Home Office hourly associates ➔ Manager ➔ People Division
- • Management associates ➔ your Division's People/Personnel area at the Home Office.

Request Date: _____ Work Location #: _____   ☒ Hourly   ☐ Salaried
Name: Darlene Jackson   SSN: _____
Current Mailing Address: 7650 Royann Fairview Pa. Phone: 474-2325

**DATES REQUESTED:**
* Continuous Leave Beginning: 2-4-03   Return Date: 2-6-03 or 2-7-
* Intermittent/Reduced Hours (available only when medically necessary; the Health Care 2-11-03
Provider's Certification Section, below, must be completed) (2-14-0
Beginning: _____   Ending Date: _____
Describe:

**TYPE OF LEAVE:**

☐ **MEDICAL LEAVE*** To be used when the associate has a medical condition (including pregnancy and childbirth, and on-the-job Workers' Comp. injuries) requiring time away from work. The Health Care Provider's Section, below, must be completed and signed. Before returning, associate must submit a return-to-work statement/release from a Health Care Provider detailing restrictions, if any. If eligible to receive short- or long-term disability benefits, the associate must file a claim by calling 1-800-492-5678.

☒ **PERSONAL**
* Is request due to birth, adoption or placement of foster child?   ☐ Yes*  ☒ No
* Is request to provide care for a seriously ill or injured family member? ☒ Yes*  ☐ No
(If yes, the Health Care Provider's Section, below, must be completed and signed.)
Relationship: My Daughter
* Other personal reason, explain: _____

☐ **MILITARY** (Attach copy of military orders.)
* Is request to fulfill 2 week summer camp duty?   ☐ Yes  ☐ No
* If yes, complete the "Military Pay for Summer Camp" worksheet **prior** to start of leave.

**HEALTH CARE PROVIDER'S CERTIFICATION:** The above ☐ Wal-Mart associate ☐ family member is under my care for: _____
If associate, Worker's Comp? ☐ Yes ☐ No   Dates: Begin Leave: _____   Return Date: _____
☐ Continuous leave required   ☐ Intermittent or Reduced Hours Leave required, describe: _____

(Stamp/Print Name, Address, Phone Number:)
Health Care Provider's Signature: _____

Date: _____

**INSURANCE:** Unless you submit a Family Status Change form to reduce or discontinue coverage, your present insurance coverage will continue for up to 12 weeks while on personal or military LOA and up to 1 year while on medical LOA. However, you must send the premium amount normally deducted from your paycheck for Medical, Dental or Life insurance to: Wal-Mart Group Benefits, Department 8096, Bentonville, AR 72716-8096. Write your name, social security number and work location number on your check or money order. (Payments for short- and long-term disability are not required while on LOA.) The premium is due each pay period (every two weeks) in which you do not receive a Wal-Mart payroll check and failure to pay premiums within 30 days of the due date will result in cancellation of your coverage. If coverage is canceled for non-payment, you may re-enroll upon return to work. However, if leave was longer than 12 weeks, you will be assigned a new enrollment date and pre-existing conditions will be excluded from coverage for 12 months. If Personal or Military leave extends beyond 12 weeks or you are unable to return to work from a medical LOA after 1 year, you may be eligible to elect continued coverage under COBRA.

I have read and understand the "Insurance" section above. Likewise, I understand that if I fail to return to work or request an extension of leave by the return date stated above, my associate benefits shall be subject to forfeiture and the company will have no further obligation to continue my employment. I also understand there will be no accumulation of benefits while I am on leave. I fully understand Wal-Mart's Leave of Absence policy.

Date: 1-30-03   Associate Signature: Darlene W Jackson

Manager's Signature: _____   Date: _____   ☒ Approved   ☐ Denied

* Leave for these reasons is designated and counted as leave pursuant to the FMLA.

Separate copies after approval   * White ➔ Facility's LOA File   * Pink ➔ Associate's Copy

# REQUEST FOR LEAVE OF ABSENCE

When you need time away from work, complete and submit this form for approval. Advance notice is requested, but notice of your need to be gone must be provided within 3 days and this form must be completed no later than 15 days from the first scheduled workday missed.    Submit completed form for approval/disapproval as follows:
* Hourly field associates → Facility Manager .
* Home Office hourly associates → Manager → People Division
* Management associates → your Division's People/Personnel area at the Home Office.

Request Date: _____ Work Location #: _____     ☒ Hourly    ☐ Salaried
Name: Darlene V Jackson     SSN: _____
Current Mailing Address: 7650 Royann Dr.    Phone: 474-2375

**DATES REQUESTED:**
° Continuous Leave Beginning: May 8 2003    Return Date: _____
° Intermittent/Reduced Hours (available only when medically necessary; the Health Care Provider's Certification Section, below, must be completed)
Beginning: May 8 2003    Ending Date: May 14-2003
Describe: _____

**TYPE OF LEAVE:**

☒ **MEDICAL LEAVE\*** To be used when the associate has a medical condition (including pregnancy and childbirth, and on-the-job Workers' Comp. injuries) requiring time away from work. The Health Care Provider's Section, below, must be completed and signed. Before returning, associate must submit a return-to-work statement/release from a Health Care Provider detailing restrictions, if any. If eligible to receive short- or long-term disability benefits, the associate must file a claim by calling 1-800-492-5678.

☐ **PERSONAL**
* Is request due to birth, adoption or placement of foster child?    ☐ Yes\*    ☐ No
* Is request to provide care for a seriously ill or injured family member?  ☐ Yes\*    ☐ No
(If yes, the Health Care Provider's Section, below, must be completed and signed.)
Relationship: _____
* Other personal reason, explain: _____

☐ **MILITARY** (Attach copy of military orders.)
* Is request to fulfill 2 week summer camp duty?    ☐ Yes    ☐ No
* If yes, complete the "Military Pay for Summer Camp" worksheet **prior** to start of leave.

**HEALTH CARE PROVIDER'S CERTIFICATION:** The above ☒ Wal-Mart associate ☐ family member is under my care for: _____
If associate, Worker's Comp? ☐ Yes ☒ No  Dates: Begin Leave: _____  Return Date: _____
☐ Continuous leave required    ☐ Intermittent or Reduced Hours Leave required, describe: _____
at off 2° to URI / laryngitis
(Stamp/Print Name, Address, Phone Number:)
Health Care Provider's Signature: _____
Date: _____

**INSURANCE:** Unless you submit a Status Change to reduce or discontinue coverage, your present insurance coverage will continue for up to 1 year while on LOA. If you choose to keep any Medical, Dental or Life Insurance, you **must send the premium amount** normally deducted from your paycheck to: Wal-Mart Benefits, Department 3001, P.O. Box 1039, Lowell, AR 72745. Write your name, social security number and work location on your check or money order. (Payments for short and long term disability are not required while on LOA.) **The premium is due each pay period (every two weeks)** in which you do not receive a Wal-Mart payroll check and **failure to pay premiums within 30 days of the due date will result in cancellation of your coverage.** While on a leave of absence, you may want to pay your premiums 2 weeks ahead to avoid a delay of your Special Pharmacy Benefits. If you did a status change to reduce or discontinue coverages when you went on LOA, you may do another status change to resume your coverages when you return to work. If coverage is cancelled for non-payment of premiums, you may be eligible for a reinstatement of coverage once a required number of hours are worked (see "Eligibility" section of Benefit book). If leave extends beyond 1 year, you may be eligible to elect continued coverage under COBRA.

I have read and understand the "Insurance" section above. Likewise, I understand that if I fail to return to work or request an extension of leave by the return date stated above, my associate benefits shall be subject to forfeiture and the company will have no further obligation to continue my employment. I also understand there will be no accumulation of benefits while I am on leave. I fully understand Wal-Mart's Leave of Absence policy.

Date: May 13 2003    Associate Signature: Darlene V Jackson
Manager's Signature: _____    Date: 5-15-2007 / ☒ Approved    ☐ Denied

\* Leave for these reasons is designated and counted as leave pursuant to the FMLA.

Separate copies after approval    • White → Facility's LOA File    • Pink → Associate's Copy

# EXHIBIT M

## Performance Appraisal
# Cashier

|  | E X C E E D S | M E E T S | B E L O W |
|---|---|---|---|

### Customer Service

| | | | |
|---|---|---|---|
| Practices 10 Foot Attitude. | ☐ | ☒ | ☐ |
| Wears appropriate work attire daily. | ☐ | ☒ | ☐ |
| Moves outside/front of register to greet the next Customer. | ☐ | ☒ | ☐ |

### Productivity

| | | | |
|---|---|---|---|
| Scans merchandise quickly and accurately. | ☐ | ☐ | ☒ |
| Achieves Item Per Hour goal. Company Goal: **375** Assoc. IPH: **357** | ☐ | ☐ | ☒ |
| Achieves Scanning Percentage goal. Company Goal: **100%** Associate's percentage: **100%** | ☐ | ☒ | ☐ |
| Attends all Cashier training sessions. | ☐ | ☒ | ☐ |

### Register Security, Safety, and Work Practices

| | | | |
|---|---|---|---|
| Utilizes "LISA" and BOB" and "CHANT." | ☐ | ☒ | ☐ |
| Uses proper lifting techniques and avoids twisting. | ☐ | ☒ | ☐ |
| Scans merchandise using the power grip whenever possible. | ☐ | ☒ | ☐ |
| Keeps front-end area clean and free of returns, objects, and liquids, and contacts Day Maintenance Associate when needed. | ☐ | ☒ | ☐ |
| Practices emergency and safety procedures (e.g. accidents, evacuations, emergency codes). | ☐ | ☒ | ☐ |
| Watches register area for security purposes and contacts CSM in the event of a problem. | ☐ | ☒ | ☐ |
| Keeps register drawer neat and organized. | ☐ | ☒ | ☐ |
| Approves checks according to Company guidelines. | ☐ | ☒ | ☐ |
| Promptly reviews pink slip (cash short/long) and returns it to the CSM and assists in the research of register overages/shortages. | ☐ | ☒ | ☐ |

### Utilizes CSM's Help

| | | | |
|---|---|---|---|
| Calls CSM for check approvals when additional support is needed (e.g. an out of town check written for a high dollar amount). | ☐ | ☒ | ☐ |
| Always utilizes front end procedures and tools when necessary (Customer Satisfaction Cards, price override function, host look up, voids/error corrections). | ☐ | ☒ | ☐ |

### Dependability

| | | | |
|---|---|---|---|
| Attendance and punctuality is within Company guidelines. Days Absent: **4** Days Tardy: **1** | ☐ | ☐ | ☒ |

### Training

| | | | |
|---|---|---|---|
| Current on CBLs    Company Goal: 100% Associate Current %: **100%** | ☒ | ☐ | |

# PERFORMANCE APPRAISAL

| Name: Darlene Jackson | Store # 2561 | Position: Cashier |
|---|---|---|
| SS#: 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 | | Current Pay Rate: 6.50 |
| Review Period: Yearly | | Increase Amount: 4%   26¢ |
| From: 11-14-00 | To: 11-14-01 | New Pay Rate: 6.76 |

☐ 90 Day          ☒ Annual          ☐ Follow Up

### STRENGTHS

• No Hand Keys • attends Cashier training Sessions • redlines
• uses disa and BoB • involved in Community Service Events
• Keeps Area clean and good. • Keeps drawer organized
• Aware of Security • Lets area in at [?] • Cashiers on CBL'S
• good with Customers at the front door • [?] and
thanks Customers • follows area policy

### AREAS FOR IMPROVEMENT

• Make decisions about Situations if you need help. (call for a C.S.M.
  make Sure you use your flashing light to get help).
• increase i.p.H
• attendance)
• Make Sure you Scan Everything over the E.A.S. deactivator.
• learn in other departments of the Store to work in

### ASSOCIATES COMMENTS/ GOAL SETTINGS

I P H   Up

*This is an evaluation of the Associate's Overall Job Performance.*

☐ EXCEEDS EXPECTATIONS     ☒ MEETS EXPECTATIONS     ☐ BELOW EXPECTATIONS

SIGNATURES:

| Associate's Signature | Print Associate's Name | Date |
|---|---|---|
| Darlene V Jackson | Darlene V Jackson | 10-9-01 |
| Deborah Vance | Deborah Vance | 10-3-01 |
| Hourly Supervisor's Signature | Print Hourly Supervisor's Name | Date |
| [signature] | Gail R. Lust | 10/9/01 |
| Salaried Manager's Signature | Print Salaried Manager's Name | Date |
| Pete Burns | Pete Burns | 10-3-01 |
| Facility Manager's Signature | Print Facility Manager's Name | Date |

| *Performance Appraisal* **Salesfloor Associate** | E X C E E D S | M E E T S | B E L O W |
|---|---|---|---|

| **Customer Service** | | | |
|---|---|---|---|
| Practices 10 Foot Attitude. | ☒ | ☐ | ☐ |
| Wears appropriate work attire | ☐ | ☒ | ☐ |
| Assists Customers in finding merchandise. | ☐ | ☒ | ☐ |
| Shows a sense of urgency with all assignments. | ☐ | ☒ | ☐ |
| Follows proper procedures for handling claims merchandise. | ☐ | ☒ | ☐ |
| Softlines/Apparel -- Is knowledgeable about: | | | |
| Sizing and colorizing. | ☒ | ☐ | ☐ |
| Hanging softlines. | ☒ | ☐ | ☐ |
| Rack rules. | ☒ | ☐ | ☐ |
| Fitting room procedures. | ☒ | ☐ | ☐ |
| Hardlines -- Is knowledgeable about: | | | |
| Cutting keys. | ☐ | ☒ | ☐ |
| Cutting chain. N/A | ☐ | ☐ | ☐ |
| Cutting fabric. | ☐ | ☒ | ☐ |
| Mixing paint. | ☐ | ☒ | ☐ |
| Live pet department. | ☐ | ☒ | ☐ |
| Homelines -- Is knowledgeable about: | | | |
| Razor case procedures N/A | ☐ | ☐ | ☐ |
| Perfume/cologne procedures N/A | ☐ | ☐ | ☐ |

| **Productivity** | | | |
|---|---|---|---|
| Zones the department. | ☐ | ☒ | ☐ |
| Maintains features. | ☐ | ☒ | ☐ |
| Follows proper procedures for: | | | |
| Ordering. N/A | ☐ | ☐ | ☐ |
| Markups/markdowns. N/A | ☐ | ☐ | ☐ |
| Signing/flagging/pricing/labels. | ☐ | ☒ | ☐ |
| Promptly gets returns from Courtesy Desk. | ☐ | ☒ | ☐ |
| Maintains all risers properly. | ☐ | ☒ | ☐ |

| **Safe Work Practices** | | | |
|---|---|---|---|
| Follows all safety and emergency policies and procedures. | | | |
| Properly uses ladders and ensures they are not left on the salesfloor. | ☐ | ☒ | ☐ |
| Ensures stable stacking of merchandise. | ☐ | ☒ | ☐ |
| Uses back support belt when necessary. | ☐ | ☒ | ☐ |
| Follows proper lifting techniques. | ☐ | ☒ | ☐ |
| Ensures all displays are secured in a safe and proper manner. | ☐ | ☒ | ☐ |

| **Dependability** | | | |
|---|---|---|---|
| Attendance and punctuality is within Company guidelines. Days Absent: ___4___  Days Tardy: ___ | ☐ | ☐ | ☒ |

| **Training** | | | |
|---|---|---|---|
| Current on CBLs    Company Goal: 100% Associate Current % _100_ | ☒ | ☐ | |

# PERFORMANCE APPRAISAL

| | | |
|---|---|---|
| Name: Darlene Jackson | Store # 2561 | Position: fitting room |
| SS#: | | Current Pay Rate: 6.51 |
| Review Period: yearly due by 10/05/02 | | Increase Amount: .26 |
| From: 11/14/01 | To: 11/14/02 | New Pay Rate: 6.77 |

☐ 90 Day        ☒ Annual        ☐ Follow Up

## STRENGTHS

Good Customer Service
Is willing to work in other areas
Helps / at the register when needed.
Helps teach other new associates
Assist the dept manager with freight

## AREAS FOR IMPROVEMENT

Continue to learn on the telxon
Do more PA announcements about the clearance in apparel.
Continue to keep the fitting room organized & clean.
Continue to practice Respect for the Individual.
Be more responsible about the organization of the fitting room
Need to be more aware of merchandise location
Attendence

## ASSOCIATES COMMENTS/ GOAL SETTINGS

— will learn the telxon

*This is an evaluation of the Associate's __Overall__ Job Performance.*

☐ EXCEEDS EXPECTATIONS    ☒ MEETS EXPECTATIONS    ☐ BELOW EXPECTATIONS

## SIGNATURES:

| Signature | Printed Name | Date |
|---|---|---|
| *Darlene V. Jackson* | Darlene V. Jackson | 10-7-02 |
| Associate's Signature | Print Associate's Name | Date |
| *Denise C. DeVore* | Denise C. DeVore | 9/30/2002 |
| Hourly Supervisor's Signature | Print Hourly Supervisor's Name | Date |
| *Allana Kinnear* | Allana Kinnear | 9/30/02 |
| Salaried Manager's Signature | Print Salaried Manager's Name | Date |
| *Pete Burns* | Pete Burns | 9-30-02 |
| Facility Manager's Signature | Print Facility Manager's Name | Date |

# EXHIBIT N

# COACHING FOR IMPROVEMENT FORM

Name: _Darlene Jackson_ SSN: _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_ Location: _2561_ Dept: _Fitting Room_

Position: _Fitting Room - Softlines_ Date: _2-5-03_

The following was observed of this Associate's behavior and/or performance: _Associate has_
_7½ absences in a 6 month period. Dates 8/17, 8/18, 8/20, 8/21,_
_11/1, 12/8, 12/9, 1/3, 1/29_

What is the impact of this behavior/performance on customer service, other Associates, and the profitability of the
operating unit? _Provides poor customer service + difficulty_
_in scheduling_

The behavior or performance expected next time: _Do not call off til 8/17/03_

The next level of corrective action if this behavior/performance continues will be: _Termination_

Written plan of action to be completed by the Associate: _____

Associate's Comments: _____

| | Print Name: | Signatures: | Level of Coaching |
|---|---|---|---|
| Associate coached: | _Darlene V Jackson_ | _Darlene V Jak_ | ___ Written Coaching |
| Supervisor: | _Lisa Dolecki_ | _Lisa Dolecki_ | X Decision-Making D |
| Witness: | _Charles F Smith_ | _Charles F Smith_ | |

Next Level of Supervision**: _____

**Only required if the Associate refuses to sign the Coaching for Improvement Form.

#9988664 (9/97)
WMP-63B

# EXHIBIT O

## COACHING FOR IMPROVEMENT FORM

Name: Darlene Jackson SSN: _____ Location: 2561 Dept: Softlines

Position: Fitting RM Date: 11/27/02

The following was observed of this Associate's behavior and/or performance: Darlene wrote a check for $22.82 on 11/5 on an account that was NSF

What is the impact of this behavior/performance on customer service, other Associates, and the profitability of the operating unit? Darlene has wnt merchandise that has not been paid for yet, this is an integrity issue.

The behavior or performance expected next time: Not write checks on an account w/ NSF

The next level of corrective action if this behavior/performance continues will be: D-Day, or including up to termination

Written plan of action to be completed by the Associate: _____
x I will not do write any checks to Wal Mart that with no I will have mony in the account

Associate's Comments: ~~xxxxxxxxxx~~
x N/C

| | Print Name: | Signatures: | Level of Coaching |
|---|---|---|---|
| Associate coached: | Darlene Jackson | Darlene Jackson | ✓ Written Coaching |
| Supervisor: | Adan Montanya | A Montanya | ___ Decision-Making Day |
| Witness: | Fasu Smith | Fasu Smith | |

Next Level of Supervision**: _____    _____

**Only required if the Associate refuses to sign the Coaching for Improvement Form.

#9988664 (9/97)
WMP-63B

*Take to Next level* *Jackson*

WMO-1 (10/96)

## FOLLOW UP ON CUSTOMER CHECKS RETURNED BY BANK



(Make

ection

**NOTE: NOTIFY STORE MANAGER IMMEDIATELY ON ANY CHECK WRITTEN BY A WAL-MART ASSOCIATE**

*22.8*

Telephone record follow-up:

| Date of Call | Result of Conversation, Person Talked To | Employee Making Call |
|---|---|---|
| | she also paid on a check on 10-1~ for $29.43, she has had a bad check from over a year ago, paid, but we don't have that info. anymore because it's ~~been~~ been over a year | |

Date certified letter sent _____ /_____ /_____

Date check was picked up by customer _____ /_____ /_____
(Once check is picked up this WMO-1 form can be destroyed)

Date charged off _____ /_____ /_____

Charged off by _____

Staple Certified Receipt H

# EXHIBIT P

Supervisor:     LISA DOLECKI

Associate:     DARLENE JACKSON
SSN:     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

## Unapproved Attendance Exceptions

### Unapproved Absences



| DATE | DESCRIPTION | REASON CODE | RECURRING | TOTAL ACTIVE ABSENCES (6 Month Rolling) |
|------|-------------|-------------|-----------|------------------------------------------|
| 08/17/2002 | Sick-Unapproved | 70 | | 1 |
| 08/18/2002 | Sick-Unapproved | 70 | | 2 |
| 08/20/2002 | Sick-Unapproved | 70 | | 3 |
| 08/21/2002 | Sick-Unapproved | 70 | * | 3 |
| 11/01/2002 | Sick-Unapproved | 70 | | 4 |
| 12/08/2002 | Other-Unapproved Absence | 75 | | 5 |
| 12/09/2002 | Other-Unapproved Absence | 75 | | 6 |
| 01/03/2003 | Sick-Unapproved | 70 | * | 6 |
| 01/29/2003 | Sick-Unapproved | 70 | | 7 |

### Unapproved Left Earlys

| DATE | DESCRIPTION | REASON CODE |
|------|-------------|-------------|
| 08/16/2002 | Unapproved Left Early | 78 |

Unappproved Attendance Exceptions Summary:
Timeframe:     08/15/2002 to 02/14/2003
Active Attendance Exceptions (6 Month Rolling)

| | |
|---|---|
| Total Active Unapproved Absences | 7 |
| Total Active Unapproved Tardies | 0 |
| Total Active Unapproved Left Earlys | 1 |
| Total Active Unapproved Worked Shifts | 0 |

Timeframe:     08/15/2002 to 02/14/2003

| | |
|---|---|
| Total Unapproved Absences | 7 |
| Total Unapproved Tardies | 0 |
| Total Unapproved Left Earlys | 1 |
| Total Unapproved Worked Shifts | 0 |

## Approved Attendance Exceptions

### Approved Absences

| DATE | DESCRIPTION | REASON CODE | RECURRING | TOTAL ACTIVE ABSENCES (6 Month Rolling) |
|------|-------------|-------------|-----------|------------------------------------------|
| 09/05/2002 | Other-Mgr. Approved Absence | 33 | | |
| 10/02/2002 | Other-Mgr. Approved Absence | 33 | | |
| 10/17/2002 | Other-Mgr. Approved Absence | 33 | | |
| 10/25/2002 | Other-Mgr. Approved Absence | 33 | | |
| 10/31/2002 | Other-Mgr. Approved Absence | 33 | * | |
| 11/25/2002 | Other-Mgr. Approved Absence | 33 | | |
| 12/03/2002 | Other-Mgr. Approved Absence | 33 | | |
| 12/04/2002 | Other-Mgr. Approved Absence | 33 | | |
| 12/10/2002 | Other-Mgr. Approved Absence | 33 | | |

Supervisor:     LISA DOLECKI

Associate:      DARLENE JACKSON
SSN:            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

From:     08/15/2002
To:       02/14/2003

12/12/2002     Other-Mgr. Approved Absence                    38

## Approved Absences

| DATE | DESCRIPTION | REASON CODE | RECURRING | TOTAL ACTIVE ABSENCES (6 Month Rolling) |
|------|-------------|-------------|-----------|------------------------------------------|
| 12/13/2002 | Bereavement | 32 | | |
| 12/14/2002 | Bereavement | 32 | | |
| 01/07/2003 | Other-Mgr. Approved Absence | 38 | | |
| 01/08/2003 | Other-Mgr. Approved Absence | 38 | | |
| 02/04/2003 | LOA (FMLA, ADA) | 34 | | |
| 02/05/2003 | LOA (FMLA, ADA) | 34 | | |
| 02/06/2003 | LOA (FMLA, ADA) | 34 | | |
| 02/11/2003 | LOA (FMLA, ADA) | 34 | | |
| 02/12/2003 | LOA (FMLA, ADA) | 34 | | |

2/13/14  LCK

## Approved Tardies

| DATE | DESCRIPTION | REASON CODE | ACCRUED ABSENCE | APPLIES TOWARD 3 TARDY ABSENCE |
|------|-------------|-------------|-----------------|-------------------------------|
| 12/29/2002 | Manager Approved Tardy | 41 | | N |
| 01/04/2003 | Manager Approved Tardy | 41 | | N |

## Approved Left Earlys

| DATE | DESCRIPTION | REASON CODE |
|------|-------------|-------------|
| 08/25/2002 | Manager Approved Left Early | 42 |
| 09/15/2002 | Manager Approved Left Early | 42 |
| 09/26/2002 | Manager Approved Left Early | 42 |
| 11/07/2002 | Manager Approved Left Early | 42 |
| 11/11/2002 | Manager Approved Left Early | 42 |
| 11/20/2002 | Manager Approved Left Early | 42 |
| 11/27/2002 | Manager Approved Left Early | 42 |
| 01/01/2003 | Manager Approved Left Early | 42 |
| 01/02/2003 | Manager Approved Left Early | 42 |
| 01/04/2003 | Manager Approved Left Early | 42 |
| 01/10/2003 | Manager Approved Left Early | 42 |

## Approved Non-Scheduled Worked Shifts

| DATE | DESCRIPTION | REASON CODE |
|------|-------------|-------------|
| 09/30/2002 | Manager Approved Non-Sched Worked | 43 |
| 11/03/2002 | Manager Approved Non-Sched Worked | 43 |
| 11/27/2002 | Manager Approved Non-Sched Worked | 43 |

WAL * MART STORES, INC.
Associate Attendance Report

STORE NO: 2551

Supervisor:     LISA DOLECKI

Associate:      DARLENE JACKSON
SSN:            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

From:     08/15/2002
To:       02/14/2003

Approved Attendance Exceptions Summary:
Timeframe:      08/15/2002 to 02/14/2003
        Active Attendance Exceptions (6 Month Rolling)
        Total Active Approved Absences          18
        Total Active Approved Tardies            2
        Total Active Approved Left Earlys       11
        Total Active Approved Worked Shifts      3

Timeframe:      08/15/2002 to 02/14/2003
        Total Approved Absences                 18
        Total Approved Tardies                   2
        Total Approved Left Earlys              11
        Total Approved Worked Shifts             3

LEGEND:

** ABSENCE: Associate did not work scheduled shift
** TARDY: Associate clocked in more than minutes after scheduled start time
** LEFT EARLY: Associate clocked out 30 minutes or more prior to scheduled leave time
** NON-SCHEDULED WORKED SHIFT: Associate worked a shift not scheduled
** RECURRING: An absence tied/related to a previous absence, counted as part of the original absence
    (ex. Strep throat: day 1 is an absence; day 2 and 3 are recurring absences, tied to the original absence)
** APPLIES TOWARD 3 TARDY ACCRUED ABSENCE: Tardies which count toward the Unapproved Absence calculation for three accrued Unapproved
** ACTIVE ATTENDANCE EXCEPTIONS (Absences, Tardies, Left Early, Non-Sched Worked shifts):
    Attendance exceptions which have occurred in the last six months, and are subject to Coaching
    if they are Unapproved

NOTE: Attendance Exceptions are reported for all Job codes in which Associate has worked within the Timeframe above

                ** END OF JOB **
                Associate Attendance Report
        REPORT: sas3341r RUN ON: 02/15/2003 AT 20:22:24

        ******  WAL-MART STORES, INC. CONFIDENTIAL  ******

# EXHIBIT Q

I Darlene Jackson will try harder to get to work on time, and not miss so many days of work. I understand that this is an inconvenience to my associates and the customers that come to Wal-Mart. I also understand that I should schedule doctor appointments and other things after or before I have to go to work. Again sorry for this inconvenience and you have my word that I will try harder to succeed at what Wal-Mart employees should do.

Thank you,

Darlene V. Jackson

# EXHIBIT R

WM9-20 Revised 04/03

# EXIT INTERVIEW

An Exit Interview is to be conducted for all Associates leaving the employment of Wal★Mart Stores, Inc. DATE OF TERMINATION MUST BE THE LAST DAY WORKED, EXCEPT IN CASES OF A LEAVE OF ABSENCE, SUSPENSION, OR 3 DAYS UNREPORTED ABSENCE.

Associate Name _Darlene Jackson_                Social Security No. _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_

Associate ID No._____    Facility/Dept./Store # _2561_    ☑ Hourly  ☐ Management

Actual Last Day Worked _6/7/03_                Vacation Avail (Mgmt. Only _____

Updated Address and Phone Number: _____

Detailed Statement of Termination. This Section Needs To Be Completed By The Associate for Voluntary Termination or By The Manager/Supervisor for Involuntary Termination. (Please be specific.)

_Darlene Six unapproved absences in the Six month rolling peri_
_this was in conection to previous Coachings._

| VOLUNTARY TERMINATION (Eligible to re-apply) | | INVOLUNTARY TERMINATION (Eligible to re-apply) | |
|---|---|---|---|
| 03 ___ | Not Available For Work (NVL) | 37 ___ | Misconduct w/Coachings (CON) |
| 04 ___ | Failure to Return to L.O.A. (NRL) | 47 _X_ | Excessive Absences and/or Tardies (EAT) |
| 05 ___ | Refused Offer of Work (ROW) | 53 ___ | Insubordination (INS) |
| 06 ___ | Job Abandonment/Three Days Unreported | 55 ___ | Inability to Perform Job (IPJ) |
| | Absence (DUA) | 66 ___ | 1st Violation of Fraternization Policy (FVP) |
| 10 ___ | To Leave the Area (LTA) | 72 ___ | Unintentional Violation of Corporate HIPAA* Privacy |
| 16 ___ | Child Care/Dependent Care Issues (CHI) | | Policy (UVH) *Health Insurance Portability and Accountability Act |
| 17 ___ | Due to Health (DTH) | 75 ___ | Deceased (Call Profit Sharing & Life Ins.) (DEA) |
| 20 ___ | Work Hours (HRS) | 92 ___ | Lack of Work (Job Eliminated, Location |
| 21 ___ | Salary (PAY) | | Closed, Reduction in Force) (LOW) |
| 22 ___ | Working Conditions (WOR) | 97 ___ | End of Temporary Assignment (ASC) |
| | | | |
| 24 ___ | Benefits (BEN) | | |
| 25 ___ | Career Opportunities (PRM) | | |
| 28 ___ | Supervisor (SUP) | **INVOLUNTARY TERMINATION (Mandatory No Rehire)** | |
| 29 ___ | Walked Off Job (WOJ) | 77 ___ | Intentional Violation of Corporate HIPAA* Privacy |
| 30 ___ | Stay at Home (SAH) | | Policy (IVH) *Health Insurance Portability and Accountability Act |
| 31 ___ | Attend School (EDU) | 78 ___ | Gross Misconduct – Integrity Issue (Theft, Violent Act, |
| 85 ___ | Retirement (RTD) | | Dishonesty, Misappropriation of Company Assets) (GMI) |
| 106 ___ | Failure to Produce Employment Documents | 79 ___ | Gross Misconduct – Other (GMO) |
| | in a Timely Manner (FTP) | 99 ___ | 2nd Violation of Fraternization Policy (FRA) |
| | | 107 ___ | Falsification of Employment Documents (FED) |

Re-Hire Recommended ☑ Yes  ☐ No (Explain-General Comments) _____

_____

The following Wal★Mart property must be collected at the time of Exit Interview: (Please check all that apply)
☑ Badge          ☑ Discount Card (s)                ☑ Weight Belt          ( ) Other _____
☑ Smock          ( ) Company Credit Cards/Phone card     ☑ Box Cutter

NOTE:  To be considered for re-employment, you must re-apply. Your previous work record with Wal★Mart will be reviewed. The Company assumes no obligation to contact you for possible re-employment. Where state law allows, a Neutral Reference will be provided to external employers seeking information regarding your employment with Wal-Mart Stores, Inc. Dates of employment and last position held is the only information that will be released.

_Darlene Jackson_        _6-7-03_                _Lisa Dolecki_        _6-7-03_
ASSOCIATE        DATE                SALARIED MEMBER OF MANAGEMENT        DATE

_(signature)_        _6-7-03_                _(signature)_        _6-9-03_
HOURLY SUPERVISOR        DATE                FACILITY MANAGER        DATE