IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| Darlene Jackson, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-33E |
| | ) | |
| Wal-Mart Stores, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION

Pending before the Court is Defendant Wal-Mart Stores' motion for summary judgment on all counts of the Complaint filed against it by Plaintiff Darlene Jackson ("Plaintiff" or "Jackson") (Doc #12). Plaintiff's Complaint alleges that Defendant Wal-Mart failed to reasonably accommodate Plaintiff's disability during the course of her employment with Wal-Mart in violation of the Americans with Disabilities Act.

For the reasons set forth below, Defendant's motion for summary judgment is granted.

## I. Relevant Facts.

Viewing the facts in a light most favorable to the non-moving party, Plaintiff, following is a recitation of the facts the Court has found relevant to the pending motion for summary judgment.

### A. Plaintiff's health.

Plaintiff has asthma. Plaintiff's deposition, p. 22. Certain smells set off the asthma. Id. Plaintiff uses an inhaler twice a day. Id. at 6. The medication Plaintiff has taken for her

asthma has not improved her symptoms. Id. at 42.  There are times when Plaintiff cannot get

her asthma under control. Id. at 35. She can have an asthma attack and get an infection and

lose her voice. Id. So Plaintiff's asthma is variable; sometimes it "doesn't go off; sometimes

it does." Id. at 38. Plaintiff cannot predict when she might have an asthma attack. Id. at 102.

At the time Plaintiff worked at Wal-mart, from November 2000 until June 2003, she

was taking medication for the asthma. Id. at 42. She used the inhaler at work. Id. at 46.  None

of these medications improved the asthma. Id.  Sometimes when she used the inhaler, it let

her breathe again. Id. But if she did not get to the inhaler quickly enough, then it wouldn't

work and different measures would have to be taken. Id.  Sometimes caffeine would help. Id.

at 42-43. Other times, management would have to call an ambulance. Id. at 43.  Ambulances

were called at least 3 times to Wal-Mart because Plaintiff could not get her asthma under

control. Id.  Plaintiff was working as a cashier two of the times an ambulance had to be

called; the other time she was working in the fitting rooms. Id. at 44. Plaintiff recalled

leaving her shift at Wal-Mart early due to her asthma three or four times. Id. at 79.

Plaintiff was able to walk while she was working at Wal-Mart. Id. at 45. She could

walk as long as her shift lasted. Id.  If she had to get from point A to point B quickly, she

could get there quickly, but would get out of breath "real easy" because of the asthma; she

would not have to use the inhaler for this unless it got real bad. Id. at 46.

During the time Plaintiff worked at Wal-Mart, she could care for her personal

hygiene. Id. at 46. During this time period, Plaintiff was able to drive. Id. at 47. She was also

able to lift things. Id. at 47. There were a couple of times during this period when her asthma

would affect her vocal cords to the point where she had no voice. Id.  When this happened,

Defendant still wanted her to work and she worked as much as she possibly could. Id. Her

2

problems with her voice occurred while she was working as a cashier, in the fitting room, and in the toy department. Id. at 47-48.

Plaintiff does not have any restrictions with regard to her asthma. Id. at 48. She just has to watch for smells; also, certain perfumes can set it off. Id. According to the Plaintiff, restricting her exposure would require putting her in a bubble. Id. Different types of plants and different types of perfume can trigger her asthma. Id. at 48.

On the days Plaintiff would call off sick, she would stay at home. Id. at 50. There were times her condition would improve at home and times it would not improve. Id.

Medical records reflect that on August 18, 2002, Plaintiff went to Hamot Medical Center complaining of chest pains. On the History & Physical form completed by Hamot personnel, concerning Plaintiff's asthma, it was noted that Plaintiff stated she had used her "puffers" (presumably an inhaler) a few times the day before without relief and that she used her "puffers" rarely at home. Her discharge summary noted with respect to her asthma, that Plaintiff had been stable on Azmacort and p.r.n. Albuterol; she had been using her "puffers" intermittently, and her asthma was stable.

Plaintiff had a serious asthma attack in May of 2003. Id. at 63. Medical records reflect that on May 9, 2003, Plaintiff went to see Dr. Michael Spellacy, D.O. complaining about her asthma, that her chest was tight, that she had "no air," and that she currently was taking "Advair 250/50, 1 puff bid, Albuterol q 4 hours" with minimal relief. Dr. Spellacy noted that an examination of her lungs revealed decreased breath sounds throughout. Plaintiff was given a nebulizer treatment, and that after the treatment, she had clear lung fields and better air flow. Dr. Spellacy's assessment was acute exacerbation of asthma.

3

Plaintiff also is dyslexic. Id. at 33. The dyslexia caused her to sign some papers at Wal-Mart that she did not understand. Id. at 86. One was the Wal-Mart matrix of essential job functions form. Id. She told them that she had dyslexia and they told her "[j]ust read it to the best of knowledge, because we're not allowed to read it to you." Id.

### B. Plaintiff's job at Wal-Mart.

Plaintiff began working at Wal-Mart as an associate in November 2000. Plaintiff's deposition, p. 16. She was hired by "Bobbi." Id. She was hired to stock the shelves and help customers in the toy department. Id. at 17, 19-20. Her supervisor in the toy department was "Joe." Id. at 17. After working in the toy department for the holiday season, she began working in the shoe department. Id. at 17. She worked full-time. Id. Her duties in the shoe department were the same as in the toy department. Id. at 20. Her supervisor in the shoe department was "Bob." Id. at 18. Next, after working in the shoe department for 2 or 3 months, Plaintiff became a cashier. Id. While a cashier, Plaintiff was supervised daily by whomever was the "CSM" during her shift. Id. at 18-19. Her duties as a cashier were to cash out the customer and help them. Id. at 20. After the cashier position, she worked in the fitting rooms. Id. at 19. There her supervisor was "Denise." Id. Plaintiff's duties in the fitting rooms were to count out how many items the customer was trying on, give them a number that matched the number of items they were trying on, open the door for them, make sure they brought the clothes back out, answer the telephone and relay messages over the loud speaker. Id. at 20. Plaintiff then went back to being a cashier. Id. at 19. She did this for about a week and then she was fired on or about June 7, 2003. Id.

Plaintiff received a copy of the employee handbook when she first started working. Id. at 20-21. She signed the handbook on November 14, 2000. Id. at 21. On April 3, 2001,

4

she signed a paper out of the book, but did not receive the book. Id. at 22.

At the time she was hired, "Keith" was the manager of the store. Id. at 22.On the day she was hired, Plaintiff brought to the attention of Bobbi and Keith the fact that she has asthma and that certain smells set off the asthma. Id. at 22-23. They said it was okay. Id. at 22.  "And they said that we will deal with it when it happens, that I could do the inhaler when I needed it. And they told me that I had to keep my inhaler with me at all times in my pocket or have it in a container or something, and I did do that." Id. at 23-24.

On November 6, 2000, the day she was hired, Plaintiff signed a form stating that she had "the ability to perform all of the above functions with or without reasonable accommodations." Id. at 51. She signed the form because Bobbi told her to do so "They had me - this is when I talked to them about the asthma to Bobbi. She said: they understood and everything, to mark yes, that I could do that, because we didn't know what would happen at that time, if it would set off the asthma or not, what I could do or not." Id.

Plaintiff also received a copy of Defendant's corporate policy on attendance and punctuality. Id. at 25. Plaintiff reviewed the policy and said she understood it before she signed it. Id.  She recalled being told either verbally or because of the attendance policy, that associates should not have more than three unapproved absences in a rolling six-month period. Id. at 26.

All of Plaintiff's absences were approved by Pete Burns ("Burns"), a manager, who always told her "[d]on't worry about it; we understand your problem." Id. at 26.  Once, while Plaintiff was working in the toy department, she was sick for a whole week; Keith said that was okay. Id.

5

Plaintiff thinks there were more than 2 times when her doctor had her take a medical leave from Wal-Mart because she did not have a voice because she was having a difficult time getting her asthma under control. Id. at 26-27, 29.  One of the times, she asked for a medical leave was when she was stung by a cactus at Wal-Mart and her throat became swollen. Id. at 26, 30, 80.  She was off for quite a while "because of the toxins and everything." Id. at 82.

She also requested a medical leave from Wal-Mart once because her daughter had to get her tonsils out. Id. at 27. The time Plaintiff missed work because of her daughter's illness, between February 4 and February 14, 2003, was counted against her by Lisa Dolecki ("Dolecki") in terms of days missed under the attendance punctuality policy. Id. at 30-32. Dolecki was an assistant manager at Wal-Mart. Burns deposition, p. 50. Plaintiff received a verbal reprimand for the time she missed for her daughter's illness. Plaintiff's deposition, p. 31. This was done even though Burns said it was okay for her to miss. Id.

Two of the medical request forms were dated January 30, 2003 and May 15, 2003. Id. at 30. When she made the requests for a medical leave, Plaintiff always used the official request form and had her doctor sign. Id. at 27.  Every time Plaintiff asked for a medical leave, her request was granted. Id. at 28.

Through her doctor (she is not sure whether it was Dr. Spellacy or Dr. Beck), Plaintiff requested an accommodation from Defendant relevant to her asthma. Id. at 33-34. Her doctor asked Wal-Mart "if they could accommodate me by my absentees and getting the inhaler into me as soon as possible." Id. at 34. Defendant let her keep the inhaler with her. Id. at 34.

Plaintiff herself also requested that Defendant give her leeway with respect to her absences. Id. at 34-35. She asked Keith, Bobbi and Burns. Id. at 35.  She told them she has

6

asthma and that there were problems with smells "and stuff." Id. They told her: "Okay, if you need your inhaler use it, but just let somebody know where you're at at all times." Id. Concerning her request about missing work, Plaintiff told them that there were going to be times when she has an asthma attack, and there would be an infection or she'd lose her voice or she otherwise would not be able to get her asthma under control, and would her being absent from work be a problem. Id. at 35. First she asked Keith. Id. at 36. He agreed to her request; he said it was fine. Id. at 36-37 She's not sure she asked Burns, a subsequent manager to Keith, because she figured it was in her record. Id. at 36. Through her request, Plaintiff wanted Defendant not to punish her for missed days for the asthma if she had a doctor's excuse. Id. at 37. Plainitff does not think there should have been any limits on the number of times she could have called off sick. Id. at 38.

Plaintiff's doctor asked Wal-Mart if they could have Plaintiff not handle plants at the register, but Defendant said no, that could not be done. Id. at 48. What Plaintiff would do was turn on her light at the register and someone would come over and scan the plant for her. Id. at 48-49. But often, noone would get there, and Plaintiff would just scan the plant herself because she did not want the customer to wait. Id. at 49.

Plaintiff knew that on the days she did not come to work because of her asthma, it caused inconveniences to the other associates because there was one less cashier to run the register and that this inconvenienced the customers in a way because having one less cashier meant it took them longer to check out. Id. at 56.

Because she realized she sometimes inconvenienced Defendant, anytime Wal-Mart needed Plaintiff to come in, for example, if they were short-handed, she would go in. Id. at 57. She also would not accept sick payment for the days she missed. Id.

Plaintiff was not told by anyone at Wal-Mart that her attendance was unacceptable, until Lisa Dolecki told her. Id. at 57. Dolecki told Plaintiff this 2 or 3 months before Plaintiff was terminated. Id.

Plaintiff signed a cashier performance evaluation form dated October 9, 2001, wherein it was stated that an area where improvement was needed was her attendance. Id. at 59. Plaintiff agreed with this evaluation. Id. Gail was the manager on this evaluation. Id. at 61. Gail did not discuss attendance with Plaintiff at this time. Id.

Plaintiff also signed a sales floor associate performance appraisal form on October 7, 2002. Id. at 61. Again, attendance was listed as an area for improvement, but no one discussed the issue with her. Id.

In May, 2003, Plaintiff talked to Burns about the attendance issue. Id. at 63. Plaintiff had missed some work days in May because first she had a car accident, then an asthma attack and then had a nervous condition due to family problems. Id. at 63. She missed one day because of the accident. Id. at 64-65. She missed a day or two because of the asthma attack, until she could get the asthma under control. Id. at 68. Plaintiff couldn't remember how many days she missed because of her nerves, but she left work early one day because of it. Id. at 67, 85. Concerning these missed days, Burns said "[d]on't worry about it. You're going to be okay. Just take care of yourself." Id. at 63. Plaintiff interpreted this to mean that she did not have to worry about her job; that her job would be there when she got better and was able to go back to work. Id.

Plaintiff did not bring in a doctor's note related to the car accident. Id. at 65. She was on her way to work when she had the accident and had to go to the emergency room. Id. at 64. She called Defendant and told them where she was. Id. She was told not to worry about

8

anything. Id. When she came back, she showed Burns the paperwork from the emergency room. Id.  She did have a doctor's note with respect to the nervous condition. Id. at 68. She did not fill out a medical form because Burns told her she did not have to have one; the emergency room paperwork was fine. Id.

Plaintiff did not receive a written warning about attendance until after Dolecki came to the Wal-Mart store. Id. at 62. When Dolecki told Plaintiff she was concerned about Plaintiff's attendance, Plaintiff told her everybody else had been okay with her attendance because of her asthma. Id. Dolecki replied that she was Plaintiff's advisor and that she was worried about it. Id.  Before Dolecki arrived at the Wal-Mart store, no one had brought the attendance issue to Plaintiff's attention. Id. at 72.

Plaintiff and Dolecki had a "Decision-Making Day" coaching session on February 15, 2003, related to Plaintiff's absence from work on December 8 and 9, 2002 for her father-in-law's funeral. Id. at 70, 72. Plaintiff had told Wal-Mart at the time of her father-in-law's death that she was calling off because her father-in-law had passed away. Id.  Burns knew about the death. Id. at 71. There is not a form to fill out for taking time off due to a death in the family.  Id. at 70. Wal-Mart's bereavement policy is 3 days off and covers in-laws. Id.

At the "Decision-Making Day" meeting, Plaintiff explained to Dolecki that the dates involved were ones she had called because of the death in her family. Dolecki still gave Plaintiff (and Plaintiff signed) a written warning about attendance from Dolecki dated February 15, 2003; the form is called a "Coaching for Improvement" form. Id. at 69 and 71. Plaintiff asked Dolecki to put on the form Plaintiff's explanation for why she was not at work. Id. at 71. Dolecki said no because she considered those unexcused absences. Id. Dolecki told Plaintiff to try not to miss any more work. Id.  The form also said that Plaintiff

was expected not to call off again until August 17, 2003. Id. at 72. Plaintiff asked Dolecki

what unexcused absences meant, and if that pertained to doctors' excuses or not; Dolecki did

not answer Plaintiff.  Id. at 99-100.

Plaintiff had asked Burns once what unexcused absences meant. Id. at 103. Burns told

her "that it was [an absence] that we don't give an okay to. We don't accept." Id. at 103-104.

Burns told Plaintiff that all of her absences were okay, which she interpreted to mean they

were excused, not unexcused. Id.

As a result of the written warning by Dolecki in February 2003, Plaintiff had to write

a letter to Dolecki saying that she would try hard not to miss any more work and that she

understood it was an inconvenience to the other associates and customers; she also had to

take a day off without pay. Id. at 73-74. Plaintiff wrote the letter. Id.  At this time, Dolecki

also reviewed the Wal-Mart attendance policy with Plaintiff. Id.  at 99.

On June 7, 2003, Plaintiff was told by Dolecki that she was terminated. Id. at 45, 87.

Plaintiff was told that the reason she was terminated was because she had too many absences.

Id. at 87, 100. She was surprised to be terminated because Burns had told her that everything

was okay and not to worry about anything." Id.

Plaintiff was terminated as part of a reduction in force. Burns deposition, p. 45. Burns

was given verbal instructions that in deciding whom to terminate, he was to look first at

associates who were within their 90-day probationary period and associates who had had a

decision-making day in the last year. Id. at 46, 48, and 49. Burns compiled a list of all

associates and passed the list of names onto his district manager. Id. at 49. The district

manager, and anyone she partnered with, made the termination decision. Id. Burns did not

know who made the decision to terminate Plaintiff. Id.

Prior to Plaintiff being terminated, Burns discussed Plaintiff's absences with his District Manager in a conference call. Id. at 50. He did not discuss Plaintiff's health with the District Manager. Id.

Wal-mart's Attendance/Punctuality Policy states "[r]egular and punctual attendance is a required and essential function of each Associate's job. We do acknowledge that an Associate may have occasion to miss work, and we will accommodate these needs to the extent business demands allow." Attendance/Punctuality Policy, p. 1. It also states "Facility Management will review daily attendance exceptions when Associates do not work their scheduled hours. These exceptions will be assigned either an approved or unapproved reason code and will remain active for a rolling six-month period." Id. A "rolling six month period" is defined as "the previous six months from the current date." The policy also states "Associates should not have more than three (3) unapproved absences in a rolling six -(6) month period." Id. The policy also states "Approved absences are defined as: [1] Bereavement leave and emergency volunteer time; [2] Emergency situations (i.e. weather, medical emergencies]; [3] Requested schedule changes that are approved by management one (1) day prior to the change, including leave of absence." Id. at p. 2. The policy also states in relevant part: "[t]he following exception applies to both absences and tardies and must not be counted against the Associate's attendance record if management is notified according to guidelines. [1] Adjustments accommodating the Family Medical Leave Act (FMLA) or a disability as defined by the Americans with Disabilities Act. Intermittent leave is allowed as long as the leave falls under FMLA." Id. at p. 3. The policy calls for termination if an Associate has 6 or more unapproved absences in a rolling six-month period. Id. at p. 4.

11

Both Burns and Dolecki testified at their depositions that under Wal-Mart's attendance policy, if an employee called in sick and said she couldn't come to work that day, even if she later brought in a doctor's excuse, the missed work day would be deemed to be "unexcused." Burns deposition, p. 37; Dolecki deposition, p. 14. Also, if an employee missed consecutive days for the same reasons, under the Wal-Mart policy, that would constitute only one absence. Dolecki deposition, p. 14.

When an employee calls off work, difficulties encountered by the Wal-Mart management were loss of customer service, loss of productivity, and possibly higher wage costs and safety issues due to there being not enough associates on the floor. Burns deposition, p. 40.

An Associate Attendance Report was run on Plaintiff; the Report listed Plaintiff as having an unapproved absence because of being "sick," on (1) August 17, 2002, (2) August 18, 2002, (3) August 20, 2002, (4) August 21, 2002, (5) November 1, 2002, (6) January 3, 2003, (7) January 29, 2003, (8) February 13, 2003, (9) February 14, 2003, (10) May 5, 2003, (11) May 9, 2003, (12) May 10, 2003, (13) May 29, 2003, and (14) May 30, 2003. See Defendant's Exhibit I. The Report also listed Plaintiff as having as unexcused absences due to "other" on December 8, 2002 and December 9, 2002, an unapproved tardy on February 28, 2003 and an unapproved left early on August 16, 2002. Id. The Report counts these unexcused absences as being 13 from June 7, 2002 to June 7, 2003, and 7 from December 9, 2002 to June 8, 2003. Id.

A second Associate Attendance Report was run on Plaintiff; this Report indicated that Plaintiff had manager "approved absences" on (1) September 5, 2002, (2) October 2, 2002, (3) October 17, 2002, (4) October 25, 2002, (5) October 31, 2002, (6) November 25, 2002,

(7) December 3, 2002, (8) December 4, 2002, (9) December 10, 2002, (10) December 12, 2002, (11) January 7, 2003, and (12) January 8, 2003. See Defendant's Exhibit P. The Report also indicated that Plaintiff had "approved absences" for "bereavement" on December 13, 2002 and December 14, 2002 and for "LOA [leave of absence] FMLA, ADA" on February 4, 2003, February 5, 2003, February 6, 2003, February 11, 2003 and February 12, 2003. Id. The Report also indicated that Plaintiff had manager approved tardies on December 29, 2002 and January 4, 2003. Id. It also showed that Plaintiff had manager approval to leave early on: (1) August 25, 2002, (2) September 15, 2002, (3) September 26, 2002, (4) November 7, 2002, (5) November 11, 2002, (6) November 20, 2002, (7) November 27, 2002, (8) January 1, 2003, (9) January 2, 2003, (10) January 4, 2003, and (11) January 10, 2003. Id. The Report also notes that Plaintiff worked extra, unscheduled days for Defendant on: (1) September 30, 2002, (2) November 3, 2002, and (3) November 27, 2002. Id.

As noted on a February 15, 2003 Coaching for Improvement Form, Defendant counted Plaintiff as having seven unexcused absences in a six month rolling period. See Coaching For Improvement Form, p. 1. The dates involved were August 17 and 18, 2002, August 20 and 21, 2002, November 1, 2002, December 8 and 9, 2003, January 3, 2003, and January 29, 2003. Id.

Plaintiff's Requests for Leave of Absence from February 4, 2003 until February 14, 2003 and from May 8, 2003 to May 14, 2003 were approved by Burns. See January 30, 2003 Request for Leave of Absence Form, p. 1; May 13, 2003 Request for Leave of Absence Form, p. 1

**I. Standard of Review.**

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, fail to demonstrate a genuine issue of material fact and thus, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505 (1986).

The moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry the burden of persuasion at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct 2548 (1986). The nonmoving party must then go beyond the pleadings and, by affidavits, depositions, answers to interrogatories, and admissions on file, designate facts showing that a genuine issue of material fact remains for trial. Id. at 324. In deciding a motion for summary judgment, the facts must be viewed in a light most favorable to the nonmoving party and all inferences must be drawn in that party's favor." Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).

**III. Legal Analysis.**

The Americans with Disabilities Act ("ADA") prohibits employers from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In addition, the ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an

14

otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." Id. at § 12112(b)(5)(A).

In order for a plaintiff to establish a *prima facie* case of discrimination under the ADA, she must demonstrate that: "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination." Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998), citing, Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996). Once the plaintiff establishes a *prima facie* case, the defendant must rebut an inference of wrongdoing with evidence of a legitimate, non-discriminatory or non-retaliatory reason for the action taken. See Peter v. Lincoln Technical Institute, Inc., 255 F.Supp.2d 417, 424 (E.D. Pa. 2002). If the defendant successfully meets this burden, in order to avoid summary judgment the plaintiff must present evidence of pretext or cover-up, or show that discrimination played a role in the employer's decision-making and had a determinative effect on the outcome. See id.

Defendant argues that summary judgment must be granted in its favor because Plaintiff cannot establish that she was a qualified individual with a disability under the Americans with Disabilities Act, that her requested accommodation was reasonable, and because Plaintiff's proposed accommodation would present an undue burden to Wal-Mart. Defendant's Memorandum of Law in Support of Motion for Summary Judgment, p. 2.

15

**A. Whether Plaintiff has a disability as that term is defined in the ADA?**

The first prong of the *prima facie* case under the ADA requires that the plaintiff demonstrate a disability as that term is defined by the Act. For purposes of the ADA, a "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

The Code of Federal Regulations ("C.F.R.") defines "major life activity" to include: "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I). The United States Court of Appeals for the Third Circuit has explained that "major life activities" are "those basic activities that the average person in the general population can perform with little of no difficulty." Marinelli v. City of Erie, Pa., 216 F.3d 354, 361 (3d Cir. 2000). Here, the "major life activity" at issue is Plaintiff's ability to breathe.

The C.F.R. provides that the term "substantially limits" means that the individual is unable to perform a major life activity or that the person is "significantly restricted as to the manner or duration under which [she] can perform a major life activity as compared to ... the average person in the population ." Id. The Supreme Court has determined that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 198, 122 S.Ct. 681 (2002). The ADA requires plaintiffs to not only submit evidence of a medical diagnosis but to "offer[ ] evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial." Id., quoting,

16

Albertson's, Inc. v.. Kirkingburg, 527 U.S. 555, 567 (1999).  Notably, an ADA plaintiff need

not experience symptoms of an impairment every day to establish that her impairment is

substantially limiting. See Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 380 (3d Cir. 2002).

In order to determine whether Plaintiff's asthma substantially limits the major life

activity of breathing, we must consider the following factors: "(I) the nature and severity of

the impairment; (ii) the duration or expected duration of the impairment; and (iii) the

permanent or long term impact ... of or resulting from the impairment." 29 C.F.R.

§ 1630.2(j)(2); see also Meyers v. Conshohocken Catholic School, 2004 WL 3037945 at *7

(E.D. Pa. Dec. 30, 2004). "In determining whether a plaintiff's impairment substantially

limits a major life activity, the Supreme Court has stressed that courts should 'determine the

existence of disabilities on a case-by-case basis'." Taylor v. Phoenixville School Dist., 184

F.3d 296, 306 (3d Cir. 1999), quoting Albertson's, Inc., 119 S.Ct. at 2169.

Viewing the facts of evidence in a light most favorable to Plaintiff, while Plaintiff

does not have asthma attacks daily, she does have to take asthma medication daily.

Moreover, her asthma can leave her out of breath and without the ability to speak; she never

knows when she is going to have an asthma attack and when she does have one,  she cannot

always control it. Also, Plaintiff sometimes needs additional medical care in order to breathe

properly. Based upon this evidence, we conclude that there is sufficient evidence in the

record from which a jury reasonably could conclude that Plaintiff is substantially limited in

the major life activity of breathing.

17

**B. Whether Plaintiff is a qualified individual?**

The ADA defines the term "qualified individual" as an individual "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The Interpretive Guidance to the EEOC Regulations divides this inquiry into two prongs. First, a court must determine whether the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires. See 29 C.F.R. pt. 1630, app. § 1630.2(m). Second, it must determine whether the individual, with or without reasonable accommodation, can perform the essential functions of the position held or sought. See id.

Plaintiff's position is that she is otherwise qualified to perform the essential functions of her job as an associate at Wal-Mart with a reasonable accommodation of additional absences. Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, p. 5. To the contrary, Defendant argues that Plaintiff is not a qualified individual under the ADA because she could not maintain regular attendance, an essential function of her job. Defendant's Memorandum in Support of its Motion for Summary Judgment, p. 2. Defendant further argues that Plaintiff's requested accommodation of unlimited leeway under Wal-Mart's attendance policy, is inherently unreasonable because it seeks to exempt Plaintiff from an essential job function, regular attendance, rather than allowing her to perform that essential function. Id.

For purposes of deciding this motion only, we find that Plaintiff has the necessary prerequisites for the job of Wal-Mart associate such as skill, experience, education, etc. Thus, we turn next to the issue of whether Plaintiff could, with or without reasonable

18

accommodation, perform the essential functions of her position.

In <u>Deane v. Pocono Medical Center</u>, 142 F.3d 138 (3d Cir. 1998), the United States

Court of Appeals for the Third Circuit explained:

> [d]etermining whether an individual can, with or without reasonable
> accommodation, perform the essential functions of the position held . . . is
> relatively straightforward. First, a court must consider whether the individual
> can perform the essential functions of the job without accommodation. If so,
> the individual is qualified (and, a fortiori, is not entitled to accommodation). If
> not, then a court must look to whether the individual can perform the essential
> functions of the job with a reasonable accommodation.  If so, the individual is
> qualified. If not, the individual has failed to set out a necessary element of the
> *prima facie* case.

<u>Id</u>. at 146 (footnote omitted).

Here, even viewing the evidence in a light most favorable to Plaintiff, we find that

Plaintiff could not perform the essential functions of her job as a Wal-Mart associate without

an accommodation in that one of the essential functions of her job as an associate was regular

attendance and due to her asthma, she was not attending her job regularly.  <u>See</u> <u>Tyndall v.</u>

<u>National Educ. Ctrs., Inc. of Ca.</u>, 31 F.3d 209, 213 (4th Cir.1994) (citations omitted)

("[e]xcept in the unusual case where an employee can effectively perform all work-related

duties at home, an employee 'who does not come to work cannot perform any of his job

functions, essential or otherwise'"). Therefore, we must look to whether Plaintiff could

perform the essential functions of the job with a reasonable accommodation.

As stated above, Plaintiff's position is that she could perform the essential functions

of her job if Wal-Mart allowed her additional absences. It is the Plaintiff's burden to identify

the reasonable accommodation. <u>See</u> <u>Skerski v. Time Warner Cable Co.</u>, 257 F.3d 273, 284

(3d Cir. 2001).

19

It is well established that granting indefinite or open ended disability leave is not an accommodation required of an employer under the ADA. See Conoshenti v. Public Service Electric & Gas Co., 364 F.3d 135, 151 (3d Cir.2004) ("the federal courts that have permitted a leave of absence as a reasonable accommodation under the ADA have reasoned, explicitly or implicitly, that applying such a reasonable accommodation at the present time would enable the employee to perform his essential job functions in the near future" ); Fogelman v. Greater Hazleton Health Alliance, 2004 WL 2965392 (3d Cir. Dec. 23, 2004) (unpublished opinion) (finding that a request for time off from work did not constitute a reasonable accommodation where the requested leave was for an indefinite and open-ended time period and the plaintiff did not establish that the time off would have enabled her to perform the essential job functions within a reasonable amount of time); Rascon v. US West Communications, Inc., 143 F.3d 1324, 1334 (10th Cir. 1998) ("[A]n indefinite unpaid leave is not a reasonable accommodation where the plaintiff fails to present evidence of the expected duration of her impairment"); Peter v. Lincoln Technical Institute, Inc., 255 F.Supp.2d 417, 437 (E.D. Pa. 2002) ("many courts have found that a request for indefinite leave is inherently unreasonable, particularly where there is no favorable prognosis); Shafnisky v. Bell Atlantic, Inc., 2002 WL 31513551 (E.D. Pa. Nov. 5, 2002) ("Open ended disability leave is not a reasonable accommodation").  Similarly, we find that the ADA does not require an employer to accommodate an employee by allowing her to take additional absences from work whenever she needs to because of her disability when there is no evidence that allowing this time off from work will enable the employee to perform the essential functions of her job within a reasonable time.  Therefore, because Plaintiff cannot perform the essential functions of her job with a reasonable accommodation, Plaintiff is not a

qualified individual under the ADA and Wal-Mart's motion for summary judgment on

Plaintiff's ADA claim against it must be granted. An appropriate Order follows.


Maurice B. Cohill, Jr.
Senior District Court Judge

April 5, 2007